# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**ROBERT O'SHEA, CHAIRMAN OF THE**
**WARD 6 DEMOCRATIC COMMITTEE,**
**ET AL,**

          **Plaintiffs,**

                                     **C.A. No.**

**v.**

**BOSTON CITY COUNCIL**
                   **Defendant.**

---

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§1331, 1441 and 1446, defendant the Boston City Council (the "City Council"), files this Notice of Removal of the above-captioned case from the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts, Suffolk County, to the United States District Court for the District of Massachusetts. In support of this notice of removal, the City states as follows:

### CASE BACKGROUND AND GROUNDS FOR REMOVAL

1.      On November 2, 2022, plaintiffs Robert O'Shea, Rita Dixon, Shirley Shillingford, Maureen Feeney, Phyllis Corbitt, The South Boston Citizens Association, Martin F. McDonough American Legion Post, St. Vincent's Lower End Neighborhood Association, and Old Colony Tenant Association, (collectively the "Plaintiffs") commenced a civil action in the Suffolk Superior Court against the City Council, styled *Robert O'Shea, Chairman of the Boston Ward 6 Democratic Committee in South Boston et al vs. Boston City Council,* Civil Action. No. 2284CV02490 (the "State Court Action"). Plaintiff's complaint asserts three (3) counts against the City Council. The initial Complaint referenced the Massachusetts Open Meeting Law and sought a temporary restraining order and preliminary injunction but contained no federal causes of action.

2.      On November 21, 2022, Plaintiffs filed an Amended Complaint. Plaintiffs' Amended Complaint assets counts against the City Council. Count II for alleged violations of the Voting Rights Act of 1965 and Count II for violations of the Fourteenth Amendment.

3.      As required by 28 U.S.C. §1446(a), attached as **<u>Exhibit A</u>** are copies of all process, pleadings and orders served upon the City in the State Court Action. The Notice of Removal is timely as the Plaintiff's Amended Complaint, which raises a federal question for the first time, was filed on November 21, 2022. This Notice of Removal was filed prior to the expiration of 30 days from the date the City Council received a copy of the Amended Complaint containing the federal claims. See 28 U.S.C. §1446(b)(3); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

4.      This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the civil action arises under Title 52 of the United States Code and United States Constitution.

5.      Venue is proper in this Court pursuant to 28 U.S.C.A. §1441(a) because the State Court Action is pending in Massachusetts.

6.      This Notice of Removal has been served on Plaintiff's counsel. A Notice of Filing of Notice of Removal (attached as **<u>Exhibit B</u>**) will be filed in the Suffolk Superior Court upon filing of this Notice of Removal.

**WHEREFORE**, the City hereby removes the above-captioned case from the Superior Court Department of the Trial Court for the Commonwealth of Massachusetts (Suffolk) and requests that further proceedings be conducted in this Court as provided by law.

Date:  December 2, 2022                    Respectfully submitted,

**BOSTON CITY COUNCIL**

By its attorneys:

ADAM CEDERBAUM
Corporation Counsel


*/s/*_____
Samantha Fuchs (BBO# 708216)
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA  02201
(617) 635-4034
Samantha.Fuchs@boston.gov


**Certificate of Service**


        I, Samantha Fuchs hereby certify that on December 2, 2022, a true and correct copy of this document filed through the ECF system will be sent by email to counsel for the plaintiff, Paul Gannon.

                    */s/*_____
                    Samantha Fuchs

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER<br>2284CV02490 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>**Robert O'Shea, Chairman of the Boston Ward 6 Democratic**<br><del>Committee in South Boston et al vs. Boston City Council</del> | Michael Joseph Donovan, Clerk of Court |
|---|---|

| To:<br>**Boston City Council**<br><br>CC512087 | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |
|---|---|

To the above named defendant(s):

You are hereby summoned and required to serve upon:

Paul J Gannon, Esq.
Law Office of Paul J Gannon P.C.
PO Box E46
82 West Broadway
Boston, MA 02127

FORWARDED BY THE CITY CLERK TO THE

NOV  4 2022

LAW DEPARTMENT

RECEIVED CITY CLERKS OFFICE
2022 NOV -4  A 10:
BOSTON, MA

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Temporary Restraining Order has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

Date: 11/09/2022

Time: 09:00 AM

Event: Hearing on Equity Issue

Session Location: Civil H /  BOS-10th FL, CR 1015 (SC)

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED<br>11/02/2022 | CHIEF JUSTICE OF THE SUPERIOR COURT<br>Witness:<br>**Hon. Heidi E Brieger** | ASSOCIATE JUSTICE<br>**Hon. Anthony M. Campo** | ASSISTANT CLERK<br>X Brenda J Shishlak |
|---|---|---|---|

| RETURN OF SERVICE |
|---|
| I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint.<br><br><br>PARTY NAME:<br>X |

Date/Time Printed 11-02-2022 12:21:01

SCV1027i.04/2017

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARMTENT
CIVIL ACTION NUMBER:

RECEIVED

NOV - 2 2022

SUPERIOR COURT CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

ROBERT O'SHEA, CHAIRMAN OF     )
THE WARD 6 DEMOCRATIC          )
COMMITTEE, ET AL,              )
        Plaintiffs             )
                               )
v.                             )
                               )
THE BOSTON CITY COUNCIL        )
        Defendant              )
                               )

## VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER

1. The Plaintiff, Robert O'Shea, is the Chairman of the Boston Ward 6 Democratic Committee in South Boston, Massachusetts, and registered voter and resident of South Boston.

2. The Plaintiffs: The South Boston Citizens Association: Martin F. McDonough American Legion Post: St. Vincent's Lower End Neighborhood Association; and the Old Colony Tenant Association are civic associations whose members include residents and registered voters of the City of Boston's South Boston section.

3. The Defendant Boston City Council is an elected municipal body, consisting of the following members: Julia Mejia; Brian Worrell; Ruthzee Louijeune; Ricardo Arroyo; Erin Murphy; Frank Baker; Michael Flaherty; Ed Flynn; Tania Fernandes Anderson; Gabriela Coletta; Liz Breadon; Kendra Lara; and Kenzie Bok.

4. On Oct 10, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

5. On Oct. 18, 2022, four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet and discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

6. On Oct. 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

7. An Open Meeting Law Complaint, a copy of which is attached hereto as Exhibit "A", based on the violations of MGL.c 30A set forth above was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022.

8. On October 26, 2022, the Boston City Council met for its regularly scheduled meeting at which it intended to vote on a proposed Redistricting Map.

9. Due to the Open Meeting Law Complaint noted above, the Boston City Council did not proceed with its anticipated vote on any proposed Redistricting Maps at that October 26, 2022 meeting.

10. Although there was mention of the October 25, 2022 filed Open Meeting Law Violations, (Exhibit "A") at that meeting, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

11. At the October 26, 2022 meeting, the Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

12. As of this date, the Boston City Council hasn't responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

13. It's anticipated that other residents of the City of Boston will file additional Open Meeting Law Complaints concerning deliberations on proposed redistricting maps prior to the November 2, 2022 scheduled meeting of the Boston City Council.

14. The Attorney General's Office is in possession of the Open Meeting Law Complaint. Per M.G.L.c. 30A, they will not address the issue until on or after November 24, 2022.

15. Although the Boston City Council has not responded to the Open Meeting Law Complaint, (Exhibit "A"), the Boston City Council has indicated that they plan to vote on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

16. Should the Boston City Counsel take a vote on the proposed Redistricting Map prior to responding to the Open Meeting Law Complaint, and prior to the Attorney General's Office response to that Complaint, (which is not required until November 24, 2022), the Plaintiffs will be irreparably harmed, as the remedies pursuant to M.G.L.c. 30A section 23(c) and 23(f) will be insufficient to remedy the Plaintiffs' claims arising out of the deliberations of the elected officials which took place in violation of the Open Meeting Law in advance of any such vote.

17. The Defendant will not be prejudiced in any way from a delay in the vote as the City is under no express statutory deadline to take a vote on this issue at this time, or prior to November 24, 2022.

2

**WHEREFORE, the Plaintiffs respectfully requests this Honorable Court:**

1. Issue, on an Ex Parte basis, a temporary restraining order preventing the Defendant, the Boston City Council, from taking a vote on any proposed "Redistricting Plan", (redrawing the City Council Districts), at their next scheduled meeting on Wednesday, November 2, 2022.

2. Issue preliminary injunctive relief in the form of an Order preventing the Defendant, the Boston City Council, from taking a vote on any proposed "Redistricting Plan", (redrawing the City Council Districts), until the Attorney General's Office's response to the Open Meeting Law Complaint filed by the Plaintiffs is issued.

3. Issue a short order of notice for an immediate hearing of Plaintiffs' Request for Preliminary Injunctive Relief as set forth in paragraph 2 above.

4. Grant all other relief which the Court may deem just and proper.

Respectfully submitted,
The Plaintiffs,
By their Attorney,

Paul Gannon, Esquire
Law Office of Paul Gannon, P.C.
546 E. Broadway
South Boston, MA 02127
(617) 269-1993
BBO# 548865
pgannon@paulgannonlaw.com

Dated: November 2, 2022

3

## VERIFICATION

I, Robert O'Shea do state, under the pains and penalties of perjury that I have read this within Verified Complaint and I can state that the facts set forth are true to the best of my knowledge, and that no material facts have been omitted therefrom.

Signed this 2nd day November, 2022.

Robert O'Shea

4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                  SUPERIOR COURT DEPARMTENT
                                             CIVIL ACTION NUMBER:

ROBERT O'SHEA, CHAIRMAN OF          )
THE WARD 6 DEMOCRATIC               )
COMMITTEE, ET AL,                   )
          Plaintiffs                )
                                    )
v.                                  )
                                    )
THE BOSTON CITY COUNCIL             )
          Defendant                 )
                                    )

## AFFIDAVIT OF ROBERT O'SHEA

Now comes Robert O'Shea, Chairman of the Boston Ward 6 Democratic Committee and

South Boston resident based on personal knowledge do hereby state and affirm that:

1.  I am the Chairman of the Boston Ward 6 Democratic Committee in South

Boston, Massachusetts.

2.  I am a resident of South Boston, Massachusetts.

3.  On Oct 10, 2022, four (4) members of the Boston City Council Redistricting

Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling

Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without

giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

4.  On Oct. 18, 2022, four (4) members of the Boston City Council Redistricting

Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet

and discuss the topic of Legislative Redistricting in the City of Boston without giving notice

pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

5.  On Oct. 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

6.  The Open Meeting Law Complaint, a copy of which is attached hereto, was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022.

7.  On October 26, 2022, the Boston City Council met for its regularly scheduled meeting.

8.  Due to the Open Meeting Law Complaint noted above, the Boston City Council withdrew its anticipated vote on any proposed Redistricting Maps.

9.  Although there was mention of the October 25, 2022 filed Open Meeting Law Violations, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

10. The Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

11. As of this date, the Boston City Council hasn't responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

12. It's anticipated that other residents of the City of Boston will file new Open Meeting Law Complaints prior to the November 2, 2022 scheduled meeting of the Boston City Council.

13. The Attorney General's Office is in possession of the Open Meeting Law Complaint; they will not address the issue until on or after November 24, 2022.

14. The Boston City Council has indicated that they would be voting on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

2

15. Although the Boston City Council has not responded to the Open Meeting Law Complaint, (Exhibit "A"), the Boston City Council has indicated that they plan to vote on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

16. Should the Boston City Council take a vote on the proposed Redistricting Map prior to responding to the Open Meeting Law Complaint, and prior to the Attorney General's Office response to that Complaint, (which is not required until November 24, 2022), the Plaintiffs will be irreparably harmed, as the remedies pursuant to M.G.L.c. 30A section 23(c) and 23(f) will be insufficient to remedy the Plaintiffs claims arising out of the deliberations of the elected officials which took place in violation of the Open Meeting Law in advance of any such vote.

17. The Defendant will not be prejudiced in any way from a delay in the vote as the City is under no express statutory deadline to take a vote on this issue at this time, or prior to November 2nd.

3

Signed under the pain and penalties of perjury on this 2nd day November 2022.

Robert O'Shea

4

3

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.
                                    SUPERIOR COURT DEPARMTENT
                                    CIVIL ACTION NUMBER:
                                    22-2490 H

| | |
|---|---|
| ROBERT O'SHEA, CHAIRMAN OF THE WARD 6 DEMOCRATIC COMMITTEE, ET AL,     Plaintiffs | ) ) ) ) |
| v. | ) ) ) |
| THE BOSTON CITY COUNCIL     Defendant | ) ) ) |

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
2022 NOV -2 A II: I
SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

## PLAINTIFFS' EMERGENCY EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION, AND MOTION FOR SHORT ORDER OF NOTICE

      Now comes the Plaintiffs in the above-captioned matter and hereby requests this Court issue, **Ex Parte**, Plaintiffs' request for a Temporary Restraining Order and grant, following a hearing, Plaintiffs' request for Preliminary Injunctive Relief as set forth in the Verified Complaint filed herewith. In support thereof the Plaintiffs rely upon the facts set forth in the Verified Complaint, and the facts set forth in the Affidavit of Robert O'Shea submitted herewith.

      The Plaintiffs further state the Plaintiffs would suffer irreparable harm if the temporary restraining order was not granted.  Further the Defendant contends that that the Plaintiffs have a reasonable likelihood of success on the merits of this dispute, (as set forth in the Verified Complaint, and the Open Meeting Law Complaint attached as Exhibit "A" thereto), and that the balancing of the equities in this matter favor granting the requested relief.

## STANDARD

A temporary restraining order/preliminary injunction shall issue if when the moving party establishes: (a) that they have a substantial likelihood of success on the merits; (b) that there exists a substantial threat of irreparable harm should the injunction not be granted; and (c) that a threat of an injury to Plaintiffs in the absence of the injunction outweighs the risk of harm to the Defendant if the injunction is granted.  See Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616, 621-622, 405 N.E.2d 106 (1980).  An injunction may issue only if the judge concludes that the risk of irreparable harm to a plaintiff, in light of his chances of success on his claim, outweighs the defendant's probable harm and likelihood of prevailing on the merits of the case.  John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124, 131, 713 N.E.2d 955 (1999), citing Commonwealth v. Mass. CRINC, 392 Mass. 79, 87-88, 466 N.E.2d 79 (1984).  The burden is on the party seeking the injunction.  Lanier v. Mass. Parole Board, 396 Mass. 1018, 489 N.E.2d 670 (1986) (rescript); Robinson v. Secretary of Administration, 12 Mass.App.Ct. 441, 425 N.E.2d 772 (1981).

In this case the Plaintiffs seek only time for the statutory procedure and remedies set forth in M.G.L. c. 30A section 23 to take their due course.  The Plaintiffs have established a reasonable likelihood that their claims, (as set forth in their Open Meeting Law Complaint), have a reasonable likelihood of success.  If so, the Attorney General's Office can and may take action on the Complaint to address the violations as allowed by Chapter 30A section 23(c).  Should the Attorney General's Office take no action, the Plaintiffs could, and would, proceed to enforce the provisions of the Open Meeting Law pursuant to Chapter 30A section (f).  Section 23(b) of Chapter 30A, however, has a thirty (30) day waiting period during which the public body, (the Defendant, the Boston City Council), has time to discuss and respond in writing to any alleged violations.

As set forth in the Verified Complaint, the Council has not properly reviewed and/or responded in writing to the allegations set forth in the Open Meeting Law Complaint to date. The Plaintiffs simply seek to restrict the Council from voting on a Redistricting Plan when the deliberations leading up to such vote may reasonably be found to have been in violation of the Open Meeting Law.  If the vote takes place prior to the procedure and remedies set forth in Chapter 30A section 23 are allowed to run their course, then any remedial measures deemed appropriate would be inadequate.

2

On the other hand, in balancing the equities of the circumstances, the Council is under no statutory deadline to take a vote on this matter at this time, or at any time certain in the future. Any such deadline set by the Council is self- imposed for politically expedient reasons, not for any urgent public good. Neither the Council, nor the public's interest, will be prejudiced by a delay in any such vote. In fact, the public interest will be well served by requiring the Council to comply with the provisions of Chapter 30A by responding to the Plaintiffs' Open Meeting Law Complaint in a timely fashion, and allowing the Attorney General's Office adequate time to review the Complaint and Response and take appropriate action.

**WHEREFORE, the Plaintiffs respectfully requests this Honorable Court:**

1. Issue, on an Ex Parte basis, a temporary restraining order preventing the Defendant, the Boston City Council, from taking a vote on any proposed "Redistricting Plan", (redrawing the City Council Districts), at their next scheduled meeting on Wednesday, November 2, 2022.

2. Issue preliminary injunctive relief in the form of an Order preventing the Defendant, the Boston City Council, from taking a vote on any proposed "Redistricting Plan", (redrawing the City Council Districts), until the Attorney General's Office's response to the Open Meeting Law Complaint filed by the Plaintiffs is issued.

3. Issue a short order of notice for an immediate hearing of Plaintiffs' Request for Preliminary Injunctive Relief as set forth in paragraph 2 above, for a date prior to the Boston City Council's next scheduled meeting on Wednesday, November 9, 2022.

