**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ROBERT O'SHEA, individually and as
Chairman of the Ward 6 Democratic
Committee, et al.,

      Plaintiffs,

      v.

THE BOSTON CITY COUNCIL,

      Defendant.

C.A. No.: 1:22-cv-12048-PBS

**Leave to file granted on February 16, 2023**

**BRIEF OF *AMICI CURIAE* THE NAACP BOSTON BRANCH,
MASSVOTE, MASSACHUSETTS VOTER TABLE, LA COLABORATIVA,
CHINESE PROGRESSIVE ASSOCIATION, MASSACHUSETTS IMMIGRANT
& REFUGEE ADVOCACY COALITION, AND NEW ENGLAND UNITED FOR
JUSTICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

The NAACP Boston Branch, MassVOTE, the Massachusetts Voter Table, La
Colaborativa, the Chinese Progressive Association, the Massachusetts Immigrant & Refugee
Advocacy ("MIRA") Coalition, and New England United for Justice file this brief as *amici curiae.*

*Amici* are civil rights organizations with a shared interest in ensuring equal voting
opportunity for all Boston citizens. *Amici* urge this Court to deny Plaintiffs' request for a
preliminary injunction. Despite their sweeping claims to the contrary, Plaintiffs neither represent
the collective viewpoint of Boston's minority communities, nor have Plaintiffs' come anywhere
close to demonstrating a likely violation of the Voting Rights Act or the Equal Protection Clause.

<u>**STATEMENT OF IDENTITY AND INTEREST**</u>

*Amici* are civil rights organizations that advocate for the advancement of interests of people
of color, immigrants, language minorities, and working-class individuals:

- The NAACP Boston Branch, the first chapter of the oldest and largest civil rights organization in the country, advocates to secure the political, educational, social, and economic equality and rights of all persons and to eliminate racial hatred and racial discrimination.

- MassVOTE seeks to increase voter registration, education, and participation in historically underrepresented communities across Massachusetts, with a particular focus on those in Boston, to promote social, economic, and racial justice.

- The Massachusetts Voter Table promotes civic access, engagement, and representation to increase resources and power for people of color and working-class people with the goal achieving a multiracial democracy.  The organization strives to combat the kinds of racial injustice and economic inequality that undermine democracy in Massachusetts.

- La Colaborativa delivers an array of programs, initiatives, and community organizing campaigns throughout Massachusetts that serve, protect, celebrate, and uplift Latinx immigrants.

- The Chinese Progressive Association strives to achieve full equality and empowerment of the Chinese community in the Greater Boston area and beyond.

- The MIRA Coalition's mission is to convene, serve, and organize, together with its members, community leaders, and allies, for the advancement of all immigrants across Massachusetts and beyond.  The MIRA Coalition places immigrant and refugee voices at the forefront to advocate for the well-being of our communities.

- New England United for Justice organizes to promote social, economic, and racial justice in the Greater Boston Region.  The group engages and empowers Boston families to improve worker's rights, childcare and housing access, and voter protections.

In furtherance of their shared goals, *amici* were among the many organizations and individuals that provided feedback and input to the Boston City Council during the subject

redistricting process.  Although they did not secure all of their objectives as part of that process, *amici* support the redistricting map that the Boston City Council enacted and that Boston Mayor Michelle Wu signed into law on November 7, 2022 (the "map").  Plaintiffs seek the extraordinary relief of an injunction to halt the City's implementation of the map, incorrectly asserting that such implementation would contravene the Voting Rights Act ("VRA") and Equal Protection Clause. *Amici*, which exist to advance the interests that the VRA and Equal Protection Clause were designed to protect, could not disagree more.  *Amici* share the City's position that an injunction is not supported by law and would be contrary to the public interest.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy … that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (cleaned up).  To determine whether a party is entitled to such relief, the courts in this Circuit weigh the following four factors:[1]

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Wine & Spirits Retailers, Inc. v. R.I.,* 418 F. 3d 36, 46 (1st Cir. 2005) (cleaned up).  Factors three and four "'merge when the Government is the opposing party.'"  *Mass. Fair Hous. Ctr. V. U.S. Dept. of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The moving party carries the burden to show that these four factors