Respectfully submitted,
The Plaintiffs,
By their Attorney,

Paul Gannon, Esquire
Law Office of Paul Gannon, P.C.
546 E. Broadway
South Boston, MA 02127
(617) 269-1993
BBO# 548865
pgannon@paulgannonlaw.com

Dated: November 2, 2022

3

4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARMTENT
                                               CIVIL ACTION NUMBER:

                                               22-2490H

ROBERT O'SHEA, CHAIRMAN OF      )
THE WARD 6 DEMOCRATIC           )
COMMITTEE, ET AL,               )
        Plaintiffs              )
                                )
v.                              )
                                )
THE BOSTON CITY COUNCIL         )
        Defendant               )
                                )

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2022 NOV -2  A 11: 17
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## AFFIDAVIT OF ROBERT O'SHEA

Now comes Robert O'Shea, Chairman of the Boston Ward 6 Democratic Committee and

South Boston resident based on personal knowledge do hereby state and affirm that:

1. I am the Chairman of the Boston Ward 6 Democratic Committee in South

Boston, Massachusetts.

2. I am a resident of South Boston, Massachusetts.

3. On Oct 10, 2022, four (4) members of the Boston City Council Redistricting

Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling

Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without

giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

4. On Oct. 18, 2022, four (4) members of the Boston City Council Redistricting

Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet

and discuss the topic of Legislative Redistricting in the City of Boston without giving notice

pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

5.  On Oct. 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

6.  The Open Meeting Law Complaint, a copy of which is attached hereto, was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022.

7.  On October 26, 2022, the Boston City Council met for its regularly scheduled meeting.

8.  Due to the Open Meeting Law Complaint noted above, the Boston City Council withdrew its anticipated vote on any proposed Redistricting Maps.

9.  Although there was mention of the October 25, 2022 filed Open Meeting Law Violations, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

10. The Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

11. As of this date, the Boston City Council hasn't responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

12. It's anticipated that other residents of the City of Boston will file new Open Meeting Law Complaints prior to the November 2, 2022 scheduled meeting of the Boston City Council.

13. The Attorney General's Office is in possession of the Open Meeting Law Complaint; they will not address the issue until on or after November 24, 2022.

14. The Boston City Council has indicated that they would be voting on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

15. Although the Boston City Council has not responded to the Open Meeting Law Complaint, (Exhibit "A"), the Boston City Council has indicated that they plan to vote on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

16. Should the Boston City Council take a vote on the proposed Redistricting Map prior to responding to the Open Meeting Law Complaint, and prior to the Attorney General's Office response to that Complaint, (which is not required until November 24, 2022), the Plaintiffs will be irreparably harmed, as the remedies pursuant to M.G.L.c. 30A section 23(c) and 23(f) will be insufficient to remedy the Plaintiffs claims arising out of the deliberations of the elected officials which took place in violation of the Open Meeting Law in advance of any such vote.

17. The Defendant will not be prejudiced in any way from a delay in the vote as the City is under no express statutory deadline to take a vote on this issue at this time, or prior to November 2nd.

3

Signed under the pain and penalties of perjury on this 2nd day November 2022.

Robert O'Shea



# OPEN MEETING LAW COMPLAINT FORM
### Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Please note that all fields are required unless otherwise noted.

## Your Contact Information:

First Name: Paul                    Last Name: Gannon, Esq.

Address:  546 East Broadway

City:  South Boston        State: MA      Zip Code: 02127

Phone Number:     +1 (617) 269-1993      Ext. _____

Email:   pgannon@paulgannonlaw.com

Organization or Media Affiliation (if any):   1. Boston Ward 6 Democratic Committee (see attached for add'l names)

Are you filing the complaint in your capacity as an individual, representative of an organization, or media?
  (For statistical purposes only)

☐ Individual      ☒ Organization      ☐ Media

## Public Body that is the subject of this complaint:

☒ City/Town      ☐ County      ☐ Regional/District      ☐ State

Name of Public Body (including city/
town, county or region, if applicable):  Boston City Council and Boston City Council Committee on Redistricting

Specific person(s), if any, you allege
committed the violation:        Councilor Elizabeth Breadon (see attached for add'l names)

Date of alleged violation:     (see attached)

**Organization or Media Affiliation (Continued from pg. 1)**

2. South Boston Citizens Association;
3. Martin F. McDonough American Legion Post;
4. St. Vincent's Lower End Neighborhood Association; and
5. Old Colony Tenant Association.

**Specific person(s), if any, you allege committed the violation (Continued from pg. 1):**

2. Councilor Julia Mejia;
3. Councilor Brian Worrell;
4. Councilor Ruthzee Louijeune;
5. Councilor Ricardo Arroyo;
6. Councilor Erin Murphy;
7. Councilor Frank Baker;
8. Councilor Michael Flaherty;
9. Councilor Edward Flynn; and
10. Councilor Tania Fernandes Anderson.

**Date of alleged violation (Continued from pg. 1):**

1. October 10, 2022;
2. October 18, 2022; and
3. October 19, 2022.

**Description of alleged violation:**

Describe the alleged violation that this complaint is about. If you believe the alleged violation was intentional, please say so and include the reasons supporting your belief.

Note: This text field has a maximum of 3000 characters.

Oct 10, 2022 - Four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Building Municipal Building to discuss the topic of Legistative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

Oct. 18, 2022 - Four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet and discuss the topic of Legistative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

Oct. 19, 2022 - Four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legistative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

What action do you want the public body to take in response to your complaint?

Note: This text field has a maximum of 500 characters.

1. The Boston City Council Committee on redistricting shall conduct a minimum of five (5) properly noticed public hearings in neighborhoods impacted by the proposal including South Boston, Dorchester, Mattapan, South End and Roslindale neighborhoods prior to any vote on redistricting in the Boston City Council.

(See attached)

## Review, sign, and submit your complaint

**I. Disclosure of Your Complaint.**
**Public Record.** Under most circumstances, your complaint, and any documents submitted with your complaint, is considered a public record and will be available to any member of the public upon request.

**Publication to Website.** As part of the Open Data Initiative, the AGO will publish to its website certain information regarding your complaint, including your name and the name of the public body. The AGO will not publish your contact information.

**II. Consulting With a Private Attorney.**
The AGO cannot give you legal advice and is not able to be your private attorney, but represents the public interest. If you have any questions concerning your individual legal rights or responsibilities you should contact a private attorney.

**III. Submit Your Complaint to the Public Body.**
The complaint must be filed first with the public body. If you have any questions, please contact the Division of Open Government by calling (617) 963-2540 or by email to openmeeting@state.ma.us.

By signing below, I acknowledge that I have read and understood the provisions above and certify that the information I have provided is true and correct to the best of my knowledge.

Signed: _____     Date: 10/25/22

For Use By Public Body     For Use By AGO
Date Received by Public Body     Date Received by AGO

**What action do you want the public body to take in response to your complaint? (Continued from pg. 2)**

2. To require the Boston City Council to vote on the criteria as outlined in the memo from Jeffrey M. Wice, Esq. who was contracted and retained by the City of Boston Corp. Counsel to promulgate criteria for the Boston City Council to utilize in redrawing City Council District maps.

3. To require the Boston City Council to vote on the Boston City Council District redistricting map for the City of Boston in accordance with the criteria noted in paragraph 2 above.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARMTENT
                                               CIVIL ACTION NUMBER:


ROBERT O'SHEA, CHAIRMAN OF          )
THE WARD 6 DEMOCRATIC               )
COMMITTEE, ET AL,                   )
          Plaintiff s               )
                                    )
v.                                  )
                                    )
THE BOSTON CITY COUNCIL             )
          Defendant                 )
                                    )


**TEMPORARY RESTRAINING ORDER ON PLAINTIFFS' EMERGENCY EX PARTE
MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A
PRELIMINARY INJUNCTION, AND MOTION FOR SHORT ORDER OF NOTICE**

Following an ex parte hearing it is hereby Ordered that the Defendant, the Boston City

Council, and its members are restrained from taking any vote on a "Redistricting Plan", or any other

final action resulting in the redrawing of Boston City Council Districts at a meeting on Wednesday,

November 2, 2022 or any time thereafter pending further Order of this Court.


                                    _____

                                    Honorable
                                    Justice, Suffolk Superior Court

Dated: _____

5

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          **SUPERIOR COURT**
                                                     **CIVIL ACTION**
                                                     **NO. 2284CV2490 H**

### ROBERT O'SHEA, CHAIRMAN OF
### THE WARD 6 DEMOCRATIC COMMITTEE, ET AL

<u>vs.</u>

### THE BOSTON CITY COUNCIL

## <u>ORDER</u>

The plaintiffs, in the papers submitted, have not demonstrated an irreparable risk of harm warranting a Temporary Restraining Order, see *Packaging Industries Group, Inc. v. Cheney,* 380 Mass 609, 616-617 (1980). The Court will issue a *short order of notice* for hearing to take place on preliminary injunction, pursuant to Mass. R. Civ. P. 65, on Wednesday, November 9, 2022 at 9:00 AM. The Motion for a Temporary Restraining Order is **DENIED**.

Anthony M. Campo
Justice of the Superior Court

DATED: November 2, 2022

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                              SUPERIOR COURT DEPARMTENT
                                         CIVIL ACTION NUMBER: 2284CV02490

ROBERT O'SHEA, Individually and as Chairman of
the Ward 6 Democratic Committee, RITA DIXON,
SHIRLEY SHILLINGFORD, MAUREEN
FEENEY, PHYLLIS CORBITT, Individually and as
President of the Massachusetts Union of Public
Housing Tenants, THE SOUTH BOSTON
CITIZENS ASSOCIATION, MARTIN F.
MCDONOUGH AMERICAN LEGION POST, ST.
VINCENT'S LOWER END NEIGHBORHOOD
ASSOCIATION, and OLD COLONY TENANT
ASSOCIATION,

                 Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

                 Defendant.

**NOTICE OF APPEARANCE**

To the Clerk of the Above Named Court:

        Please enter my appearance as attorney for the Plaintiffs in this action.


                          /s/ Glen Hannington
                          Glen Hannington, Esq.
                          LAW OFFICES OF GLEN HANNINGTON
                          Ten Post Office Square, 8th Floor South
                          Boston, MA  02109
                          TEL#:   (617) 725-2828
                          BBO#:  635925
                          glenhannington@aol.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS
SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY
BY E-MAIL ON THIS THE 21st DAY OF NOVEMBER 2022.

/s/ Glen Hannington
Glen Hannington, Esquire

2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARMTENT
                                     CIVIL ACTION NUMBER: 2284CV02490

ROBERT O'SHEA, Individually and as Chairman
of the Ward 6 Democratic Committee, RITA
DIXON, SHIRLEY SHILLINGFORD, MAUREEN
FEENEY, PHYLLIS CORBITT, Individually and as
President of the Massachusetts Union of Public
Housing Tenants, THE SOUTH BOSTON
CITIZENS ASSOCIATION, MARTIN F.
MCDONOUGH AMERICAN LEGION POST, ST.
VINCENT'S LOWER END NEIGHBORHOOD
ASSOCIATION, and OLD COLONY TENANT
ASSOCIATION,

                     Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

                     Defendant.

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUCTION PURSUANT TO MASS.R.CIV.P 65(b)**

Now Come the Plaintiffs and respectfully submit this memorandum of law in support of

Plaintiffs' Application for Preliminary Injunction against the Defendant Boston City Council pursuant

to Mass. R. Civ. P. 65(b).

I.    **Facts**

This action relates to the Redistricting Plan (Docket #1275) that was approved by the Boston

City Council on November 2, 2022.  This Redistricting Plan was motivated by a desire to achieve

"racial balancing" between various Districts in the City of Boston.  Primarily, the goal was to make

white-majority districts less white, and African-American majority districts less black.

In order to achieve the desired results, the City Council engaged in secretive and inaccessible meetings at which the citizens of the effected districts did not have sufficient access under the Open Meeting Law.  Specifically, language access was not provided to many language minority residents. Also, the final Redistricting Plan was not provided to Councilors and the general public until less than 48 hours before the scheduled vote.

On November 2, 2022, the City Council voted 9-4 to approve the Redistricting Plan.  A full recitation of the applicable facts is included in Plaintiffs' First Amended Complaint, filed herewith. Councilor Liz Breadon became the Char of Redistricting on August, 29, 2022.

## II.    Argument

To determine whether a preliminary injunction should issue, the Court is to follow the three-step analysis laid out by the Supreme Judicial Court in Packaging Industries Group v. Cheney, 380 Mass. 609 (1980).  First, the Court "evaluates in combination the moving party's claim of injury and chance of success on the merits."  Id. at 617.  Next, if the Court finds that failure to issue the order would subject the movant to "a substantial risk of irreparable harm," then the Court must then balance such harm against the injury to the nonmovant if the order is granted together with the nonmovant's chance of succeeding on the merits.  Id.  Lastly, the Court must balance the risk of irreparable harm to the movant against the injury to the nonmovant if the injunction is granted or denied with their respective chances of succeeding on the merits.  Id.  When the balance between these risks, together with their respective chances of success on the merits, "cuts in favor of the moving party" then a preliminary injunction should issue.  Id.

### A.  Likelihood of Success on the Merits

#### 1. The Open Meeting Law

The Open Meeting Law, G. L. c. 39, §§ 23A-23C, was enacted by the Legislature because "It is essential to a democratic form of government that the public have broad access to the decisions made

by its elected officials and to the way in which the decisions are reached." <u>Foudy v. Amherst-Pelham</u> <u>Regional Sch. Comm.</u>, 402 Mass. 179, 184 (1988).  The Supreme Judicial Court held that ""the general provision[s] of ... the Open Meetings Law are to be broadly and liberally construed in order to effectuate the legislative purpose of openness." <u>General Elec. Co. v. Department of Envtl. Protection</u>, 429 Mass. at 806 n.9, *quoting from* Cella, Administrative Law and Practice § 1186, at 592 n.16 (1986).

As described in the First Amended Complaint, and in <u>Exhibit J</u> thereto, the Boston City Council repeatedly violated the Open Meeting Law.  Specifically, meetings on October 10, 2022, October 18, 2022, and October 19, 2022 were not properly noticed.  "All meetings of a governmental body shall be open to the public." G. L. c. 39, § 23B, first par., as appearing in St. 1976, c. 397, § 6. "[N]otice of every meeting of any governmental body shall be filed with the clerk of the city ... in which the body acts, and the notice or a copy thereof shall, at least forty-eight hours ... prior to such meeting, be publicly posted in the office of such clerk or on the principal official bulletin board of such city." G. L. c. 39, § 23B, sixth par.

These meetings (and presumably other secret meetings) were not properly noticed and did not give the public an opportunity to engage in the deliberative and legislative process.  Moreover, the City Council's failure to provide access to language minority residents (see <u>Exhibits F through I</u> attached to the First Amended Complaint) further limited public access to these governmental proceedings.

At least two Open Meeting Law complaints have been filed against the City Council in relation to these meetings (<u>Exhibits J and K</u>).  Despite these complaints, the City Council proceeded to a vote on the Redistricting Plan on November 2, 2022.  Alarmingly, the final proposed map (Docket #1275) was not provided to the other Councilors or to the public until less than 48 hours before the scheduled vote.

Throughout the process, the City Council has pushed to pass this unconstitutional and illegal Redistricting Plan without giving adequate notice of meetings, without providing meaningful access to

language minority residents, and with secretive plans not revealed until the eleventh hour before the eventual vote.

For these reasons, the Plaintiffs respectfully request that this Honorable Court find that the City Council violated the Open Meeting Law.

**2.The Voting Rights Act**

Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group. This prohibition applies nationwide to any voting qualification or prerequisite to voting or standard, practice, or procedure, including districting plans and methods of election for governmental bodies. Growe v. Emison, 507 U.S. 25, 39-40 (1993). Section 2 also prohibits adopting or maintaining voting practices for the purpose of disadvantaging citizens on account of race, color, or membership in a language minority group. Chisom v. Roemer, 501 U.S. 380, 394 n.21 (1991). "To prevail on a s. 2 claim, plaintiffs need not show discriminatory purpose; rather, they must first meet the three threshold Gingles conditions: (1) that they are a part of a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the plaintiff minority group is "politically cohesive"; and (3) that "the white majority votes sufficiently as a bloc to enable it - in the absence of special circumstances, such as the minority candidate running unopposed - usually to defeat the minority's preferred candidate." Meza v. Galvin, 332 F. Supp. 2d 52 (D. Mass. 2004), *quoting* Thorburg v. Gingles, 478 U.S. 30, 50-51 (1986).

There can be no doubt that District Four contains a minority group (African-Americans) that is sufficiently large and compact to constitute a majority in the District. The Redistricting Plan approved by the City Council effective splits District Four, transferring African-American votes out of the district and receiving primarily white votes in return. This "cracking" of a historically African-

American district will result in the dilution of the African-American vote in that District and critically endanger the opportunity to elect the minority's preferred representative.