---

[1] In their Motion for a Preliminary Injunction filed in this Court, Plaintiffs cite to the Massachusetts preliminary injunction test.  *See* Pls.' Mot., ECF No. 21, at 2.  Although this test is similar to the federal preliminary injunction standard, because Defendants removed the matter to this Court based on federal question jurisdiction, the federal standard applies.  *See United States v. Mass. Gen. Hosp., Inc.,* 498 F. Supp. 3d 186, 189-90 (D. Mass. 2020) (stating that when a case presents a federal question, the federal common law applies to both federal and state law claims).

favor them, *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir 2006), with the likelihood of success on the merits "weigh[ing] most heavily." *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).  If the movant fails to establish a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." *Id.* (cleaned up).

## SUMMARY OF ARGUMENT

Plaintiffs assert claims pursuant to the Massachusetts Open Meeting Law, Mass Gen. Laws ch. 30A, §§ 18-25 (Am. Compl. ¶¶ 151-154), Section 2 of the VRA, 52 U.S.C. § 10301 (*id.* ¶¶ 155-165), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (*id.* ¶¶ 166-176).  Because ensuring equal voting opportunity for Boston citizens is the primary thread that unites *amici*, this brief focuses on Plaintiffs' flawed VRA and Equal Protection Clause claims.  The Court should deny Plaintiffs' request for preliminary injunctive relief as to those claims because (1) Plaintiffs' evidence is woefully inadequate to establish a likelihood of success on the merits, and (2) granting such relief is not in the public interest.

First, Plaintiffs make no attempt to establish the requisite elements of a VRA claim, even affirmatively stating that the threshold condition of racial polarization is absent.  Second, Plaintiffs fail to proffer the requisite evidence in support their Equal Protection Clause claim.  Their speculative and conclusory assertions fall well short of the showing necessary to invalidate a duly-enacted redistricting map.  Finally, as their thin record demonstrates, Plaintiffs are merely attempting to supplant the democratic process and impose their desired policy outcome on the public.  Such a result would contravene the public interest by, among other things, discounting the diverse voices—including those of *amici* and many others—who availed themselves of that process.  Although Plaintiffs opine that the redistricting process silenced Boston's racial and language minorities, the reality is that Plaintiffs' requested relief would actually do so.

4

**ARGUMENT**

I.   **PLAINTIFFS HAVE FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS**

   A.   **Plaintiffs' Evidence Is Insufficient to Sustain a Voting Rights Act Claim**

   Plaintiffs' Motion for a Preliminary Injunction asserts that the map enacted by the City Council dilutes Black voting power in violation of Section 2 of the VRA.  *See* Pls.' Mot., ECF No. 21, at 4.  As Plaintiffs acknowledge, the Supreme Court's decision in *Thornburg v. Gingles* sets forth the standard for a Section 2 vote dilution claim.  *See id.* (citing 478 U.S. 30 (1986)).  To succeed on such a claim, Plaintiffs must first establish three threshold conditions, namely:

> (1) that they are a part of a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the plaintiff minority group is "politically cohesive"; and (3) that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Meza v. Galvin,* 322 F. Supp. 2d 52, 57 (D. Mass. 2004) (quoting *Gingles,* 478 U.S. at 50-51).  Plaintiffs, however, make no effort to establish the *Gingles* preconditions.[2]

   1.   Plaintiffs have failed to establish they are advocating for a minority group

   As an initial matter, Plaintiffs have failed to provide any evidence that they are part of a minority group, let alone one that is sufficiently large and compact to constitute a majority in a single member district.  The Amended Complaint contains only muddled allegations about race – seemingly advancing the interests of white voters at times (*see* Am. Compl. ¶¶ 128, 130, 160, 164) and Black voters at others (*see* Am. Compl. ¶¶ 117, 130, 138, 160), without ever stating who those voters are.  Additionally, neither the Amended Complaint nor the Preliminary Injunction Motion

---

[2] Notably, even showing these three preconditions is insufficient to prevail in a vote dilution case. Plaintiffs must go on to show that under the totality of circumstances, they are denied equal voting opportunity.  *See Vecinos De Barrio Uno v. City of Holyoke,* 72 F.3d 973, 983 (1st Cir. 1995).