As described more fully in the First Amended Complaint, the stated goal of the City Council was "racial balancing" of districts.  In attempting to racially balance Districts 2, 3, and 4, the City Council has diluted the power of the African-American vote in what is currently District 4.  As stated above, Plaintiffs need not show that the City Council intended to discriminate against African-American voters, only that a dilution of the minority majority vote will occur as result of the redistricting.

For these reasons, Plaintiffs respectfully request that this Honorable Court enter an order finding that the Redistricting Plan approved by the City Council violates Section 2 of the Voting Rights Act.

### 3. The Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides, in pertinent part that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Equal Protection Clause prohibits a state, "without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" Bethune-Hill v. Va. State Bd. of Elections, 137 S. Ct. 788, 797 (2017)  Race-based lines, therefore, are unconstitutional where (1) "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," and (2) the district's design cannot withstand strict scrutiny. Miller v. Johnson, 515 U.S. 900, 916 (1995).  To pass strict scrutiny, the state must prove that its race-based redistricting scheme is "narrowly tailored" to meet a "compelling interest."  Bethune-

Hill, 137 S. Ct. at 801.  As discussed hereinabove, the primary (if not the only) goal of the City

Council was to engage in "racial balancing" of various districts.

In order to show a violation of the Equal Protection Clause , Plaintiffs must show "either

through circumstantial evidence of a district's shape and demographics or more direct evidence going

to legislative purpose, that race was the predominant factor motivating the legislature's decision to

place a significant number of voters within or without a particular district."  Miller, 515 U.S. at 916.

"To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral

districting principles, including but not limited to compactness, contiguity, and respect for political

subdivisions or communities defined by actual shared interests, to racial considerations."  Id.

The City Council throughout the redistricting process has repeatedly claimed that the

motivation for the Redistricting Map was "racial balancing".  The express intent of the City Council

should be determinative of the fact that the Redistricting Map was based primarily (if not solely) on

racial considerations.  Other evidence supports this outcome as well.  The Boston City Charter

provides that during redistricting "Each such district shall be compact and shall contain, as nearly as

may be, an equal number of inhabitants as determined by the most recent state decennial census, shall

be composed of contiguous existing precincts, and shall be **drawn with a view toward preserving the**

**integrity of existing neighborhoods.**" Boston City Charter § 18 (emphasis added).  G.L. c. 43 § 131

contains identical language.  Similarly, the memorandum provided to the City Council by Professor

Wice at their request states that such preservation of neighborhoods is a required criteria of

redistricting.  Exhibit O to Amended Complaint.  Specifically, Prof. Wice states that "Consideration

must be given to drawing districts that respect the boundaries of Boston's recognized neighborhoods."

Id.

As discussed hereinabove and more fully in the Amended Complaint, the Redistricting Plan

eviscerates the neighborhoods in Districts 2, 3, and 4.  Mattapan and Dorchester are each effectively

split in two, and South Boston loses neighborhoods that have been historically connected to District 2 for many years.  The failure of the City Council to protect any of these neighborhoods belies their intent to redistrict solely based on race, and to ignore any other criteria.

Also, as described eloquently in Congressman Lynch's letter to the Court (Exhibit S to the Amended Complaint), the Redistricting Plan divides public housing developments, diluting the power of public housing residents who share many things in common from pooling their power to elect their chosen representatives and to effect significant change.

Lastly, the City Council's reckless push for "racial balance" does not even achieve the goal it seeks.  Boston is a very diverse city, with many Hispanics, Vietnamese, Haitians, Cape Verdeans, Chinese, and various other significant minority groups.  However, the City Council's Redistricting Plan ignores the various minority groups, and instead focuses solely on a matter of white vs. non-white.  In doing so, the City Council has also uprooted and divided neighborhood of minority residents who collectively will suffer a diminution of their collective voting power if spread across multiple districts.

It is easy to see why the Fourteenth Amendment prohibits redistricting based on race except in the most extreme circumstances.  Although the City Council did need to shift some precincts to other districts in order to meet the population requirements of the City Charter, the proposed maps from Councilors Murphy, Flynn, Baker, and Flaherty all address the population shift without causing unnecessary damage to existing neighborhoods.

Because the City Council's Redistricting Plan is based primarily on race, the Plaintiffs respectfully request that this Honorable Court enter an order finding that the Redistricting Plan violates the Fourteenth Amendment.

B. **Irreparable Harm**

Plaintiffs face imminent and irreparable harm if the preliminary injunction is not granted.  As residents of the effected districts, the Plaintiffs are rightfully concerned about the Redistricting Plan and its effect on the integrity of existing communities, as well as the negative effect it will have on the political power and cohesiveness of its most vulnerable residents.  The deprivation of Plaintiffs' constitutional rights constitutes irreparable harm. T & D Video, Inc. v. City of Revere, 423 Mass. 577, 582 (1996).  Because Plaintiffs raise a substantial constitutional claim, no further showing of irreparable harm is necessary. Id.; *see also, e.g.,* Coleman v. Bd. of Ed. of the City of Mt. Vernon, 990 F. Supp. 221, 226 (S.D.N.Y. 1997) ("the deprivation or dilution of voting rights constitutes irreparable harm.").

C. **Balance of Harms**

There is no harm to the City Council that could result from the issuance of a preliminary injunction at this time.  According to the City of Boston Corporation Counsel, the only explicit statutory deadline set forth in the Boston City Charter is that City Council districts be redrawn by August 1, 2026.  The City Council has plenty of time to get this right.

On the other hand, the harms to the voters of the effected districts are severe.  And constitutional deprivation is severe, but the damage done to the right to vote, a core right of American citizens, is as significant a harm as one can endure.  Plaintiffs ask only that the City Council engage the community in the Redistricting Process and follow the Required Criteria in the City Charter to preserve the integrity of neighborhoods.  Plaintiffs also ask that the City Council pursue redistricting in a race-neutral manner, with careful though given to the various communities affected by the redistricting process.

III.     **Conclusion**

For the foregoing reasons, Plaintiff respectfully requests this Court issue a preliminary

injunction enjoining the Defendant Boston City Council from enacting the Redistricting Plan (Docket

#1275) approved by the Boston City Council on November 2, 2022.

Respectfully submitted,
The Plaintiffs,
By their Attorneys,

/s/ Paul Gannon
Paul Gannon, Esquire
Law Office of Paul Gannon, P.C.
546 E. Broadway
South Boston, MA 02127
(617) 269-1993
BBO# 548865
pgannon@paulgannonlaw.com

/s/ Glen Hannington
Glen Hannington, Esq.
LAW OFFICES OF GLEN HANNINGTON
Ten Post Office Square, 8th Floor South
Boston, MA  02109
TEL#:   (617) 725-2828
BBO#:   635925
glenhannington@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS
SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY
BY E-MAIL ON THIS THE 21st DAY OF NOVEMBER 2022.

/s/ Glen Hannington
Glen Hannington, Esquire

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARMTENT
                                               CIVIL ACTION NUMBER:2284CV02490

ROBERT O'SHEA, Individually and as Chairman
of the Ward 6 Democratic Committee, RITA
DIXON, SHIRLEY SHILLINGFORD, MAUREEN        **FIRST AMENDED COMPLAINT**
FEENEY, PHYLLIS CORBITT, Individually and as
President of the Massachusetts Union of Public
Housing Tenants, THE SOUTH BOSTON
CITIZENS ASSOCIATION, MARTIN F.
MCDONOUGH AMERICAN LEGION POST, ST.
VINCENT'S LOWER END NEIGHBORHOOD
ASSOCIATION, and OLD COLONY TENANT
ASSOCIATION,

              Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

              Defendant.

        Plaintiffs bring this action to challenge the decision of the Defendant Boston City Council

approving redistricting plans which violate the Boston City Charter, The Voting Rights Act, and the

Fourteenth Amendment to the United States Constitution.  Plaintiffs also contend that the action taken

by the Defendant was in violation of the Massachusetts Open Meeting Law.

## PARTIES

        1.      Plaintiff Robert O'Shea is the Chairman of the Boston Ward 6 Democratic Committee

in South Boston, Massachusetts, and registered voter, taxpayer and resident of South Boston.

        2.      Plaintiff Rita Dixon is a registered voter, taxpayer and resident of Mattapan.

3.      Plaintiff Shirley Shillingford is a registered voter, taxpayer and resident of the Mission Hill neighborhood of Roxbury and is the Vice Chair of the Caribbean American Political Action Committee.

4.      Plaintiff Maureen Feeney is a registered voter, taxpayer and resident of Dorchester.

5.      Plaintiff Phyllis Corbitt is the President of the Massachusetts Union of Public Housing Tenants and a registered voter, taxpayer and resident of South Boston.

6.      Plaintiffs The South Boston Citizens Association, Martin F. McDonough American Legion Post.  St. Vincent's Lower End Neighborhood Association and the Old Colony Tenant Association are civic associations whose members include residents and registered voters of the City of Boston's South Boston section.

7.      The Defendant Boston City Council is an elected municipal body, consisting of the following members: Julia Mejia; Brian Worrell; Ruthzee Louijeune; Ricardo Arroyo; Erin Murphy; Frank Baker; Michael Flaherty; Ed Flynn; Tania Fernandes Anderson; Gabriela Coletta; Liz Breadon; Kendra Lara; and Kenzie Bok.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction in this case pursuant to M.G.L. c. 212 § 4.

9.      This Court has jurisdiction over the Open Meeting Law claims pursuant to M.G.L. c. 30A § 23(f).

10.     Venue is proper here as the Defendant is the Boston City Council and all of the Plaintiffs are residents of the City of Boston.

## STATEMENT OF FACTS

11.     Councilor Liz Breadon became the Chair of Redistricting on August, 29, 2022.

12.     Councilor Brian Worrell was simultaneously named as Vice Chair of Redistricting.

13.     At a City Council meeting on August 31, 2022, Councilor Breadon filed an order for a hearing regarding Redistricting Principles. Exhibit A.

14.     The City Council thereafter had a "Redistricting Working Session" on September 20, 2022 regarding the adoption of City Council redistricting principles.

15.     Another City Council meeting was held on September 23, 2022 via Zoom, again regarding the adoption of redistricting principles.

16.     On September 26, 2022, the City Council held a working session in an effort to allocate split precincts to their appropriate district.

17.     Similar meetings were held throughout the remainder of that week, both regarding the allocation of split precincts and regarding the adoption of redistricting principles.

18.     On September 28, 2022, Councilor Breadon Filed an Amended Order for the Adoption of City Council Redistricting Principles.  Exhibit B.

19.     At the meeting on September 28, 2022, Councilor Ricardo Arroyo and Councilor Tania Fernandes Anderson filed a proposed map (Exhibit C), as did Councilor Erin Murphy (Exhibit D)

20.     On October 3, 2022 Councilors Breadon and Worrell filed their proposed map (Exhibit D).

21.     On Oct 10, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

22.     The October 10, 2022 meeting was an "emergency meeting" held by the NAACP, the Chinese Progressive Association, and other advocacy groups.

23.     On Oct. 18, 2022, four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet

3

and discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

24.     On Oct. 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

25.     At the October 19, 2022, the City Council voted to adopt the amended version of Councilor Breadon's Order for the Adoption of City Council Redistricting Principles.

26.     On October 20, 2022, there was a meeting to hear public testimony regarding the redistricting from residents.

27.     The meeting was held in Fields Corner at the Community Academy for Science and Health, which is in the heart of the Vietnamese-American community.

28.     However, the Council provided no translation services which prompted complaints from the CDVN Vietnamese American Community of MA.  Exhibit F.

29.     The CDVN complaint that "the Vietnamese community in Dorchester stands to be impacted like all immigrant communities by the Redistricting legislation . . . [d]espite this, the Council has not provided the typical language access that is provided for meetings of even lesser consequence." Id.

30.     Similarly, Sarepta Women and Children Empowerment Center, Inc. wrote to Mayor Wu alleging disenfranchisement of the Haitian Community of Dorchester, Hyde Park, and Mattapan which would be "eviscerated" by the new redistricting legislation.  Exhibit G.

31.     The Mary Ellen McCormack Task Force has similar complaints regarding the division of public housing developments, and the lack of language access.  Exhibit H.

32.     Specifically, the Mary Ellen McCormack Community Task Force complained that the Redistricting Plan divides historically united public housing developments and asked Mayor Wu to send the plan back to the City Council "with an amendment to unite Boston's neighborhoods including South Boston's public housing developments into District 2 where they had historically been."  Id.

33.     The Task Force further stated that "[d]ividing our communities is a violation of our voting rights and cannot stand to pass."  Id.

34.     South Boston En Accion ("SBEA") also wrote to Councilor Breadon on November 1, 2022, on behalf of the Spanish-speaking residents of Mary Ellen McCormack, Old Colony and West Broadway Developments and their "questions, concerns, and frustrations" regarding the redistricting process.  Exhibit I.

35.     SBEA noted that "language access has not been a priority" and that "[w]hen attempts were made to translate for residents, the interpretations were disrupted."  Id.

36.     SBEA further noted that many of the Spanish-speaking residents of these public housing developments "don't know what is occurring and are confused about their next steps."  Id.

37.     Lastly, SBEA disagrees with the splitting of public housing developments into different districts, noting that "[o]ur community is made up of the most vulnerable residents, and dividing us will create more chaos and harm."  Id.

38.     An Open Meeting Law Complaint based on the violations of MGL. C. 30A set forth above was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022.Exhibit J – Affidavit of Robert O'Shea and Open Meeting Law Complaint.

39.     On October 26, 2022, the Boston City Council met for its regularly scheduled meeting at which it intended to vote on a proposed Redistricting Map.

40.     Due to the Open Meeting Law Complaint noted above, the Boston City Council did not proceed with its anticipated vote on any proposed Redistricting Maps at that October 26, 2022 meeting.

41.     Although there was mention of the October 25, 2022 filed Open Meeting Law Violations, (Exhibit J) at that meeting, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

42.     At the October 26, 2022 meeting, the Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

43.     On November 2, 2022, the Boston City Council responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

44.     It's anticipated that other residents of the City of Boston will file additional Open Meeting Law Complaints concerning deliberations on proposed redistricting maps prior to the November 2, 2022 scheduled meeting of the Boston City Council.

45.     In fact, another Open Meeting Complaint was filed on November 1, 2022 on behalf of Dorchester Civic Associations.  Exhibit K.

46.     The Attorney General's Office is in possession of the October 25, 2022Open Meeting Law Complaint.  Per M.G.L. c. 30A, they will not address the issue until on or after November 24, 2022.

47.     Despite several Open Meeting Law complaints and many complaints from minority communities that were shut out of the legislative process, the Boston City Council still pressed ahead to a vote Wednesday, November 2, 2022.

48.     The proposed map to be voted on was proposed by Councilors Breadon and Arroyo. Exhibit L.

49.     The Councilors reviewed a committee report and a copy of the proposed map less than

forty-eight (48) hours before taking a vote, leaving minimal time to digest a redistricting plan that

would shape the future of the City for the next decade.

50.     Despite all of these issues, on November 2, 2022, the City Council voted in favor of the

Legislative Redistricting by a vote of 9 to 4.

51.     Councilor Flaherty submitted a proposed map (Exhibit M), as did Councilor Baker

(Exhibit N), but neither of these proposals was discussed or seriously considered by the Council, who

were laser focused on passing the map submitted by Councilors Breadon and Arroyo at any cost.

52.     Previously, on October 9, 2022, Professor Jeffery Wice of New York Law School was

retained by the City of Boston to provide a memorandum outlining the criteria which the City Council

must or should consider when redrawing council districts.  Exhibit O.

53.     Professor Wice discussed that Section 128 of the Boston City Charter requires that

districts "shall be compact and contain, as nearly as may be, an equal number of inhabitants as

determined but the most recent state decennial census, shall be composed of contiguous existing

precincts, and shall be drawn with a view toward preserving the integrity of existing

neighborhoods."Id.

54.     However, Massachusetts no longer conducts a state decennial census; therefore the

necessary date for redrawing legislative districts is drawn from the 2020 Federal Census.

55.     The data from the 2020 Census as applied to the City of Boston dictates that the ideal

district size is 75,071 residents, plus or minus 5%.

56.     Therefore, the range allowed per district is between 71,317.45 and 78,767.85 residents.

57.     The Voting Rights Act ("VRA") also prohibits the imposition of any voting

qualification, practice or procedure that results in the denial or abridgement of any citizen's right to

vote on account of race, color, or status as a member of a language minority group.

58.     Section 2 of the VRA further prohibits vote dilution by "cracking" minority populations across districts, just as it prohibits vote dilution by "packing" minority populations into one district.

59.     The Fourteenth Amendment to the Constitution of the United States and the VRA require the avoidance of both discriminatory intent and discriminatory effect when redistricting.

60.     The City Charter and the VRA require districts to also be "compact" meaning that there should be a minimum distance between all parts of the district and to be "contiguous" meaning that all precincts should be geographically connected.

61.     Last, but not least, it is required that consideration must be given to drawing districts that respect the boundaries of Boston's recognized neighborhoods in order to preserve historical neighborhood boundaries.

62.     The City Council redistricting process was flawed and unfair to the most vulnerable residents of the City, particularly public housing residents, immigrants, and language minorities. Exhibit P – Affidavit of Edward Flynn at ¶ 2.