offers anything more than conclusory statements about the size, *see* Am. Compl. ¶¶ 121, 138, or compactness of Boston's Black population, Pls.' Mot. at 4. Plaintiffs cannot carry their burden based on such unsupported conclusions. *See Huot v. City of Lowell*, 280 F. Supp. 3d 228, 236 (D. Mass. 2017) (stating that "[m]ere recitation" of a *Gingles* precondition is insufficient to adequately plead a Section 2 claim") (cleaned up); *see also* Meza, 322 F. Supp. 2d at 59 (discussing evidence relevant to first *Gingles* factor and stating that "citizenship voting age population data, where readily available, should be used in the *Gingles* analysis").

2. <u>Plaintiffs' proffer fails to satisfy the second and third *Gingles* preconditions and instead establishes that they cannot satisfy them</u>

The second and third *Gingles* preconditions measure minority voting power against the strength of the relevant majority bloc. As those factors are interrelated, courts often consider them together, *see Meza*, 322 F. Supp. 2d at 64, under the umbrella term "racially polarized voting." And because they involve the analysis of voting patterns of minority voters in comparison to those of majority bloc voters, "plaintiffs typically offer statistical evidence detailing the voting patterns of racial groups in past elections." *Black Political Task Force,* 300 F. Supp. 2d at 303; *see Growe v. Emison,* 507 U.S. 25, 26 (1993) (reversing finding of a VRA Section 2 violation where the record contained "no statistical evidence" supporting that outcome); *Vecinos de Barrio Uno v. City of Holyoke,* 72 F.3d 973, 985 (1st Cir. 1994) (ruling that "[i]n order reliably to tell whether racial groups do (or do not) band together behind particular candidates with regularity, all elections in the relevant time frame (or, at least, a representative sampling of them) must be studied").

Here, Plaintiffs have presented no statistical evidence in support of their VRA claim. Rather, Plaintiffs rely heavily—and ineffectually—on affidavits submitted by Ward 6 Democratic Party Chair O'Shea, City Council President Flynn, Councilor Frank Baker, and Councilor Erin Murphy, attached to the Amended Complaint as Exhibits J, P, Q, and R, respectively. Some of

6

those affidavits state in conclusory fashion that the map would dilute minority power, but none even feign to undertake the type of rigorous electoral analysis needed to demonstrate that racial polarization in the relevant districts frequently operates to defeat the minority's preferred candidate.  *See* Flynn Aff. ¶¶ 10, 16; Baker Aff. ¶¶ 4, 17; Murphy Aff. ¶¶ 7, 20.  Such a failure dooms Plaintiffs' VRA claim.  *See Growe,* 507 U.S. at 26; *City of Holyoke,* 72 F.3d at 985; *see also Unitt v. Bennett*, Civil Action No. 17-11468-RGS, 2018 WL 717345, at *2 (D. Mass. Feb. 5, 2018) (acknowledging that "in general … a district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff") (cleaned up).

Compounding their failure to offer requisite evidence, Plaintiffs state repeatedly that they believe there is ***no*** racially polarized voting in Boston.  *See* Am. Compl. ¶¶ 104, 121, 137, 162, 173.  As neither the Amended Complaint nor its accompanying affidavits support a finding of the necessary VRA preconditions, the Court should refuse to enter a preliminary injunction on Plaintiffs' VRA claim.  *See Meza,* 322 F. Supp. 2d at 57.

B.  <u>Plaintiffs' Equal Protection Clause Showing Is Insufficient to Support A Preliminary Injunction</u>

Plaintiffs' scant record is in no manner sufficient to establish a likelihood of success on their Equal Protection Clause claim.  At most, the record indicates that during the redistricting process, the City Council was aware of racial demographics and sought to adhere to governing VRA principles—far from violating the Constitution, that is responsible governance.