63.     The City Council did not engage residents in an effective way, and failed to listed to or engage residents in public housing developments, immigrants, and language minorities.  Id. at ¶ 3.

64.     Communities of color had almost no involvement in the City Council's secretive process. Id. at ¶ 4.

65.     Throughout the redistricting debate, Councilor Flynn repeatedly informed his colleagues on the council that one of his most important goals was to ensure public housing residents were united in District 2. Id. at ¶ 5.

66.     Keeping the public housing residents united was and is an important goal because being united in one district allows public housing residents' collective voice to be heard in government. Id. at ¶ 6.

67.     In District 2, residents at the Anne Lynch Homes at Old Colony, the West 9th Apartments, and the West Broadway Development are all a short walk from each other and have much in common. Id. at ¶ 7.

68.     However, under the approved redistricting plan, these public housing developments would move from District 2 to District 3. Id. at ¶ 8.

69.     Under the previous version of the Breadon-Arroyo Map, the plan was to divide public housing developments in half, both at the Anne M. Lynch Homes (al The previous version of the Breadon-Arroyo map proposed to divide public housing developments in half - both at the Anne M. Lynch Homes (along Mercer St.) and the West Broadway Development (along Orton Marotta Way) into District 2 and District 3. Id. at ¶ 9.

70.     At that time, public housing advocates like South Boston En Accion, BHA Task Force leaders, nonprofit partners, and all civic groups in South Boston voiced complete opposition to a proposal that would divide our public housing developments from District 2, and dilute the voice of communities of color to organize and advocate for their interests. Id. at ¶ 10.

71.     The approved map still divides public housing in South Boston. The version of the map made available to the Councilors only two days before the November 2nd vote completely cut out these developments from District 2, the Council district where these developments have traditionally been located. Id. at ¶ 11.

72.     And in the last hours before the vote, West Broadway was added into District 2, still dividing public housing developments into two districts. Id. at ¶ 12.

73.     It is critical residents of color in Boston Housing Authority units are not further divided from the community of South Boston. Id. at ¶ 13.

74.     These public housing developments, managed by the Boston Housing Authority, are mostly made up of communities of color and immigrants. Id. at ¶ 14.

9

75.     During the pandemic, Councilor Flynn and his staffed worked closely with neighbors in District 2's public housing developments on language and communication access, senior outreach, food access, access to COVID-19 testing, providing information on vaccines, support for immigrant families, social services, youth, educational and athletic programs. Id. at ¶ 15.

76.     Placing these residents out of District 2 punishes these public housing residents and dilutes their organizing power. Id. at ¶ 16.

77.     Language and communication access are critical issues that unite residents in public housing developments. Id. at ¶ 17.

78.     In District 2, many residents in public housing speak Spanish and an increasing number also speak Cantonese. Id. at ¶ 18.

79.     Both of these languages directly unite the history and residents of District 2, with a large Cantonese speaking community in Chinatown, the South End and Bay Village.  Id. at ¶ 19.

80.     The larger Spanish speaking community in the South End, such as Cathedral Public Housing and Villa Victoria, also have much in common with the public housing residents in South Boston that also speak Spanish. Id. at ¶ 20.

81.     However, the City Council, with its approved map, failed to engage these residents in the redistricting process. Id. at ¶ 21.

82.     It is unconscionable to separate these public housing developments from District 2, the Council district where these developments have traditionally been located. Id. at ¶ 22.

83.     These actions are wholly contrary to the redistricting principles that we discussed at length with experts and academics when it comes to the preservation of the core of prior districts and maintaining communities of interest.  Id. at ¶ 23.

84.     Our public housing developments have a large number of Hispanic and Black residents, and they contribute greatly to the diversity of South Boston and District 2. Id. at ¶ 24.

85.     These developments have always been in District 2, and they identify with the neighborhood of South Boston. Id. at ¶ 25.

86.     Removing them completely, and separating them from the rest of South Boston, makes District 2 less diverse. Id. at ¶ 26.

87.     The Redistricting Committee ignored the requests from community groups to hold additional meetings in Cantonese, Spanish, Vietnamese, and Haitian Creole, and went ahead with a vote on November 2nd. Id. at ¶ 27.

88.     The deadline of having a map in place by November 7th was an artificial and self-imposed one. Id. at ¶ 28.

89.     According to the City of Boston Corporation Counsel, the only explicit statutory deadline set forth in the Boston City Charter is that City Council districts be redrawn by August 1, 2026. Id. at ¶ 29.

90.     Moreover, the Council did not know what the exact map was when there were plans to vote on October 26, 2022 and they still did not know the exact map until a few hours before the vote on November 2, 2022. Id. at ¶ 30.

91.     Both the public and Councilors voting on the maps had not been afforded an opportunity to view or offer feedback in a public hearing on a final map, and there were also no further meetings, hearings, or working sessions after October 25th. Id. at ¶ 31.

92.     The Council and the public did not have the opportunity to discuss the latest version of the Breadon-Arroyo map, and nobody knew what were the amendments that made it into this version that the Council was supposed to vote on.  Id. at ¶ 32.

93.     Councilors also did not have the chance to have their constituents have further input. Id. at ¶ 33.

94.     District 2 and District 3 had the most stake in this redistricting process and, yet, the final map had not taken into serious consideration the voices of the communities in these districts. Id. at ¶ 34.

95.     Despite the insistence that this would strengthen these districts, there is no doubt that these districts will suffer from losing some core communities that are not preserved from prior districts, as well as not maintaining communities of interest. Id. at ¶ 35.

96.     More time was spent by the Council with the advocates of the so-called UNITY map, some of whom may not live in the City of Boston, than listening to the voices of the communities that will bear the brunt of the irreparable harm that this redistricting will cause.  Id. at ¶ 36.

97.     Council President Flynn tried to offer support for the recommended criteria to be formally considered and adopted by our body. Id. at ¶ 37.

98.     Councilor Flynn argued that already established communities of interest, such as public housing residents, should be respected, united and factored in. Id. at ¶ 38.

99.     Councilor Flynn's request was denied, as was his request to hold off on a vote and to seek more community meetings in various languages. Id. at ¶ 39.

100.    The process lacked transparency and it was completely flawed. Id. at ¶ 40.

101.    The Council failed as a collective body to respect the most impacted by our decision; residents living in public housing and our immigrant neighbors. Id. at ¶ 41.

102.    They failed as a city to include the voices and opinions of communities of color, immigrants and public housing residents during the districting debate. Id. at ¶ 42.

103.    The current map that was approved, and the process that led to it, has not done right by the neighbors living in my district in public housing in South Boston, and the rushed process was not done right for the residents across the City of Boston. Id. at ¶ 43.

104.     Councilor Baker contends that the map the Boston City Council approved on November 2, 2022, and the actions taken by his colleagues on the City Council indicate that the goal of the redistricting map is to split up the southeastern part of District Three, even though there is no Voting Rights Act violation. Exhibit Q – Affidavit of Frank Baker at ¶ 2

105.     Communities of interest in other parts of the City were a non-starter when it came to being moved; however the southeastern part of Dorchester was not offered the same privilege. Id. at ¶ 3.

106.     The redistricting process was disingenuous and was at the expense of marginalized communities that have been organized and worked together for decades. Id. at ¶ 4.

107.     District 3 contains a cohesive network of civic groups that has traditionally banded together under common interests such as schools, churches, safe streets, developments, billboards, libraries and other public programs. Id. at ¶ 5.

108.     Those civic groups are anchored in District 3's villages which happen to coincide with parish boundaries. Id. at ¶ 6.

109.     These communities from St. Margaret's to St. Brendan's and everything in between play sports together - Dorchester Youth Hockey, Dorchester Baseball, Dorchester Youth Soccer and in times of need, unite together for a common cause, in places like Florian Hall. Id. at ¶ 7.

110.     There is a complete disruption of District 3, by removing the core of its district from its historical home – something of which does not need to happen. Id. at ¶ 9.

111.     District 3 is a community that is integrated, supportive, and diverse, who share resources and services, but will now be split apart from one another – Carney Hospital, Eileen's Recovery House for Women, Olmstead designed Dorchester Park and especially the Neponset River Greenway, Pope John Paul II Park and Joseph Finnegan Park. Id. at ¶ 10-11.

112.   The aforementioned parks came to fruition as a direct result of the civic groups in these communities advocating, in concert, for decades. Id. at ¶ 11.

113.   Under Docket #1275 there are no clear boundaries for District Three, unlike previous redistricting years (1983, 1993, 2003, 2013) Dorchester Avenue and the Neponset River are not just boundaries but also are common interests on important issues facing the City of Boston including transportation, business, and environment concerns including coastal flooding. Id. at ¶ 12.

114.   These two boundaries give District Three common interests from South to North. Id. at ¶ 13.

115.   The purpose of redistricting should be more than just balancing populations, but must also take into account the existing structure of neighborhoods and avoid splitting up neighborhood unless absolutely necessary. Id. at ¶¶ 14-15.

116.   The proposed maps offered by Councilors Baker, Flynn, Murphy and Flaherty all provide a means by which population can be equalized with minimal damage to the communities. Id. at ¶ 16.

117.   The proposed map not only destroys District 3, but also causes significant harm to other communities, including South Boston which will be carved in half, and Mattapan, which will dilute the African-American voting power in District 4. Id. at ¶ 17.

118.   The approved map not only dilutes a moderate vote and breaks up Ward 16, it will also adversely affect the African-American vote in District Four for no reason. Id. at ¶ 18.

119.   Plaintiff Ruth Dixon specifically believes that dividing her Mattapan neighborhood in half is against the City Charter and her voting rights, making it impossible to elect the candidate of her choice because rather than be a united community with an ability to influence their city councilor we will be divided on the edge of 2 districts.

120.     Similarly, Plaintiff Shirley Shillingford believes that the Redistricting Plan will divide the Afro-Caribbean community in and around Mission Hill in Roxbury, diluting the voice of the Afro-Caribbean community.  Under the Redistricting Plan, Mission Hill would be represented by Kenzie Bok who is the councilor for District 8 which is largely comprised of Beacon Hill.  District 8 and Mission Hill have a 30-year life expectancy gap, and wildly different populations.

121.     There has been no racial polarization regarding voting in the City, as was confirmed by Professor Wice, as can be seen from Councilor Baker's re-election in his 63% non-white district, in the election of Secretary Galvin in the African-American majority of District 4, and in various other elections throughout the City. Id. at ¶ 20.

122.     Hundreds of emails were sent to the Council from residents throughout District Three, but their voice and concerns fell on deaf ears. Id. at ¶ 21.

123.     Councilor Erin Murphy avers that the approved map is primarily focused on race in violation of the Voting Rights Act and the Fourteenth Amendment.  Exhibit R – Affidavit of Erin Murphy at ¶ 2.

124.     The approved map does not focus on creating voting opportunity neighborhoods for particular minority groups but instead focuses on the non-white populations as if it were a homogeneous group in each City Council District. Id. at ¶ 3.

125.     The approved map focuses on City Council District 3 as being "too white".  Id. at ¶ 4.

126.     The approved map does not distinguish between different minority groups but added all minority group's total populations without regard for the vast differences in background, language, history, voting strengths etc., in order to achieve "racial balance".  Id. at ¶ 5.

127.     The approved map dismantles the compact City Council District 3 boundary along Dorchester Ave and substitutes a gerrymandered, wandering boundary in order to achieve "racial balancing". Id. at ¶ 6.

128.    The approved map is designed to diminish the voting power of white voters in City Council District 3.  Id. at ¶ 7.

129.    The approved map destroys the Cedar Grove neighborhood ignoring the requirement to preserve existing communities of related and mutual interest solely in order to achieve "racial balancing".  Id. at ¶¶ 8-9.

130.    The stated goal of the approved map is to make District 4 less black and District 3 less white.  Id. at ¶ 11.

131.    Councilor Breadon expressed fear that the majority black population of District 4 could invite accusations of "packing" which is the term used to describe the practice of drawing district lines so that minority voters are compressed into a small number of districts when they could effectively control more. Id. at ¶ 12.

132.    Using this reasoning, the approved map swaps majority black precincts in District 4 with majority white precincts in District 3 in order to make District 4 less black and District 3 less white. Id. at ¶ 13.

133.    District 3, under the existing plan before redistricting, does not have a majority race, and there is no evidence whatsoever that the widely diverse groups of American blacks, Vietnamese, Cape Verdean, Haitian and Dominican people in District 3, that is the non-white people, are a cohesive minority and they are surely not a single minority. Id. at ¶ 14.

134.    However, the precincts that comprise the Cedar Grove neighborhood are majority white neighborhoods. Id. at ¶ 15.

135.    Using a "racial balancing" criteria, the approved map carves these precincts out of District 3 purely on the basis of race.  Id. at ¶ 16.

16

136.    This is an example of "cracking" which is the practice of drawing District boundaries that split or fracture voting groups to diminish their ability to elect officials that represent their interests. Id. at ¶ 17.

137.    District 3, under the existing plan before redistricting and termed "too white" by the Council, has a history of electing black officials.  Linda Dorcena Forrey was elected as the State Representative in 2004 and reelected until 2012 when she was elected as State Senator.  She was reelected until 2018 when she retired from politics.  The specific precincts that the approved map carves out of District 3 voted overwhelmingly in the 2022 primary for Attorney General candidate Andrea Campbell, a black woman. Id. at ¶ 18-19.

138.    Also, District 4's black majority (also attacked and diluted by the approved map) has created a significant political power base for the black community resulting in electing black councilors for over four decades along with a U.S Representative, State Senators and State Representatives.  Id. at ¶ 20.

139.    Councilor Breadon stated at the October 5, 2022 City Council meeting that her goal was to "racially balance" District 3 so that it becomes a majority minority district. Id. at ¶ 21.

140.    The approved map achieves this unconstitutional "racial balancing" by pretending that all non-white citizens of Boston belong to a homogeneous group that has one set of political goals and that each and every member is opposed to all of their white neighbors, their views, and their political goals. Id. at ¶ 22.

141.    The Little Saigon neighborhood is a vital part of District 3 that spans Dorchester Avenue in the Fields Corner neighborhood of Dorchester. It is a vibrant area and is home to 75% of Vietnamese Americans in the city of Boston.  These neighbors are mostly first and second-generation immigrants from a country in south East Asia, with a rich culture, extremely strong family and religious values, and a deep commitment to education.  Id. at ¶ 25.

142.    The first black community of Dorchester came almost exclusively from the southern states fleeing discrimination and poverty in the 1960's.  These were the descendants of slaves and came north for work and to escape Jim Crow laws.  In 1965 a new wave of blacks arrived in Dorchester: Haitians, Cape Verdeans, West Indians and Dominicans.  Although they shared a skin color with the recently settled Southern blacks, in all other respects they were a widely diverse group with little in common: an eclectic mix of languages, religions, native countries, education levels, goals and aspirations. Id. at ¶ 26.

143.    The approved map lumps all of these divergent people into one category calling them non-white, or people of color, or minority. Id. at ¶ 27.

144.    The approved map divides District 3 into two groups: white and non-white, ignoring the immense differences in each of the categories.  There is no cohesive history, ethnicity, religion, language, or culture that binds them into a recognizable group with a compact and united neighborhood that should create an opportunity neighborhood.  Id. at ¶ 28.

145.    The goal of equal population distribution across districts could have been achieved without damaging the existing neighborhood in Districts 2, 3, and 4, and without an improper focus on "racial balancing" as the driving force behind redistricting. Id. at ¶ 29.

146.    The proposed maps provided by Councilors Murphy, Flynn, Baker, and Flaherty all achieve the goals of redistricting with minimal impact to neighborhood cohesiveness and without an improper focus on race. Id. at ¶ 30.

147.    United States Congressman Stephen Lynch also wrote to this Honorable Court regarding the unconstitutional nature of the redistricting legislation.  Exhibit S.

148.    Specifically, Congressman Lynch stated that "the City Council proposal will arbitrarily and recklessly divide longstanding and close-knit public housing developments – including the Anne M. Lynch Homes at Old Colony and West Broadway development – across multiple city districts."

18

149.     Congressman Lynch further stated that "these public housing communities are communities of common interest whose abrupt division into multiple city districts will unfairly and irreparable dilute their voting power and encumber them with unfamiliar and disparate political representation."

150.     Congressman Lynch urges the Court to consider the "preservation of neighborhoods and communities" and notes that "[t]he failure to safeguard these communities against division not only neglects to preserve the cores of the preexisting districts but could very well have the potential to weaken the voting strength of these politically cohesive and like-minded voters in future City Council elections."

## COUNT I – INJUNCTIVE RELIEF

151.     Paragraphs 1 through 150 of this Complaint are hereby incorporated by reference.

152.     The Boston City Council failed to comply with the Open Meeting Law by having secretive meetings and not providing adequate language access to non-English speakers.

153.     Furthermore, the final map approved by the City Council was not provided to the public or the Councilors until less than 48 hours before the scheduled vote.

154.     Because the public did not have broad access to the deliberations and decision-making process of the City Council regarding the redistricting process, Plaintiffs respectfully request that this Honorable Court issue a preliminary injunction prohibiting the implementation of this approved redistricting map (Docket #1275) from taking effect until further order of this Honorable Court.