As a general matter, courts apply rational basis review to legislative enactments such as a redistricting plan.  *See*, *e.g.*, *Berry v. Kander*, 191 F. Supp. 3d 982, 985 (E.D. Mo. 2016); *Harris v. McCrory*, 159 F. Supp. 3d 600, 610 (M.D.N.C. 2016).  This standard is "highly deferential" to the government, *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 249 (1st Cir.

7

2012), and sets an "exceedingly low threshold" for the government to meet in redistricting. *Powell v. Tompkins*, 926 F. Supp. 2d 367, 393 (D. Mass. 2013).

Courts only apply the more stringent strict scrutiny test where the challenging party can show that "race [was] the predominant consideration in drawing the district lines such that 'the legislature subordinate[d] traditional race-neutral districting principles … to racial considerations." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (cleaned up). "[T]he evidentiary burden to prove that race predominated in legislative map-drawing is a 'demanding one.'" *Walen v. Burgum*, Case No. 1:22-cv-31, 2022 WL 1688746, at *3 (D.N.D. May 26, 2022) (quoting *Easley v. Cromartie*, 532 U.S. 234, 241 (2001)). It is not enough for Plaintiffs to show that the legislature was aware of race. As the Supreme Court has explained, "[r]edistricting legislatures will … almost always be aware of racial demographics; but it does not follow [from that] that race predominates." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The difficulty in distinguishing between racial awareness and racial motivation, combined with the "sensitive nature of redistricting" and "presumption of good faith" accorded to legislatures, "requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.*

Here, Plaintiffs' speculative assertions and otherwise meager record are insufficient to meet their demanding burden. Indeed, they provide nothing more than: conjecture from the Amended Complaint and Councilor Murphy's Affidavit that racial balancing was the City Council's purpose in enacting the map;[3] hearsay testimony regarding isolated and out-of-context

---

[3] The Amended Complaint relies on Councilor Murphy's Affidavit in asserting that: (1) Councilor Breadon's goal was to racially balance District 3 (*see* Am. Compl. ¶ 139 (citing Murphy Aff. ¶ 21)), and (2) this goal somehow generally motivated the redistricting process. *See*, *e.g.*, Am. Compl. ¶¶ 126-127, 129, 145. Councilor Murphy's Affidavit, however, does not actually attribute such a statement to Councilor Breadon and only ever asserts in conclusory fashion that racial balancing was the City Council's goal. *See generally* Murphy Aff.

statements by Councilors Breadon and Arroyo;[4] and cherry-picked examples of neighborhoods that the map supposedly breaks up.[5]  Even ignoring all other evidence in the record, Plaintiffs' showing comes nowhere close to demonstrating—as it must for Plaintiffs to succeed—that race was likely the predominant factor in this process.  *See Walen*, 2022 WL 1688746, at *4 (declining to preliminarily enjoin map based on "a handful of statements from Redistricting Committee Members and other legislators" over many hours of discussion, and testimony from one representative "that his colleagues subdivided the challenged districts because of race").

Finally, viewed as a whole, the record plainly contradicts the idea that race predominated. The City Council adopted "Redistricting Principles" that incorporate all of the traditional, race-neutral redistricting considerations (*see* Am. Compl., Ex. A), and, as noted in Defendant's Opposition, the Council engaged in a comprehensive process that incorporated at least nineteen public meetings and hearings, as well as expert and public testimony. *See* Goldberg Aff., ECF No. 25-1, at Ex. B. With that context in mind, Plaintiffs' narrative—built on little more than speculation and hearsay—crumbles.  At most, Plaintiffs' proffer shows an awareness of race and the need for the City to adhere to the requirements of the VRA, necessary components of a proper redistricting process.  *See Abbot v. Perez,* 138 S. Ct. 2305, 2315 (2018) (noting that "the VRA demands consideration of race"); *League of United Latin American Citizens*, 548 U.S. 399, 518-19 (2006) (Scalia, J., concurring).  Because Plaintiffs have not established that race predominated in the redistricting process, rational basis review applies.  Under that standard, Plaintiffs cannot show any likelihood of success on the merits of their Equal Protection Clause claim.

---

[4] *See* Murphy Aff. ¶¶ 12, 21 (asserting—through hearsay—that Councilor Breadon feared that the previous make-up of District 4 could be viewed as "packing," and that Councilor Ricardo Arroyo "was quoted" by an unnamed source as saying that District 3 was too white).