## COUNT II – VIOLATION OF THE VOTING RIGHTS ACT

155.     Paragraphs 1 through 154 of this Complaint are hereby incorporated by reference.

156.     Section 2 of the Voting Rights Act of 1965 prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group.

157.    As discussed hereinabove, the Boston City Council discriminated against residents based solely on their race in an effort to achieve their stated goal of "racial balancing".

158.    There was no violation of the Voting Rights Act in any of the affected Districts that would necessitate the aggressive redistricting of boundaries along racial lines.

159.    Moreover, as is evident from the attachments to this Complaint, many minority residents and language minority residents were shut out from the deliberative and legislative process due to a failure of the City Council to provide access.

160.    The City Council deliberately diluted the white vote in District 3, while also diluting the African-American vote in District 4 for no valid reason other than their stated purpose of "racial balancing".

161.    Under the existing plan before redistricting, District 3 had a long history of electing African –American officials, and District 4 had a long history of electing white officials.

162.    There was no racial polarization of voting blocs in either district that would require redistricting based on race.

163.    Also, the City Council failed to take into account the various different minority groups in the affected districts, instead seeing them as a duopoly of monolithic groups of whites and non-whites.

164.    In pursuing their stated goal of racial balancing, the City Council has diluted the voting power of African-Americans in District 4, of whites in District 3, and of various other minority groups whose tight-knit communities have been severed across multiple districts, damaging their collective power to effect meaningful change at the ballot box.

165.    The redistricting legislation approved by the City Council violates Section 2 of the Voting Rights Act and Plaintiffs respectfully request that his Honorable Court issue an order vitiating said legislation.

COUNT III – VIOLATION OF THE FOURTEENTH AMENDMENT

166.   Paragraphs 1 through 165 of this Complaint are hereby incorporated by reference.

167.   The Fourteenth Amendment to the United States Constitution provides, in pertinent part that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

168.   The Equal Protection Clause prohibits a state, "without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"Bethune-Hill v. Va. State Bd. of Elections, 137 S. Ct. 788, 797 (2017)

169.   Race-based lines, therefore, are unconstitutional where (1) "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district,"and (2) the district's design cannot withstand strict scrutiny. Miller v. Johnson, 515 U.S. 900, 916 (1995).

170.   To pass strict scrutiny, the state must prove that its race-based redistricting scheme is "narrowly tailored" to meet a "compelling interest."  Bethune-Hill, 137 S. Ct. at 801.

171.   As discussed hereinabove, the primary (if not the only) goal of the City Council was to engage in "racial balancing" of various districts.

172.   There was no compelling interest that would excuse the naked racial animus behind the City Council's plan, and certainly there was no narrow tailoring to achieve such compelling interest that would survive strict scrutiny.

173.   There is no evidence in the record of racial polarization of votes in the City of Boston or in the affected districts.

174.   There have been no Voting Rights Act violations (as confirmed by Professor Wice).

21

175.    The Districts most affected by the redistricting legislation each have long histories of race-neutral elections, with white candidates winning elections in majority minority districts and minority candidates winning in majority white districts and precincts.

176.    Because the redistricting legislation does not meet a compelling interest, and because the legislation is not narrowly tailored to that compelling interest, Plaintiffs respectfully request that this Honorable Court issue an order finding said legislation unconstitutional.

**WHEREFORE, the Plaintiffs respectfully requests this Honorable Court:**

1.   Issue a preliminary injunction preventing the Defendant, the Boston City Council, from enacting the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022;

2.   Enter an order finding that the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 violates Section 2 of the Voting Rights Act;

3.   Enter an order finding that the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 violates the Fourteenth Amendment to the United States Constitution; and

4.   Grant all other relief which the Court may deem just and proper.

Respectfully submitted,
The Plaintiffs,
By their Attorneys,

/s/ Paul Gannon
Paul Gannon, Esquire
Law Office of Paul Gannon, P.C.
546 E. Broadway
South Boston, MA 02127
(617) 269-1993
BBO# 548865
pgannon@paulgannonlaw.com

/s/ Glen Hannington
Glen Hannington, Esq.
LAW OFFICES OF GLEN HANNINGTON

Ten Post Office Square, 8th Floor South
Boston, MA  02109
TEL#:   (617) 725-2828
BBO#:  635925
glenhannington@aol.com

Dated: November 21, 2022

# **<u>EXHIBIT A</u>**

**Order of Councilor Liz Breadon**



# CITY OF BOSTON
# IN CITY COUNCIL

### ORDER FOR THE ADOPTION OF CITY COUNCIL
### REDISTRICTING PRINCIPLES

*WHEREAS,*    At the 1981 municipal election, residents of the City of Boston voted 41,973 to 34,623 in favor of a binding referendum changing the structure of the Boston City Council from being elected entirely at-large to adding district representation; *and*

*WHEREAS,*    The Massachusetts Legislature enacted chapter 605 of the Acts of 1982, providing for the election of a City Council consisting of nine members elected from equally populous districts and four members elected at-large, specifying the process by which the final City Council to be elected entirely at-large was to draw the inaugural district lines; *and*

*WHEREAS,*    Boston's first electoral district map passed by the City Council, 7 to 2, and approved by the Mayor (chapter 6 of the Ordinances of 1982) was challenged by a lawsuit from a coalition of the Latino Political Action Committee, Caucus Latino de Poliza Social de Massachusetts, Inc., the Black Political Task Force, and the Boston Peoples Organization; *and*

*WHEREAS,*    Drawn on the basis of the 1975 state census, the districts were invalidated in *Latino Political Action v. City of Boston*, 568 F. Supp. 1012 (D. Mass. 1983) when 1980 federal census data revealed a constitutionally impermissible population variance of 23.6 percent violating the "one person, one vote" standard, a ruling upheld on appeal, 716 F.2d 68 (1st Cir. 1983); *and*

*WHEREAS,*    U.S. Supreme Court Justice William J. Brennan, Jr. in August 1983 ruled that the delay caused by having to redraw districts for the November 1983 municipal election did not warrant approval of the Massachusetts Attorney General's application for stay, *Bellotti v. Latino Political Action*, 463 U.S. 1319 (1983), prompting passage of a home rule petition for Boston's one-time emergency election procedures in chapter 357 of the Acts of 1983; *and*

*WHEREAS,*    A second map that unanimously passed the Council with Mayoral approval (chapter 25 of the Ordinances of 1983) was again challenged by the coalition, with the addition of the Asian Political Caucus, alleging unlawful dilution of minority voting power and infringing on the rights of minority candidates; however, the Court ruled that the Council was absolutely immune from suit in exercising their legislative duties, *Latino Political Action v. City of Boston*, 581 F. Supp. 478 (D. Mass. 1984) and the map was later upheld 609 F. Supp. 739 (D. Mass. 1985) and affirmed, 784 F.2d 409 (1st Cir. 1986); *and*

*WHEREAS,*    The City Council again redrew electoral districts in 1987, 1993, and 2002 amid the backdrop of further redistricting litigation for equal representation of Boston's Black voters at the state and federal levels, *Black Political Task Force v. Connolly*, 679 F. Supp. 109 (D. Mass. 1988), *Black Political Task Force v. Connolly*, F. Supp. Civ., Nos. 91-12750-H, 91-12751-H (D. Mass. 1992), *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291 (D. Mass. 2004); *and*

*WHEREAS,*    Historic context led the Massachusetts Legislature's Special Joint Committee on Redistricting and the Boston City Council's Committee on Census and Redistricting to facilitate 2011-2012 redistricting processes by intentionally prioritizing meaningful engagement of residents from marginalized communities and neighborhoods historically split across district lines, with ample time to scrutinize proposals at dozens of public hearings and committee meetings spanning more than one year, and, despite these efforts, the Mayor twice disapproved the Council's maps due to inequitable racial imbalance; *NOW, THEREFORE BE IT*

ORDERED:    That the Boston City Council adopt the following principles to guide and inform procedures led by its Committee on Redistricting for crafting legally defensible City Council electoral districts for the City of Boston, pursuant to chapter 605 of the Acts of 1982, as amended by chapter 343 of the Acts of 1986:

<u>2022 Redistricting Principles (*Draft – August 31, 2022*)</u>

I.  *Conduct.* Councilors will adhere to Rule 38 of the City Council Rules relative to conduct during debate and deliberation, and refer to present or proposed electoral districts by the assigned district number or neighborhood name(s), refraining from using the name of any incumbent City Councilor;

II.  *Public Participation*. To enhance and expand civic participation while strengthening public confidence in elections and governance, transparency in redistricting is essential. Deliberation among Councilors as decision-makers, or with legal and mapping consultants, must remain restricted to public Committee hearings, working sessions, and meetings duly noticed pursuant to the Open Meeting Law, with opportunities for the public to provide testimony, where appropriate. Ample outreach to communities and access to redistricting tools to allow meaningful participation is also essential.

III.  *Legal Standards.* To craft a legally defensible redistricting plan, Councilors must consider pertinent constitutional and statutory provisions, such as the Voting Rights Act and City Charter provisions, as well as redistricting case law, including those involving the City of Boston;

IV.  *Use of Existing Precincts.* Notwithstanding any imperfections of geographic boundaries due to decadeslong deferral of citywide reprecincting, proposed electoral districts must be composed of existing precincts, as most recently adopted by the Board of Election Commissioners;

V.  *Guidelines*. Proposed maps should be drawn to ensure population equality and avoidance of excessive deviation, have compact and contiguous boundaries, avoid over-concentration of protected groups, preserve communities of interest, provide voters of protected groups opportunities to achieve proportionality by electing their candidates of choice, and prohibit favoring of incumbent residency.

VI.  *Presentation of Proposals.* Submissions of nine (9) proposed districts should consist of the following:

A.  Written descriptions in the form of an ordinance listing wards and precincts;

B.  A corresponding map illustrating proposed districts, produced using Esri Redistricting software in coordination with City Council Central Staff and City of Boston GIS staff;

C.  Corresponding tables presenting the following demographic statistics for each district:

1.  Total population deviation by district *and* the plan's overall deviation range;

2.  Total population disaggregated by race, *and* each racial group's population as a percentage of each district's total population;

3.  Aggregate racial minority (total non-White) population, *and* minority population as a percentage of each district's total population;

4.  Total Voting Age Population (VAP), or Citizen Voting Age Population (CVAP), disaggregated by race, *and* each racial group's VAP or CVAP as a percentage of each district's total VAP or CVAP, for purposes of evaluating potential voter strength;

D.  If possible, present total population change from 2010 to 2020 Census, *and* future population projections based on generally accepted statistical methods; and

E.  If possible, present total housing unit change from 2010 to 2020 Census, *and* future housing unit estimates based on approved and permitted residential unit development pipeline; and

VII.  *Deadline for Action*. Electoral districts must be drawn with approval of the Mayor by no later than November 7, 2022. Councilors may file proposed ordinances for the City Council meetings of September 14, September 21, September 28, or October 5, aiming for passage by October 19, and, in the event of disapproval, leave October 26 and/or November 2 for revision.

In City Council: August 31, 2022

# EXHIBIT B

Order of Councilor Liz Breadon



# CITY OF BOSTON
## IN CITY COUNCIL

### ORDER FOR THE ADOPTION OF CITY COUNCIL REDISTRICTING PRINCIPLES

WHEREAS,   At the 1981 municipal election, residents of the City of Boston voted 41,973 to 34,623 in favor of a binding referendum changing the structure of the Boston City Council from being elected entirely at-large to adding district representation; *and*

WHEREAS,   The Massachusetts Legislature enacted chapter 605 of the Acts of 1982, providing for the election of a City Council consisting of nine members elected from equally populous districts and four members elected at-large, specifying the process by which the final City Council to be elected entirely at-large was to draw the inaugural district lines; *and*

WHEREAS,   Boston's first electoral district map passed by the City Council, 7 to 2, and approved by the Mayor (chapter 6 of the Ordinances of 1982) was challenged by a lawsuit from a coalition of the Latino Political Action Committee, Caucus Latino de Poliza Social de Massachusetts, Inc., the Black Political Task Force, and the Boston Peoples Organization; *and*

WHEREAS,   Drawn on the basis of the 1975 state census, the districts were invalidated in *Latino Political Action v. City of Boston*, 568 F. Supp. 1012 (D. Mass. 1983) when 1980 federal census data revealed a constitutionally impermissible population variance of 23.6 percent violating the "one person, one vote" standard, a ruling upheld on appeal, 716 F.2d 68 (1st Cir. 1983); *and*

WHEREAS,   U.S. Supreme Court Justice William J. Brennan, Jr. in August 1983 ruled that the delay caused by having to redraw districts for the November 1983 municipal election did not warrant approval of the Massachusetts Attorney General's application for stay, *Bellotti v. Latino Political Action*, 463 U.S. 1319 (1983), prompting passage of a home rule petition for Boston's one-time emergency election procedures in chapter 357 of the Acts of 1983; *and*

WHEREAS,   A second map that unanimously passed the Council with Mayoral approval (chapter 25 of the Ordinances of 1983) was again challenged by the coalition, with the addition of the Asian Political Caucus, alleging unlawful dilution of minority voting power and infringing on the rights of minority candidates; however, the Court ruled that the Council was absolutely immune from suit in exercising their legislative duties, *Latino Political Action v. City of Boston*, 581 F. Supp. 478 (D. Mass. 1984) and the map was later upheld 609 F. Supp. 739 (D. Mass. 1985) and affirmed, 784 F.2d 409 (1st Cir. 1986); *and*

WHEREAS,   The City Council again redrew electoral districts in 1987, 1993, and 2002 amid the backdrop of further redistricting litigation for equal representation of Boston's Black voters at the state and federal levels, *Black Political Task Force v. Connolly*, 679 F. Supp. 109 (D. Mass. 1988), *Black Political Task Force v. Connolly*, F. Supp. Civ., Nos. 91-12750-H, 91-12751-H (D. Mass. 1992), *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291 (D. Mass. 2004); *and*

WHEREAS,   Historic context led the Massachusetts Legislature's Special Joint Committee on Redistricting and the Boston City Council's Committee on Census and Redistricting to facilitate 2011-2012 redistricting processes by intentionally prioritizing meaningful engagement of residents from marginalized communities and neighborhoods historically split across district lines, with ample time to scrutinize proposals at dozens of public hearings and committee meetings spanning more than one year, and, despite these efforts, the Mayor twice disapproved the Council's maps due to inequitable racial imbalance; *NOW, THEREFORE BE IT*

*ORDERED:*   That the Boston City Council adopt the following principles to guide and inform procedures led by its Committee on Redistricting for crafting legally defensible City Council electoral districts for the City of Boston, pursuant to chapter 605 of the Acts of 1982, as amended by chapter 343 of the Acts of 1986:

<div align="center">2022 Redistricting Principles</div>

I.   *Decorum.* Councilors will adhere to Rule 38 of the City Council Rules relative to conduct during debate and deliberation, and refer to present or proposed districts by the assigned district number or neighborhood name(s), refraining from using the name of any incumbent City Councilor;

II.   *Public Participation.* To enhance and expand civic participation while strengthening public confidence in elections and governance, transparency in redistricting is essential. Deliberation among Councilors as decision-makers, or with legal and mapping consultants, must remain restricted to public Committee hearings, working sessions, and meetings duly noticed pursuant to the Open Meeting Law, with opportunities for the public to provide testimony, where appropriate. The Committee will livestream and record redistricting working sessions. Ample outreach to communities and access to redistricting tools to allow meaningful participation is also essential.

III.   *Legal Review.* Prior to presentation before the Council for adoption, a proposed redistricting plan should be reviewed by outside counsel to ensure compliance under the Voting Rights Act of 1965 to prohibit the denial of equal access to the political process on account of race, color, or membership in a language minority group;

IV.   *Consideration of Proposals.* Review of proposed redistricting plans should:

  A.   Ensure the proposed ordinance properly allocates all 275 voting precincts of the City;

  B.   Present data for each of the six tables in the 2020 Census Redistricting Data (Public Law 94-171) Summary File;

  C.   Be compared to 2020 Census data for the "baseline" districts reconciling split precincts, as discussed at the Committee on Redistricting working session on September 20, 2022;

  D.   Be compared to 2010 Census data for the "baseline" districts reconciling split precincts, as discussed at the Committee on Redistricting working session on September 20, 2022.

In City Council: September 28, 2022

# **EXHIBIT C**

**OFFERED BY COUNCILORS RICARDO ARROYO, TANIA FERNANDES ANDERSON, LARA AND MEJIA**



# CITY OF BOSTON
# IN CITY COUNCIL

### AN ORDINANCE AMENDING CITY COUNCIL ELECTORAL DISTRICTS

*Be it ordained by the City Council of Boston, as follows:*

City of Boston Code, Ordinances, Chapter Two be amended by striking 2-9.2 in its entirety and replacing it with the following new language:

The districts redrawn under the authority of Chapter 605 of the Acts of 1982 as amended by Chapter 343 of the Actions of 1986 are hereby redrawn, as follows:

District One - Consisting of precincts numbered one through fourteen of Ward One; precincts one through eight of Ward Two; precincts numbered one through four and ten and eleven of Ward Three.