[5] Plaintiffs' Motion lists a few neighborhoods in Districts 2, 3, and 4 as being broken up.  Pls.' Mot. at 2.

## II.   THE PUBLIC INTEREST WEIGHS IN FAVOR OF DENYING THE PRELIMINARY INJUNCTION

As discussed above, because the likelihood of success on the merits is the most important factor in the preliminary injunction test, and because plaintiffs have failed to meet their burden as to that factor, the Court need not address the public interest prong of the preliminary injunction standard. *See Ryan*, 974 F.3d at 18.

But it bears highlighting that the public interest weighs heavily against the grant of a preliminary injunction. *Amici* are civil rights organizations that advocate for the voting rights of all Boston citizens and are each actively engaged with City residents who are racial minorities, language minorities, and immigrants. Although Plaintiffs have expansively claimed in their Amended Complaint that racial and language minority groups were cut out of redistricting process, the very involvement of *amici*—which are uniquely positioned to champion the rights and interests of said groups— demonstrates otherwise.

The requested preliminary injunction would harm *amici*, the communities they serve, and the public as a whole. As noted above, the challenged redistricting process involved at least nineteen public hearings, which took place over the course of many weeks. Numerous organizations and individuals had an opportunity to weigh in—including *amici*, Plaintiffs themselves, and many others. Maps were proposed, scrapped, and revised, and no one got exactly what they wanted. But that is democracy. And unlike the vast majority of Bostonians who have accepted a legitimate democratic result, Plaintiffs seek to subvert the legislative process in pursuit of their own preferred policy ends. Allowing such an outcome—particularly when Plaintiffs have presented virtually no evidence to support their theories of legal violations—is emphatically not in the public interest.

Finally, invalidating a duly enacted map would leave the City—and its residents—without a City Council district map passed pursuant to the decennial census.  This would not only be constitutionally problematic, but would also hinder the ability of the City, its residents, and potential City Council candidates to plan for future elections.  *See Reynolds v. Sims*, 377 U.S. 533, 583-84 (1964) (stating that "[d]ecennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth," and "if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect").  Such a disruption contravenes the public interest.  For these reasons— and especially given that "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions"—the Court should decline to grant a preliminary injunction.  *Miller*, 515 U.S. at 915.

## CONCLUSION

Plaintiffs are impermissibly attempting to upend a legitimate legislative process because they did not achieve their desired outcome.  As part of the City Council's redistricting proceedings, all City residents, including Plaintiffs, had the opportunity to express their views and advocate for their elected officials to adopt them.  Plaintiffs' attempt to supplant that legislative process through this action, and resultant attempt to negate the will of City residents, should be rejected.  *Amici* urge the Court to protect the valid legislative process, the voice of the people who contributed to that process, and the rights enshrined in the Voting Rights Act and the Equal Protection Clause. The Court should deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

*/s/ Jacob M. Love*                               */s/ Andrew C. Glass*
Oren M. Sellstrom, BBO # 569045          Andrew C. Glass, BBO #638362
Jacob M. Love, BBO # 699613              Gregory N. Blase, BBO #662751
LAWYERS FOR CIVIL RIGHTS                 K&L GATES LLP
61 Batterymarch Street, 5th Floor        State Street Financial Center
Boston, Massachusetts 02110              One Lincoln Street
Tel.: (617) 988-0608                     Boston, Massachusetts 02111
osellstrom@lawyersforcivilrights.org     Tel.: (617) 261-3100
jlove@lawyersforcivilrights.org          andrew.glass@klgates.com
                                         gregory.blase@klgates.com

                                         Rasheem Johnson (admitted *pro hac vice*)
                                         K&L GATES LLP
                                         200 South Biscayne Boulevard
                                         Miami, Florida 33131
                                         Tel.: (305) 539-3360
                                         rasheem.johnson@klgates.com

*Counsel for* Amici Curiae

February 16, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent by mail to those indicated as non-registered participants on February 16, 2023.

*/s/ Andrew C. Glass*
Andrew Glass