District Two - Consisting of precincts numbered six through eight and twelve through sixteen in Ward Three; precincts numbered one and thirteen in Ward Five; precincts numbered one through twelve in Ward Six; and precincts numbered one through seven in Ward Seven.

District Three - Consisting of precincts numbered one through five in Ward Four; precinct numbered fourteen in Ward Five; precincts numbered eight and nine in Ward Seven; precincts numbered one, two, and six in Ward Eight; precincts numbered one and two in Ward Nine; precincts numbered three, and six through ten in Ward Thirteen; precincts numbered three, four, six, eight, and nine in Ward Fifteen; and precincts numbered one, two, four through ten, and twelve in Ward Sixteen.

District Four - Consisting of precincts numbered one through seven and nine through thirteen in Ward Fourteen; precincts numbered two, five, and seven in Ward Fifteen; precincts numbered three and eleven in Ward Sixteen; precincts numbered one through fourteen in Ward Seventeen; and precincts numbered one and two in Ward Eighteen.

District Five - Consisting of precincts numbered eight and fourteen in Ward Fourteen; precincts numbered three through twenty-three in Ward Eighteen; precincts numbered ten through thirteen in Ward Nineteen; and precincts numbered one, two, four, and nine in Ward Twenty.

District Six - Consisting of precincts numbered six through nine in Ward Ten; precincts numbered four through ten in Ward Eleven; precincts numbered one through nine in Ward

Nineteen; precincts numbered three, five through eight, and ten through twenty-one in Ward Twenty.

District Seven - Consisting of precincts numbered eight, nine, and eleven in Ward Four; precinct numbered ten in Ward Seven; precincts numbered three through five in Ward Eight; precincts numbered three through seven in Ward Nine; precincts numbered one through three in Ward Eleven; precincts numbered one through nine in Ward Twelve; precincts numbered one, two, four, and five in Ward Thirteen; and precinct numbered one in Ward Fifteen.

District Eight - Consisting of precincts numbered five, nine, and seventeen in Ward Three; precincts numbered six, seven, ten, and twelve in Ward Four; precincts numbered two through twelve, and fifteen in Ward Five; precincts numbered one through five in Ward Ten; and precincts numbered one and two in Ward Twenty-One.

District Nine - Consisting of precincts numbered three through sixteen in Ward Twenty-One; and precincts numbered one through thirteen in Ward Twenty-Two.

Filed in City Council: September 23, 2022

# B
CITY of BOSTON

## Proposed Redistricting Plan submitted by Councilors Arroyo and Fernandes Anderson (Docket #1186)



# EXHIBIT D

# B
**CITY of BOSTON**

## Proposed Redistricting Plan submitted by Councilor Murphy
### (Docket #1215)



# EXHIBIT E

# City Council Committee on Redistricting proposed plan submitted by Chair Councilor Breadon and Vice Chair Councilor Worrell (Docket #1216)



# EXHIBIT F

 **CDVN MASS**
to liz.breadon, Ed, brian.worrell@boston.gov, +10
7 minutes ago  Details



Dear President Flynn, Chair Breadon, Vice Chair Worrell, members of the
Committee and members of the Council,

I write to you to request that the Boston City Council refrain from voting on the
matter of Redistricting until you have a hearing in the Vietnamese language.
As you know the Vietnamese community in Dorchester stands to be impacted like
all immigrant communities by the Redistricting legislation.
Despite this, the Council has not provided the typical language access that is
provided for meetings of even lesser consequence.

Last year to accommodate those who speak English as a second language
including many of our elderly residents, Redistricting hearings were held in
Vietnamese, Cantonese, Mandarin, Haitian Creole, Cape Verdean Creole,
Spanish, Portuguese and Khmer.
Therefore, we, the Vietnamese Community of Massachusetts, are calling on the
Boston City Council to hold hearings in Vietnamese and the aforementioned
languages so that our immigrant communities can be informed and understand
how the decisions of their City Councilors are being made and how it will affect
them.

Sincerely,

Khang Nguyen

--
**Executive Board**
President: Vinnie Than
Vice President of Internal Affairs: Khang Nguyen
Vice President of External Affairs: Nhu Le
Secretary Chief : Daniel Lam
Treasurer: Nhi Le
Media Chair: Daniel Lam
Event Chair: Oanh Lac
Youth and Student Activities Chair: Thuy-Lieu Vu

# EXHIBIT G



Sarepta Women and Children Empowerment Center, Inc
100 Morrissey Boulevard | Boston, MA 02125 |
P: 857-991-6198 | sareptawcec@gmail.com

November 7th, 2022

Request to Veto the Boston Redistricting Process

Honorable Mayor Michelle Wu,

I am writing to request that you veto the Boston Redistricting Process and request that the newly
proposed redistricting maps be redrawn. The current maps presented as part of this process will
divide the Haitian community of Mattapan and will disenfranchise Haitian voters making it
virtually impossible for them to elect someone to best represent their cultural and political
values.

There are many strengths to this great city of ours among which is its cultural fabric and ethnic
representation. We have the Latin Quarter, Little Saigon, North End ("Little Italy"), South End
(Irish Enclave), China Town, and others; all of these communities collectively contribute to the
rich fabric that is this great City of Boston. For over forty (40) years parts of the Dorchester,
Hyde Park and Mattapan neighborhoods has been synonymous with a strong Haitian Creole vein
resulting in ceiling-breaking first political achievements. These newly proposed municipal
district maps stand to eviscerate all political gains and future opportunities for this community.

As an administration that prides itself in honoring and uplifting the cultural vibrancy of this city,
endorsing the proposed maps on your part will compromise the integrity of ethnic black
neighborhoods, weakening their political strength. This is illegal and in direct violation of the
city charter and in actuality violates voting rights legislation. According to Section 18, district
boundaries: "respective district lines shall be the same for the city council and the school
committee. Each such district shall be compact and shall contain, as nearly as may be, an equal
number of inhabitants as determined by the most recent state decennial census, shall be
composed of contiguous existing precincts, and shall be drawn with a view toward preserving the
integrity of existing neighborhoods."

This process will impact the Haitian community of Mattapan and be deeply affected by the
outcome of this legislation for the next 10-20 years. It is for this reason that we ask that you,
Honorable Mayor Michelle Wu, veto this process and conduct hearings that accommodate to the
languages of communities of interests that have been illegally left out of this process. This is a

critical decision for our community as the stakes on the ramifications and implications of this
legislation are too great. Equity matters and so does the equity of geographies and communities.

Respectfully,

James Eliscar
Director of Operations
Sarepta Women and Children Empowerment Center, Inc
100 Morrissey Boulevard
Boston, MA 02125
W : 617-287-7138
C: 857-991-6198
sareptawcec@gmail.com

# **<u>EXHIBIT H</u>**

----- Forwarded Message -----
**From:** Carol Sullivan <carolsullivan1129@yahoo.com>
**To:** mayor@boston.gov <mayor@boston.gov>
**Cc:** Anna White <anna.white@boston.gov>
**Sent:** Tuesday, November 8, 2022 at 06:18:48 AM EST
**Subject:** Redistricting Legislation Email From The Community

Dear Mayor Wu,

The residents of the Mary-Ellen McCormack Community in South Boston
respectfully request that Mayor Wu veto the City Council's Redistricting
legislation that would divide public
housing tenants in South Boston.  We also ask that you send it back with an
amendment to unite Boston's neighborhoods including South Boston's
public housing developments
into District 2 where they had historically been. Dividing our communities
is a violation of our voting rights and cannot stand to pass.

Also please request that the City hold hearings with language access so that
our many residents who speak English as a second language have ample
opportunity to understand
how these plans that will be in place for decades and will impact our
community.

Sincerely,

Carol Sullivan


Thank you,

Carol Sullivan
Executive Director
Mary Ellen McCormack Task Force, Inc.
345 Old Colony Avenue
South Boston, MA  02127



# **EXHIBIT I**



**Office**: 1244 Columbia Road Suite. 797, Boston, MA 02127
**Mail**: 10 Logan Way, Basement Suite 1, Boston, MA 02127
**Rec Space**: 10 Logan Way, Basement Suite 1, Boston, MA 02127

November 1st, 2022

Dear Councilor Liz Breadon,

My name is Mercy Robinson, and I am the executive director of South Boston En Accion. Over the past few weeks, I have been working extensively to ensure that the Spanish-speaking residents of Mary Ellen McCormick, Old Colony, and the West Broadway Developments' questions, concerns, and frustrations are addressed. At the last several meetings that I have participated in person and on zoom, language access has not been a priority. When attempts were made to translate for residents, the interpretations were disrupted. I want to request a redistricting hearing in Spanish formally. We must ensure that everyone has the opportunity to learn about the impacts of redistricting. With elections around the corner, many of our residents don't know what is occurring and are confused about their next steps. Again, I'm afraid I must disagree with the political splitting of the developments. Our community is made up of the most vulnerable residents, and dividing us will create more chaos and harm. Our residents are not satisfied, and there must be better solutions to our population crisis within the districts that do not put our low- and moderate-income communities on the chopping block.

Sincerely,

_____

Mercy Robinson
Executive Director
South Boston En Accion

---

https://www.sbeaccion.org/       Phone: (857) 275-8339       donations@sbeaccion.org

Facebook: @SBEAccion       Instagram: Sbeaccion       Twitter: @AccionSouth

# **<u>EXHIBIT J</u>**

4

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARMTENT
CIVIL ACTION NUMBER:

22-2490H

ROBERT O'SHEA, CHAIRMAN OF )
THE WARD 6 DEMOCRATIC )
COMMITTEE, ET AL, )
    Plaintiffs )
              )
v. )
              )
THE BOSTON CITY COUNCIL )
    Defendant )
              )

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
2022 NOV -2 A II: 17
SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

### **AFFIDAVIT OF ROBERT O'SHEA**

Now comes Robert O'Shea, Chairman of the Boston Ward 6 Democratic Committee and South Boston resident based on personal knowledge do hereby state and affirm that:

1. I am the Chairman of the Boston Ward 6 Democratic Committee in South Boston, Massachusetts.

2. I am a resident of South Boston, Massachusetts.

3. On Oct 10, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

4. On Oct. 18, 2022, four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet and discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

5.  On Oct. 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

6.  The Open Meeting Law Complaint, a copy of which is attached hereto, was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022.

7.  On October 26, 2022, the Boston City Council met for its regularly scheduled meeting.

8.  Due to the Open Meeting Law Complaint noted above, the Boston City Council withdrew its anticipated vote on any proposed Redistricting Maps.

9.  Although there was mention of the October 25, 2022 filed Open Meeting Law Violations, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

10. The Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

11. As of this date, the Boston City Council hasn't responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

12. It's anticipated that other residents of the City of Boston will file new Open Meeting Law Complaints prior to the November 2, 2022 scheduled meeting of the Boston City Council.

13. The Attorney General's Office is in possession of the Open Meeting Law Complaint; they will not address the issue until on or after November 24, 2022.

14. The Boston City Council has indicated that they would be voting on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

2

15. Although the Boston City Council has not responded to the Open Meeting Law Complaint, (Exhibit "A"), the Boston City Council has indicated that they plan to vote on a Redistricting Map at their next scheduled meeting on Wednesday, November 2, 2022.

16. Should the Boston City Council take a vote on the proposed Redistricting Map prior to responding to the Open Meeting Law Complaint, and prior to the Attorney General's Office response to that Complaint, (which is not required until November 24, 2022), the Plaintiffs will be irreparably harmed, as the remedies pursuant to M.G.L.c. 30A section 23(c) and 23(f) will be insufficient to remedy the Plaintiffs claims arising out of the deliberations of the elected officials which took place in violation of the Open Meeting Law in advance of any such vote.

17. The Defendant will not be prejudiced in any way from a delay in the vote as the City is under no express statutory deadline to take a vote on this issue at this time, or prior to November 2nd.

Signed under the pain and penalties of perjury on this 2nd day November 2022.

Robert O'Shea



# OPEN MEETING LAW COMPLAINT FORM
## Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Please note that all fields are required unless otherwise noted.

---

### Your Contact Information:

First Name: Paul

Last Name: Gannon, Esq.

Address: 546 East Broadway

City: South Boston

State: MA

Zip Code: 02127

Phone Number: +1 (617) 269-1993

Ext.

Email: pgannon@paulgannonlaw.com

Organization or Media Affiliation (if any): 1. Boston Ward 6 Democratic Committee (see attached for add'l names)

Are you filing the complaint in your capacity as an individual, representative of an organization, or media?

(For statistical purposes only)

[ ] Individual   [X] Organization   [ ] Media

---

### Public Body that is the subject of this complaint:

[X] City/Town   [ ] County   [ ] Regional/District   [ ] State

Name of Public Body (including city/town, county or region, if applicable): Boston City Council and Boston City Council Committee on Redistricting

Specific person(s), if any, you allege committed the violation: Councilor Elizabeth Breadon (see attached for add'l names)

Date of alleged violation: (see attached)

---

**Organization or Media Affiliation (Continued from pg. 1)**

2.   South Boston Citizens Association;
3.   Martin F. McDonough American Legion Post;
4.   St. Vincent's Lower End Neighborhood Association; and
5.   Old Colony Tenant Association.

**Specific person(s), if any, you allege committed the violation (Continued from pg. 1):**

2.   Councilor Julia Mejia;
3.   Councilor Brian Worrell;
4.   Councilor Ruthzee Louijeune;
5.   Councilor Ricardo Arroyo;
6.   Councilor Erin Murphy;
7.   Councilor Frank Baker;
8.   Councilor Michael Flaherty;
9.   Councilor Edward Flynn; and
10.  Councilor Tania Fernandes Anderson.

**Date of alleged violation (Continued from pg. 1):**

1.   October 10, 2022;
2.   October 18, 2022; and
3.   October 19, 2022.

**Description of alleged violation:**

Describe the alleged violation that this complaint is about. If you believe the alleged violation was intentional, please say so and include the reasons supporting your belief.

Note: This text field has a maximum of 3000 characters.

Oct 10, 2022 - Four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Building Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

Oct. 18, 2022 - Four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet and discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

Oct. 19, 2022 - Four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law.

What action do you want the public body to take in response to your complaint?

Note: This text field has a maximum of 500 characters.

1. The Boston City Council Committee on redistricting shall conduct a minimum of five (5) properly noticed public hearings in neighborhoods impacted by the proposal including South Boston, Dorchester, Mattapan, South End and Roslindale neighborhoods prior to any vote on redistricting in the Boston City Council.

(See attached)

## Review, sign, and submit your complaint

**I. Disclosure of Your Complaint.**
**Public Record.** Under most circumstances, your complaint, and any documents submitted with your complaint, is considered a public record and will be available to any member of the public upon request.

**Publication to Website.** As part of the Open Data Initiative, the AGO will publish to its website certain information regarding your complaint, including your name and the name of the public body. The AGO will not publish your contact information.

**II. Consulting With a Private Attorney.**
The AGO cannot give you legal advice and is not able to be your private attorney, but represents the public interest. If you have any questions concerning your individual legal rights or responsibilities you should contact a private attorney.

**III. Submit Your Complaint to the Public Body.**
The complaint must be filed first with the public body. If you have any questions, please contact the Division of Open Government by calling (617) 963-2540 or by email to openmeeting@state.ma.us.

By signing below, I acknowledge that I have read and understood the provisions above and certify that the information I have provided is true and correct to the best of my knowledge.

Signed: _____     Date: 10/25/22

For Use By Public Body
Date Received by Public Body:

For Use By AGO
Date Received by AGO:

**What action do you want the public body to take in response to your complaint? (Continued from pg. 2)**

2. To require the Boston City Council to vote on the criteria as outlined in the memo from Jeffrey M. Wice, Esq. who was contracted and retained by the City of Boston Corp. Counsel to promulgate criteria for the Boston City Council to utilize in redrawing City Council District maps.

3. To require the Boston City Council to vote on the Boston City Council District redistricting map for the City of Boston in accordance with the criteria noted in paragraph 2 above.

# **<u>EXHIBIT K</u>**



**OPEN MEETING LAW COMPLAINT FORM**
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Please note that all fields are required unless otherwise noted.

**Your Contact Information:**

First Name: John          Last Name: Lyons

Address: 80 Copeland Street

City: Quincy          State: MA          Zip Code: 02169

Phone Number: 617-905-2609          Ext.

Email: jjljdcpa@aol.com

Organization or Media Affiliation (if any): Attorney representing Dorchester Civic Associations

Are you filing the complaint in your capacity as an individual, representative of an organization, or media?

(For statistical purposes only)

☐ Individual          ■ Organization          ☐ Media

---

**Public Body that is the subject of this complaint:**

■ City/Town          ☐ County          ☐ Regional/District          ☐ State

Name of Public Body (including city/town, county or region, if applicable): **Boston City Council**

Specific person(s), if any, you allege committed the violation: Boston City Councilors Ricardo Arroyo, Gabriela Coletta, Tania Fernandes Anderson, Ruthzee Louijeune, Julia Mejia, Liz Breadon, Kenzie Bok, Brian Worrell

Date of alleged violation: 9/27-10/14/22

Page 1

# **EXHIBIT L**

CITY of BOSTON

# Proposed Redistricting Plan submitted by Councilors Breadon and Arroyo (Docket #1275)

Map prepared by the DoIT GIS, October 17th, 2022



# **<u>EXHIBIT M</u>**

# City Council Redistricting - Docket #1351 Councilor Flaherty
# November 2, 2022

Map prepared by the DoIT GIS, November 2, 2022



**OFFERED BY COUNCILOR MICHAEL FLAHERTY, BAKER, FLYNN & MURPHY**



# CITY OF BOSTON
## IN CITY COUNCIL

AN ORDINANCE AMENDING CITY COUNCIL
ELECTORAL DISTRICTS

*Be it ordained by the City Council of Boston, as follows:*

City of Boston Code, Ordinances, Chapter Two be amended by striking 2-9.2 in its entirety and replacing it with the following new language:

The districts redrawn under the authority of Chapter 605 of the Acts of 1982 as amended by Chapter 343 of the Actions of 1986 are hereby redrawn, as follows:

District One - Consisting of precinct numbered one through fourteen of Ward One; precincts one through eight of Ward Two; precincts numbered one through four and precinct eleven of Ward Three.

District Two - Consisting of precinct number fifteen in Ward One; precincts seven, eight, and twelve through sixteen in Ward Three; precinct numbered one in Ward Five; precincts numbered one through twelve in Ward Six; precincts numbered one through seven in Ward Seven; precincts numbered one and six in Ward Eight; and precinct number one in Ward Nine.

District Three - Consisting of precincts numbered eight through ten in Ward Seven; precincts numbered three and five through ten in Ward Thirteen; precincts numbered one through nine in Ward Fifteen; precincts numbered one through twelve in Ward Sixteen; and precincts numbered six and thirteen in Ward Seventeen.

District Four - Consisting of precinct numbered eight in Ward Eleven; precincts numbered one through fourteen in Ward Fourteen; precinct numbered one through five, seven through twelve and fourteen in Ward Seventeen; precincts numbered one through four and twenty-one in Ward Eighteen; and precincts numbered seven and twelve in Ward Nineteen.

District Five - Consisting of precincts numbered nine and ten in Ward Eleven; precincts numbered five through twenty, twenty-one and twenty-two in Ward Eighteen; precincts numbered nine, ten, eleven and thirteen in Ward Nineteen; and precincts numbered one through four, seven through nine, fifteen and twenty-one in Ward Twenty.

District Six - Consisting of precinct number ten in Ward Four; precincts numbered one through nine in Ward Ten; precincts numbered four through seven in Ward Eleven; precincts numbered one through six and eight in Ward Nineteen; precincts numbered five through six, ten through fourteen and sixteen through twenty in Ward Twenty.

District Seven - Consisting of precincts numbered four, eight, nine, and eleven in Ward Four; precincts numbered two through five in Ward Eight; precincts numbered two through seven in Ward Nine; precincts numbered one through three in Ward Eleven; precincts numbered one through nine in Ward Twelve; and precincts numbered one, two and four in Ward Thirteen.

District Eight - Consisting of precincts numbered five, six, nine, ten and seventeen in Ward Three; precincts numbered one through three and five through seven in Ward Four; precincts numbered two through fifteen in Ward Five; and precincts numbered one and two in Ward Twenty-One.

District Nine - Consisting of precincts numbered three through sixteen in Ward Twenty-One; and precincts numbered one through thirteen in Ward Twenty-Two.

**Filed in Council**: October 31, 2022

# **EXHIBIT N**

# Proposed Redistricting Plan submitted by Councilor Baker (Docket #1273)



Current City Council District (2016)

Proposed Redistricting Plan - Councilor Baker

Ward Boundary

Precinct Boundary   with Population

# **<u>EXHIBIT O</u>**



City of Boston
Law

October 11, 2022

Councilor Liz Breadon
Chair, Committee on Redistricting
Boston City Council

Councilor Brian Worrell
Vice-Chair, Committee on Redistricting
Boston City Council

Dear Chair Breadon and Vice-Chair Worrell,

      Attached hereto, please find a short memo setting forth basic principles of the criteria that the City Council should or may consider when redrawing City Council Districts. I am sharing this with the Committee on Redistricting based on a request of the Chair to have a short list of guideposts that the Committee must be cognizant of as it does its work.

      This memo was prepared by Jefferey Wice, Adjunct Professor/Senior Fellow at New York Law School and a specialist in legislative districting.  He is co-editor of the National Conference of State Legislatures 2020 Redistricting Handbook.  Mr. Wice was identified as a resource in consultation with the Chair's office, and my office contracted with Mr. Wice to utilize his expertise in this field.

      In addition to this memorandum, my office will utilize Mr. Wice's expertise to help respond to additional inquiries from the Committee or Council.

Sincerely,

Adam Cederbaum
Corporation Counsel

To:           Adam Cederbaum, Corporation Counsel, City of Boston
From:       Jeffrey M. Wice, Esq., Adjunct Professor/Senior Fellow, New York Law School
Date:        October 9, 2022
Subject:    Key Redistricting Principles for the Boston City Council

Section 18 of the Boston City Charter requires that districts "shall be compact and shall contain, as nearly as may be, an equal number of inhabitants as determined by the most recent state decennial census, shall be composed of contiguous existing precincts, and shall be drawn with a view toward preserving the integrity of existing neighborhoods. [Acts of 1982, c. 605, s. 3] Since Massachusetts no longer conducts a state decennial census, the federal decennial census provides the necessary data for the redrawing of council district boundaries.

This memorandum outlines the criteria that the City Council should consider in the redrawing of council districts.

**<u>REQUIRED CRITERIA:</u>**

1. **Population Equality:** Council districts are required to be equally substantial in population. According to U.S. Supreme Court precedents, there is a 10% limit in the population deviation from the size of the largest to smallest district. Based upon the 2020 Census, this means that the ideal district size is 75,071 residents, allowing for a + or - 5% range. Within those ranges, any deviations from 75,071 should be based upon an effort to achieve the other legitimate governmental criteria outlined below.

2. **Minority Voting Rights:**  the voting rights of minority voters must be respected when developing a new map.  In general, the federal Voting Rights Act of 1965 (VRA) prohibits the imposition of any voting qualification, practice, or procedure that results in the denial or abridgement of any citizen's right to vote on account of race, color, or status as a member of a language minority group. Covered language minorities include American Indians, Asian Americans, Alaskan Natives, and Spanish-heritage populations. Section 2 of the VRA specifically prohibits vote dilution when voters are dispersed ("cracked") among districts making them an ineffective voting block or if they are overly concentrated ("packed") in any one district creating an "excessive" majority.

The VRA requires the creation of an effective minority district where it can be demonstrated that the minority community (1) comprises at least 50% of an ideal, contiguous and reasonably compact district's voting age population; (2) minority voters vote cohesively for the same candidates; and (3) there is a significantly high level of racially polarized voting where the majority votes sufficiently as a bloc to prevent minority voters from electing their preferred candidates of choice.

The 14th Amendment to the U.S. Constitution prevents racial gerrymandering, prohibiting the drawing of maps that excessively segregates voters by race in a district.

1

It is necessary to comply with the 14th amendment and VRA requirements by avoiding discriminatory intent and a discriminatory effect of minimizing or canceling out the voting strength of members of racial or language minority groups in the voting population. Racial voting data analysis may be used to demonstrate that minority votes are not "diluted" and that race is not used as the predominant factor to draw districts (where vote dilution is not at issue). Each district must be evaluated based on local voting patterns and population data.

**Compactness:** districts should have a minimum distance between all parts of a district, subject to addressing other criteria. Several mathematical models have been developed to determine compactness that are used to compare competing plans.

**Contiguity:** all parts of a district should be connected geographically at some point with the rest of the district. In Boston, all districts must include contiguous precincts.

**Preservation of Neighborhoods:** Consideration must be given to drawing districts that respect the boundaries of Boston's recognized neighborhoods.

## <u>OTHER NON-REQUIRED CRITERIA:</u>

These criteria can be considered but are not required by federal or local law:

**Communities of Interest:** these districts include geographical areas where residents have common demographic interests that can include socio-economic, religious, academic, business, medical, or other recognizable characteristics. Communities of interest might not follow political subdivision boundaries. Boston's City Charter prioritizes neighborhoods as required criteria, making other "communities of interest" a lesser priority in the redistricting process.

**Ban on Partisanship:** not favoring or disfavoring political parties, candidates, or incumbents.

**Maintaining Existing District Boundaries:** using current district boundaries as a determinant for making the least changes necessary.

---------- Forwarded message ---------
From: **Wice, Jeffrey** <jeffrey.wice@nyls.edu>
Date: Tue, Oct 25, 2022 at 12:53 PM
Subject: Question from Council Member Flynn re: Boston City Council Redistricting
To: Adam Cederbaum <adam.cederbaum@boston.gov>, Pilar Ortiz <pilar.ortiz@boston.gov>, Lisa Handley <lrhandley@aol.com>

Council Member Flynn sent me a direct email asking for my opinion on whether there is a VRA violation in the current district 4. Lisa responded to this question during today's meeting indicating that there was not an issue in the current district. He asked for a response by the end of the day.

Unless you would want to answer directly (since I am working for you), I can answer as follows:

Dear Councilor:

Thank you for your letter asking about whether the current Council District 4 violates the federal Voting Rights Act. To the best of my knowledge, as Dr. Handley informed the Council this morning, there is currently no risk of a Voting Rights Act violation under the current Council map enacted in 2012.

My best,
Jeff Wice

# **EXHIBIT P**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    SUPERIOR COURT DEPARMTENT
                                               CIVIL ACTION NUMBER: 2284CV02490

ROBERT O'SHEA, Individually and as Chairman
of the Ward 6 Democratic Committee, RITA
DIXON, SHIRLEY SHILLINGFORD, MAUREEN
FEENEY, PHYLLIS CORBITT, Individually and as
President of the Massachusetts Union of Public
Housing Tenants, THE SOUTH BOSTON
CITIZENS ASSOCIATION, MARTIN F.
MCDONOUGH AMERICAN LEGION POST, ST.
VINCENT'S LOWER END NEIGHBORHOOD
ASSOCIATION, and OLD COLONY TENANT
ASSOCIATION,

                Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

                Defendant.

## AFFIDAVIT OF EDWARD FLYNN

I, Edward Flynn, under oath, do depose and say as follows:

1.      My name is Edward Flynn, and I am the President of the Boston City Council and a

resident of South Boston.

2.      The City Council redistricting process was flawed and unfair to the most vulnerable

residents of the City, particularly public housing residents, immigrants, and language minorities.

3.      The City Council did not engage residents in an effective way, and failed to listen to or

engage residents in public housing developments, immigrants, and language minorities.

4.      Communities of color had almost no involvement in the City Council's secretive

process.

5. Throughout the redistricting debate, I repeatedly informed my colleagues on the council that one of my most important goals was to ensure public housing residents were united in District 2.

6. Keeping the public housing residents united was and is an important goal because being united in one district allows public housing residents' collective voice to be heard in government.

7. In District 2, residents at the Anne Lynch Homes at Old Colony, the West 9th Apartments, and the West Broadway Development are all a short walk from each other and have much in common.

8. However, under the approved redistricting plan, these public housing developments would move from District 2 to District 3.

9. Under the previous version of the Breadon-Arroyo Map, the plan was to divide public housing developments in half, both at the Anne M. Lynch Homes (al The previous version of the Breadon-Arroyo map proposed to divide public housing developments in half - both at the Anne M. Lynch Homes (along Mercer St.) and the West Broadway Development (along Orton Marotta Way) into District 2 and District 3.

10. At that time, public housing advocates like South Boston En Accion, BHA Task Force leaders, nonprofit partners, and all civic groups in South Boston voiced complete opposition to a proposal that would divide our public housing developments from District 2, and dilute the voice of communities of color to organize and advocate for their interests.

11. The approved map still divides public housing in South Boston. The version of the map made available to the Councilors only two days before the November 2nd vote completely cut out these developments from District 2, the Council district where these developments have traditionally been located.

12. And in the last hours before the vote, West Broadway was added into District 2, still dividing public housing developments into two districts.

2

13.     It is critical residents of color in Boston Housing Authority units are not further divided from the community of South Boston.

14.     These public housing developments, managed by the Boston Housing Authority, are mostly made up of communities of color and immigrants.

15.     During the pandemic, my staff and I worked closely with neighbors in District 2's public housing developments on language and communication access, senior outreach, food access, access to COVID-19 testing, providing information on vaccines, support for immigrant families, social services, youth, educational and athletic programs.

16.     Placing these residents out of District 2 punishes these public housing residents and dilutes their organizing power.

17.     Language and communication access are critical issues that unite residents in public housing developments.

18.     In District 2, many residents in public housing speak Spanish and an increasing number also speak Cantonese.

19.     Both of these languages directly unite the history and residents of District 2, with a large Cantonese speaking community in Chinatown, the South End and Bay Village.

20.     The larger Spanish speaking community in the South End, such as Cathedral Public Housing and Villa Victoria, also have much in common with the public housing residents in South Boston that also speak Spanish.

21.     However, the City Council, with its approved map, failed to engage these residents in the redistricting process.

22.     It is unconscionable to separate these public housing developments from District 2, the Council district where these developments have traditionally been located.

3

23.     These actions are wholly contrary to the redistricting principles that we discussed at length with experts and academics when it comes to the preservation of the core of prior districts and maintaining communities of interest.

24.     Our public housing developments have a large number of Hispanic and Black residents, and they contribute greatly to the diversity of South Boston and District 2.

25.     These developments have always been in District 2, and they identify with the neighborhood of South Boston.

26.     Removing them completely, and separating them from the rest of South Boston, makes District 2 less diverse.

27.     The Redistricting Committee ignored the requests from community groups to hold additional meetings in Cantonese, Spanish, Vietnamese, and Hatian Creole, and went ahead with a vote on November 2nd.

28.     The deadline of having a map in place by November 7th was an artificial and self-imposed one.

29.     According to the City of Boston Corporation Counsel, the only explicit statutory deadline set forth in the Boston City Charter is that City Council districts be redrawn by August 1, 2026.

30.     Moreover, the Council did not know what the exact map was when there were plans to vote on October 26, 2022 and they still did not know the exact map until a few hours before the vote on November 2, 2022.

31.     Both the public and Councilors voting on the maps had not been afforded an opportunity to view or offer feedback in a public hearing on a final map, and there were also no further meetings, hearings, or working sessions after October 25th.

32.     The Council and the public did not have the opportunity to discuss the latest version of the Breadon-Arroyo map, and nobody knew what were the amendments that made it into this version that the Council was supposed to vote on.

33.     Councilors also did not have the chance to have their constituents have further input.

34.     District 2 and District 3 had the most stake in this redistricting process and, yet, the final map had not taken into serious consideration the voices of the communities in these districts.

35.     Despite the insistence that this would strengthen these districts, there is no doubt that these districts will suffer from losing some core communities that are not preserved from prior districts, as well as not maintaining communities of interest.

36.     More time was spent by the Council with the advocates of the so-called UNITY map, some of whom may not live in the City of Boston, than listening to the voices of the communities that will bear the brunt of the irreparable harm that this redistricting will cause.

37.     I tried to offer support for the recommended criteria to be formally considered and adopted by our body.

38.     I also argued that already established communities of interest, such as public housing residents, should be respected, united and factored in.

39.     My request was denied, as was my request to hold off on a vote and to seek more community meetings in various languages.

40.     The process lacked transparency and it was completely flawed.

41.     We failed as a collective body to respect the most impacted by our decision, residents living in public housing and our immigrant neighbors.

42.     We failed as a city to include the voices and opinions of communities of color, immigrants and public housing residents during the redistricting debate.

43.     The current map that was approved, and the process that led to it, has not done right by the neighbors living in my district in public housing in South Boston, and the rushed process was not done right for the residents across the City of Boston.

Signed under the pains and penalties of perjury this <u>18th</u> day of November, 2022.


_____
Edward Flynn

# **<u>EXHIBIT Q</u>**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARMTENT
CIVIL ACTION NUMBER: 2284CV02490

ROBERT O'SHEA, Individually and as Chairman
of the Ward 6 Democratic Committee, RITA
DIXON, SHIRLEY SHILLINGFORD, MAUREEN
FEENEY, PHYLLIS CORBITT, Individually and as
President of the Massachusetts Union of Public
Housing Tenants, THE SOUTH BOSTON
CITIZENS ASSOCIATION, MARTIN F.
MCDONOUGH AMERICAN LEGION POST, ST.
VINCENT'S LOWER END NEIGHBORHOOD
ASSOCIATION, and OLD COLONY TENANT
ASSOCIATION,

        Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

        Defendant.

## AFFIDAVIT OF FRANK BAKER

I, Frank Baker, under oath, do depose and say as follows:

1.     My name is Frank Baker, and I am the Boston City Councilor for District Three and a resident of Dorchester.

2.     The redistricting map the Boston City Council approved on November 2, 2022, and the actions taken by my colleagues on the City Council indicates that the goal of the redistricting map is to split up the southeastern part of District Three, though there was no Voting Rights Act violation to remedy under the District Council maps approved in 2012.

3.     For Councilors to state empathically - prior to a proper and thorough review of each map filed, that certain recommendations were a "non-starter" for initial discussions to take place, is not

only unjust to each author, but also the respective district. Equally alarming is the fact that the Southeastern part of Dorchester was not granted the same protection as every other Community of Interest.

4.      The City Council redistricting process was disingenuous, lacked accessibility, disregarded standard redistricting criteria all in an effort to dilute the vote of communities who have been organized around common public interests, working together for Generations.

5.      District Three has historically contained a cohesive network of neighborhood civic organizations who unite in support of their common interests in areas such as public safety, education, economic development, green space preservation and resiliency, transportation, as well as other quality of life issues that stitch together the cohesive neighborhoods of Neponset and Cedar Grove.

6.      The jurisdictional boundaries of our civic groups like many of Dorchester's neighborhoods and villages also coincide with our parish boundaries, which have also served as historic district boundaries on the southwestern border of District 3 since its formation.

7.      The neighborhoods of Dorchester from St. Margaret's to St. Gregory's Church, including all of the villages in between, come together as a diverse community through youth sports programs, art, dance, and theater groups, senior housing and services as well as other social and cultural activities and engagements like the Dorchester Day Parade.

8.      As the District Three City Councilor, it is my duty to represent my constituents who have sent me to the Boston City Council to advocate for and preserve this intersectional community and declare a violation of their voting rights in Docket #1275's redistricting map.

9.      There is an extraordinary disruption of District Three, by removing the core of its district from its historical home – without cause or necessity.

10.     This District has been historically integrated through its diverse transportation network including home to the MBTA's Redline from JFK to Cedar Grove station.

11.    The District's neighborhood civic groups built an environmental coalition of residents to come together in support of the creation of the Neponset River Greenway that stretches from Cedar Grove Cemetery to Neponset Park to Pope John Paul II Park to Hon. Joseph Finnegan Park to Tenean Beach and soon to Victory Park and Dorchester Bay-constituting Old Harbor, Dorchester Shores, and Neponset River Reservations- connecting the greenway to Boston's Harborwalk along the waterfront. The success of the aforementioned efforts, was realized as a direct result of the neighborhood civic group's decades long advocacy, holding their local, state and federal representatives accountable to the response culminating in the historic cleanup of Boston Harbor as well as the creation of the Boston Harborwalk and the Neponset River Greenway network.

12.    Under Docket #1275 there are no clear boundaries for District Three, unlike previous redistricting years (1983, 1993, 2003, 2013) Dorchester Avenue and the Neponset River are not just boundaries, but also are common interests on important issues facing the City of Boston including transportation, business, and environment concerns including coastal flooding.

13.    These two boundaries give District Three common interests from South to North.

14.    I believe the purpose of redistricting should be more than just balancing populations.

15.    Each City Council district should have its own unique objective.

16.    The proposed map that I offered, Docket #1273, along with Docket #1351 offered by Councilor Flaherty and Docket # 1215 offered by Councilor Murphy, and myself all provide a means by which population can be equalized with minimal impact to cohesive communities of interest.

17.    The proposed map not only pulls apart District Three, but also causes significant harm to other communities, including South Boston whose public housing communities get divided as well as the Mattapan neighborhood, which gets split in half at the far edges of District Four and Five, diluting the voice of African American voters and language minorities, violations of the Voting Rights Act, the United States and Massachusetts Constitutions, and Massachusetts General Laws.

3

18.     There is no evidence of "packing" in District Four, as confirmed by the City of Boston's outside Redistricting counsel, Professor Jeffrey Wice, Esq. of the New York Law School on Tuesday October 25, 2022.

19.     Based on the precinct level election data analysis of my competitive elections in 2015 and 2021 as well as the most recent statewide 2022 general elections, no racial polarization exists in District Three.

20.     No significant government purpose exists requiring a remedy that includes dividing historically aligned communities and therefore this map must be overturned by the Court in favor of a redistricting map that follows local, state, and federal laws as well standard redistricting criteria.

Signed under the pains and penalties of perjury this _18th_ day of November 2022.

_Frank Baker_
Frank Baker

4

# **EXHIBIT R**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NUMBER: 2284CV02490

---

ROBERT O'SHEA, Individually and as Chairman of
the Ward 6 Democratic Committee, RITA DIXON,
SHIRLEY SHILLINGFORD, MAUREEN FEENEY,
PHYLLIS CORBITT, Individually and as President
of the Massachusetts Union of Public Housing
Tenants, THE SOUTH BOSTON CITIZENS
ASSOCIATION, MARTIN F. MCDONOUGH
AMERICAN LEGION POST, ST. VINCENT'S
LOWER END NEIGHBORHOOD ASSOCIATION,
and OLD COLONY TENANT ASSOCIATION,

Plaintiffs,

v.

THE BOSTON CITY COUNCIL,

Defendant.

## AFFIDAVIT OF ERIN MURPHY

I, Erin Murphy, under oath, do depose and say as follows:

1.     My name is Erin Murphy, and I am an at-large Boston City Councilor and a resident of Boston.

2.     The map the Boston City Council approved on November 2, 2022, is based on race in violation of the Voting Rights Act ("VRA") and the Fourteenth Amendment.

3.     The approved map does not focus on creating voting opportunity neighborhoods for particular minority groups but instead focuses on the non-white populations as if they were a homogeneous group in each City Council District in violation of the VRA and the 14th Amendment.

4.     The approved map focuses on City Council District 3 as being "too white" in violation of the VRA and the 14th Amendment.

5.     The approved map does not distinguish between different minority groups but adds all minority group's total populations without regard for the vast differences in background, language, history, voting strengths, political goals, etc., in order to achieve "racial balance" in violation of the VRA and the 14th Amendment.

6.     The approved map dismantles the compact City Council District 3 boundary along Dorchester Ave, a straight, natural, dividing boundary, and substitutes a gerrymandered, wandering boundary in order to achieve "racial balancing" in violation of the VRA and the 14th Amendment.

7.     The approved map is designed to diminish the voting power of white voters in City Council District 3 whose rights are sacred under the VRA and the 14th Amendment.

2

8.      The approved map destroys the Cedar Grove neighborhood ignoring the requirement to preserve existing communities of related and mutual interest.  The Cedar Grove neighborhood hugs the Neponset River on the south and encompasses Cedar Grove Cemetery and Dorchester Park both dating back to the 1800's

9.      The approved map does this in order to achieve "racial balancing" in violation of the VRA and the 14th Amendment.

10.     Because race is considered a "suspect class" by the courts in 14th amendment Equal Protection cases, redistricting maps cannot be drawn primarily on the basis of race.

11.     The stated goal of the approved map is to make District 4 less black and District 3 less white.

12.     Councilor Breadon expressed fear that the majority black population of District 4 could invite accusations of "packing" which is the term used to describe the practice of drawing district lines so that minority voters are compressed into a small number of districts when they could effectively control more.

13.     Using this reasoning, the approved map swaps majority black precincts in District 4 with majority white precincts in District 3 in order to make District 4 less black and District 3 less white.

14.     District 3, under the existing plan before redistricting, does not have a majority race, and there is no evidence whatsoever that the widely diverse groups of American blacks, Vietnamese, Cape Verdean, Haitian and Dominican people in District 3, that is the non-white people, are a cohesive minority and they are surely not a single minority.

3

15.     However, the precincts that comprise the Cedar Grove neighborhood are majority white neighborhoods.

16.     Using a "racial balancing" criteria, the approved map carves these precincts out of District 3 purely on the basis of race, in violation of the VRA and the 14th Amendment.

17.     This is an example of "cracking" which is the practice of drawing District boundaries that split or fracture voting groups to diminish their ability to elect officials that represent their interests.

18.     District 3, under the existing plan before redistricting and termed "too white" by the Council, has a history of electing black officials. Linda Dorcena Forrey was elected as the State Representative in 2004 and reelected until 2012 when she was elected as State Senator. That Senate District, Suffolk District 1, overlays City Council District 3 almost entirely. She was reelected until 2018 when she retired from politics.

19.     The specific precincts that the approved map carves out of District 3 voted overwhelmingly in the 2022 primary and final for Attorney General candidate Andrea Campbell, a black woman.

20.     Also, District 4's black majority (also attacked and diluted by the approved map) has created a significant political power base for the black community resulting in electing black councilors for over four decades along with a U.S Representative, State Senators and State Representatives.

21.     Councilor Breadon, an author of the approved map, celebrated accomplishing the goal of transforming District 3 into a majority minority district at a City Council meeting, a goal

4

achieved by making District 3 less white.  Councilor Arroyo, co-author of the approved plan, was quoted as saying that District 3 was "too white."

22.     The approved map achieves this unconstitutional "racial balancing" by pretending that all non-white citizens of Boston belong to a homogeneous group that has one set of political goals and is opposed to all of their white neighbors, their views, and their political goals.

23.     This type of belief divides the people of Boston and flames the hatred of those who believe that there is such a thing as a better race of people.

24.     The goal of the VRA is to create opportunities for people who have been discriminated against by deliberate governmental policies so they can build communities and neighborhoods where they can accumulate sufficient numbers to have their voices heard in the political process. The Voting Rights Act protects people from the very goals of the approved map.

25.     The Little Saigon neighborhood is a vital part of District 3 that spans Dorchester Avenue in the Fields Corner neighborhood of Dorchester. It is a vibrant area and is home to 75% of Vietnamese Americans in the city of Boston.  These neighbors are mostly first and second-generation immigrants from a country in south East Asia, with a rich culture, extremely strong family and religious values, and a deep commitment to education.  This is a classic example of a neighborhood that the VRA intends to gather as a minority opportunity neighborhood.

26.     The first black community of Dorchester came almost exclusively from the southern states fleeing discrimination and poverty in the 1960's.  These were the descendants of slaves and came north for work and to escape Jim Crow laws.  In 1965 a new wave of blacks arrived in Dorchester: Haitians, Cape Verdeans, West Indians and Dominicans.  Although they

5

shared a skin color with the recently settled Southern blacks, in all other respects they were a widely diverse group with little in common: an eclectic mix of languages, religions, native countries, education levels, goals and aspirations.

27.    The approved map lumps all of these divergent people; Vietnamese, American blacks, Haitians, Cape Verdeans, West Indians and Dominicans; into one category calling them people of color, or minority.  The accurate descriptor in the approved map is non-white.

28.    The approved map divides District 3 into two groups: white and non-white, ignoring the immense differences in each of the categories.  There is no cohesive history, ethnicity, religion, language, or culture that binds them into a recognizable group with a compact and united neighborhood that should create an opportunity neighborhood.

29.    The goal of equal population distribution across districts could have been achieved without damaging the existing neighborhood in Districts 2, 3, and 4, and without an improper focus on "racial balancing" as the driving force behind redistricting.

30.    The proposed maps provided by myself, as well as Councilors Flynn, Baker, and Flaherty all achieve the goals of redistricting with minimal impact to neighborhood cohesiveness and without an improper focus on race.

Signed under the pains and penalties of perjury this ___ day of November, 2022.

_____
Erin Murphy

# **EXHIBIT S**

STEPHEN F. LYNCH
8TH DISTRICT, MASSACHUSETTS

COMMITTEE ON FINANCIAL SERVICES

COMMITTEE ON OVERSIGHT
AND REFORM
CHAIRMAN, SUBCOMMITTEE ON NATIONAL SECURITY

COMMITTEE ON TRANSPORTATION
AND INFRASTRUCTURE

ASSISTANT DEMOCRATIC WHIP

# Congress of the United States
# House of Representatives
# Washington, DC 20515-2108

2108 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
202-225-8273
202-225-3984 FAX

ONE HARBOR STREET
SUITE 101
BOSTON, MA 02210
617-428-2000
617-428-2011 FAX

37 BELMONT STREET
SUITE 3
BROCKTON, MA 02301
508-586-5555
508-580-4892 FAX

1245 HANCOCK STREET
SUITE 43
QUINCY, MA 02169
617-657-6305
617-773-0995 FAX

LYNCH.HOUSE.GOV

November 8, 2022

The Honorable Anthony M. Campo, Jr.
Justice
Suffolk County Superior Court
3 Pemberton Square
Boston, MA 02108

Re: Civil Case No. 2284CV2490 H

Dear Justice Campo:

As Representative of the 8th Congressional District of Massachusetts, I am writing in strong opposition to the Proposed Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022.

The U.S. Supreme Court has articulated several fundamental principles that guide its determination as to whether a particular local, state, or federal redistricting proposal is compliant with the U.S. Constitution and federal voting rights law. As set forth in *Shaw v. Reno*, *Miller v. Johnson*, *Bush v. Vera*, *Johnson v. De Grandy*, and other cases, "traditional districting principles" include a respect for the preservation of communities of common interest, political subdivisions, and the cores of existing districts as well as an adherence to geographic compactness and continuity.[1] These principles have been codified at the state level – with MASS. GEN. LAWS Ch. 43, §131 providing that city districts "shall be compact ... shall be composed of contiguous existing precincts and shall be drawn with a view toward preserving the integrity of existing neighborhoods." They are also reflected in the criteria issued by the Boston City Council Committee on Redistricting at the outset of its mapping work; importantly, the Committee stipulated that it would prioritize the "preservation of neighborhoods and communities" to ensure the fairness of the redistricting process.[2]

In its redistricting jurisprudence, the Court has particularly underscored the importance of preserving communities or neighborhoods of common interest. As stated in *Miller*, *supra*, a community of common interest is defined as a group of individuals with "actual shared interests" – including collective political, social, cultural, and economic interests. In *Lawyer v. Department of Justice*, the Court elaborated that a community of common interest can comprise

---

[1] 509 U.S. 630 (1993); 515 U.S. 900 (1995); 517 U.S. 952 (1996); 512 U.S. 997 (1994)
[2] "2022 Redistricting in Boston." Boston.gov, 24 Mar. 2022, https://www.boston.gov/departments/city-council/2022-redistricting-boston.

1

a predominantly urban, low-income population whose members "share a similarly depressed economic condition and interests that reflect it" and even "regard themselves as a community."[3] As reiterated by the Court in *League of United Latin American Citizens v. Perry*, shared interests among a community can include socioeconomic status, education, employment, health, and other related characteristics.[4]

In addition to its core redistricting principles, the Court has also repeatedly referenced and addressed the critical protections included in Section 2 of the landmark *Voting Rights Act of 1965* – prohibiting discrimination in any electoral standard, practice, or procedure on the basis of race, color, or membership in a language minority group. In particular, the Court explained in *Thornburg v. Gingles* that prohibited vote dilution, as conceived by the *Voting Rights Act*, relates to the "loss of political power" by a minority voting bloc that is politically cohesive and geographically compact and whose members have disproportionately borne the effects of discrimination in education, employment, health, and other areas.[5] The Department of Justice references this judicial precedent and the detrimental impact of vote dilution in its 2021 guidance for redistricting authorities – highlighting that Section 2 of the *Voting Rights Act* "prohibits, among other things, any electoral practice or procedure that minimizes or cancels out the voting strength of members of racial or language minority groups in the voting population."[6]

Regrettably, the Proposed Redistricting Plan at issue stands in stark contrast to fundamental redistricting principles and Supreme Court precedent. In my own congressional district, the City Council proposal will arbitrarily and recklessly divide longstanding and close-knit public housing developments – including the Anne M. Lynch Holmes at Old Colony and West Broadway Development – among multiple city districts. These public housing communities are classic communities of interest in the legal sense as they predominantly consist of non-English-speaking, low-income families of color who are kindred in socioeconomic status, education, employment, and their common identity as recently arrived immigrants. In addition to living in the same public housing developments, these families also share common landlords, property managers, rents, and utilities and are largely united as a community in their priorities and grievances. Clearly, these public housing communities are communities of common interest whose abrupt division into multiple city districts will unfairly and irreparably dilute their voting power and encumber them with unfamiliar and disparate political representation.

To divide these communities is also inconsistent with the Redistricting Committee's own stated principles that it would prioritize the "preservation of neighborhoods and communities" to ensure the fairness of the redistricting process. The Proposed Redistricting Plan should be adjusted to preserve, rather than capriciously partition, the communities of interest in their traditional districts. Such modification would ensure the degree of fairness in the redistricting process that the voters deserve. The failure to safeguard these communities against division not only neglects to preserve the cores of the preexisting districts but could very well have the

---

[3] 521 U.S. 567 (1997)
[4] 548 U.S. 399 (2006)
[5] 478 U.S. 30 (1986)
[6] "Guidance under Section 2 of the Voting Rights Act, 52 U.S.C. 10301, for ..." Justice.gov, U.S. Department of Justice, 1 Sept. 2021, https://www.justice.gov/opa/press-release/file/1429486/download.

potential to weaken the voting strength of these politically cohesive and like-minded voters in future City Council elections.

Thank you in advance for your consideration.  If you have any questions regarding this letter, please feel free to contact me directly.

Sincerely,

STEPHEN F. LYNCH
Member of Congress (MA-08)