UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RASHEED WALTERS, RITA DIXON, SHIRLEY SHILLINGFORD, MAUREEN FEENEY, PHYLLIS CORBITT, Individually and as President of the Massachusetts Union of Public Housing Tenants, THE SOUTH BOSTON CITIZENS ASSOCIATION, MARTIN F. MCDONOUGH AMERICAN LEGION POST, ST. VINCENT'S LOWER END NEIGHBORHOOD ASSOCIATION, and OLD COLONY TENANT ASSOCIATION,  GLADYS BRUNO, ZHENG HUANHUA, CARMEN LUISA GARCIA TERRERO, CARMEN GARCIA-ROSARIO, and ELEANOR KASPER, | Civil Action No. 1:220cv012048-PBS |
| Plaintiffs, | |
| v. | |
| THE CITY OF BOSTON, MICHELLE WU, in her official capacity of the Mayor of the City of Boston, ENEIDA TAVARES, in her official capacity as Commissioner of the Boston Election Commission, and THE BOSTON CITY COUNCIL, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. and this Honorable Court's Electronic Docket Order #37, Plaintiffs file this Second Amended Complaint.  Plaintiffs bring this action to challenge the redistricting plans approved by the Boston City Council and signed into law by the Mayor of the City of Boston.  The redistricting plan violates the Boston City Charter, The Voting Rights Act, and the Fourteenth Amendment to the United States Constitution.  Plaintiffs also contend that the Boston City Council violated the Massachusetts Open Meeting Law by not providing notice of hearings, and by not providing language access to minority residents.

## PARTIES

1.  Plaintiff Rasheed Walters is a registered voter, taxpayer and resident of Dorchester.

2.  Plaintiff Rita Dixon is a registered voter, taxpayer and resident of Mattapan.

3.  Plaintiff Shirley Shillingford is a registered voter, taxpayer and resident of the Mission Hill neighborhood of Roxbury and is the Vice Chair of the Caribbean American Political Action Committee.

4.  Plaintiff Maureen Feeney is a registered voter, taxpayer and resident of Dorchester.

5.  Plaintiff Phyllis Corbitt is the President of the Massachusetts Union of Public Housing Tenants and a registered voter, taxpayer and resident of South Boston.

6.  Plaintiffs The South Boston Citizens Association, Martin F. McDonough American Legion Post, St. Vincent's Lower End Neighborhood Association and the Old Colony Tenant Association are civic associations whose members include residents and registered voters of the City of Boston's South Boston section.

7.  Plaintiff Gladys Bruno is a registered voter, taxpayer and resident of South Boston who resides in the Old Colony Housing Development.

8.  Plaintiff Zheng Huahua is a registered voter, taxpayer and resident of South Boston who resides in the Old Colony Housing Development.

9.  Plaintiff Carmen Luisa Garcia Terrero is a registered voter, taxpayer and resident of South Boston who resides in the Mary Ellen McCormack Housing Development.

10.  Plaintiff Carmen Garcia‐Rosario is a registered voter, taxpayer and resident of South Boston who resides in the West Broadway Homes Housing Development.

11.  Plaintiff Eleanor Kasper is a registered voter, taxpayer and resident of South Boston.

12.  Defendant City of Boston is a municipal corporation of the State of Massachusetts.

13.  Defendant Michelle Wu is the Mayor of the City of Boston.

14.     Defendant Eneida Tavares is the Commissioner of the Boston Election Commission.

15.     The Defendant Boston City Council is an elected municipal body, consisting of the following members: Julia Mejia; Brian Worrell; Ruthzee Louijeune; Ricardo Arroyo; Erin Murphy; Frank Baker; Michael Flaherty; Ed Flynn; Tania Fernandes Anderson; Gabriela Coletta; Liz Breadon; Kendra Lara; and Kenzie Bok.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction in this case pursuant to 28 U.S.C. § 133.

17.     This Court has jurisdiction over the Open Meeting Law claims pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367.

18.     Venue is proper here as the Defendant is the City of Boston and associated entities and all of the Plaintiffs are residents of the City of Boston.

## STATEMENT OF FACTS

19.     Councilor Liz Breadon became the Chair of Redistricting on August 29, 2022.

20.     Councilor Brian Worrell was simultaneously named as Vice Chair of Redistricting.

21.     At a City Council meeting on August 31, 2022, Councilor Breadon filed an order for a hearing regarding Redistricting Principles. Exhibit A.

22.     The City Council thereafter had a "Redistricting Working Session" on September 20, 2022 regarding the adoption of City Council redistricting principles.

23.     Another City Council meeting was held on September 23, 2022 via Zoom, again regarding the adoption of redistricting principles.

24.     On September 26, 2022, the City Council held a working session in an effort to allocate split precincts to their appropriate district.

25.     Similar meetings were held throughout the remainder of that week, both regarding the allocation of split precincts and regarding the adoption of redistricting principles.

3

26.     On September 28, 2022, Councilor Breadon filed an Amended Order for the Adoption of City Council Redistricting Principles.  Exhibit B.

27.     At the meeting on September 28, 2022, Councilor Ricardo Arroyo and Councilor Tania Fernandes Anderson filed a proposed map (Exhibit C), as did Councilor Erin Murphy (Exhibit D).

28.     On October 3, 2022, Councilors Breadon and Worrell filed their proposed map (Exhibit E).

29.     On October 10, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Bruce C. Bolling Municipal Building to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

30.     The October 10, 2022 meeting was an "emergency meeting" held by the NAACP, the Chinese Progressive Association, and other advocacy groups.

31.     On October 18, 2022, four (4) members of the Boston City Council Redistricting Committee and five (5) members of the Boston City Council were present at City Hall Plaza to meet and discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

32.     On October 19, 2022, four (4) members of the Boston City Council Redistricting Committee and seven (7) members of the Boston City Council met at the Condon School in South Boston, MA to discuss the topic of Legislative Redistricting in the City of Boston without giving notice pursuant to the Open Meeting Law, Chapter 30A of the Massachusetts General Law.

33.     At the October 19, 2022, the City Council voted to adopt the amended version of Councilor Breadon's Order for the Adoption of City Council Redistricting Principles.

34.     On October 20, 2022, there was a meeting to hear public testimony regarding the redistricting from residents.

35.     The meeting was held in Fields Corner at the Community Academy for Science and Health, which is in the heart of the Vietnamese-American community.

36.     However, the Council provided no translation services which prompted complaints from the CDVN Vietnamese American Community of MA in violation of Section 203 of the Voting Rights Act and the Open Meeting Law.  Exhibit F.

37.     The CDVN complaint that "the Vietnamese community in Dorchester stands to be impacted like all immigrant communities by the Redistricting legislation . . . [d]espite this, the Council has not provided the typical language access that is provided for meetings of even lesser consequence." Id.

38.     Similarly, Sarepta Women and Children Empowerment Center, Inc. wrote to Mayor Wu alleging disenfranchisement of the Haitian Community of Dorchester, Hyde Park, and Mattapan which would be "eviscerated" by the new redistricting legislation.   Exhibit G.

39.     The Mary Ellen McCormack Task Force has similar complaints regarding the division of public housing developments, and the lack of language access.  Exhibit H.

40.     Specifically, the Mary Ellen McCormack Community Task Force complained that the Redistricting Plan divides historically united public housing developments and asked Mayor Wu to send the plan back to the City Council "with an amendment to unite Boston's neighborhoods including South Boston's public housing developments into District 2 where they had historically been."  Id.

41.     The Task Force further stated that "[d]ividing our communities is a violation of our voting rights and cannot stand to pass."  Id.

42.     South Boston En Accion ("SBEA") also wrote to Councilor Breadon on November 1, 2022, on behalf of the Spanish-speaking residents of Mary Ellen McCormack, Old Colony and West Broadway Developments and their "questions, concerns, and frustrations" regarding the redistricting process.  Exhibit I.

43.     SBEA noted that "language access has not been a priority" and that "[w]hen attempts were made to translate for residents, the interpretations were disrupted." Id.

44.     SBEA further noted that many of the Spanish-speaking residents of these public housing developments "don't know what is occurring and are confused about their next steps." Id.

45.     Lastly, SBEA disagrees with the splitting of public housing developments into different districts, noting that "[o]ur community is made up of the most vulnerable residents, and dividing us will create more chaos and harm." Id.

46.     An Open Meeting Law Complaint based on the violations of M.G.L. c. 30A set forth above was served on both the Clerk of the Boston City Council and the Boston City Council President on October 25, 2022. Exhibit J – Affidavit of Robert O'Shea and Open Meeting Law Complaint.

47.     On October 26, 2022, the Boston City Council met for its regularly scheduled meeting at which it intended to vote on a proposed Redistricting Map.

48.     Due to the Open Meeting Law Complaint noted above, the Boston City Council did not proceed with its anticipated vote on any proposed Redistricting Maps at that October 26, 2022 meeting.

49.     Although there was mention of the October 25, 2022 Open Meeting Law complaint (Exhibit J) at that meeting, the Boston City Council neither reviewed any of the alleged violations nor did they review all the proposed remedies listed therein.

50.     At the October 26, 2022 meeting, the Boston City Council members only mentioned that they were waiting for their legal counsel to respond to the Complaint.

51.     On November 2, 2022, the Boston City Council responded in writing to the Open Meeting Law Complaint filed on October 25, 2022.

52.     It's anticipated that other residents of the City of Boston will file additional Open Meeting Law Complaints concerning deliberations on proposed redistricting maps.

6

53.     In fact, another Open Meeting Complaint was filed on November 1, 2022 on behalf of Dorchester Civic Associations.  Exhibit K.

54.     The Attorney General's Office is in possession of the October 25, 2022 Open Meeting Law Complaint.  Per M.G.L. c. 30A, they will not address the issue until on or after November 24, 2022.

55.     Despite several Open Meeting Law complaints and many complaints from minority communities that were shut out of the legislative process, the Boston City Council still pressed ahead to a vote on November 2, 2022.

56.     The map to be voted on was proposed by Councilors Breadon and Arroyo.  Exhibit L.

57.     The Councilors reviewed a committee report and a copy of the proposed map less than forty-eight (48) hours before taking a vote, leaving minimal time to digest a redistricting plan that would shape the future of the City for the next decade.

58.     Despite all of these issues, on November 2, 2022, the City Council voted in favor of the Legislative Redistricting by a vote of 9 to 4.

59.     Councilor Flaherty submitted a proposed map (Exhibit M), as did Councilor Baker (Exhibit N), but neither of these proposals was discussed or seriously considered by the Council, who were laser focused on passing the map submitted by Councilors Breadon and Arroyo at any cost.

60.     Previously, on October 9, 2022, Professor Jeffery Wice of New York Law School was retained by the City of Boston to provide a memorandum outlining the criteria which the City Council must or should consider when redrawing council districts.  Exhibit O.

61.     Professor Wice discussed that Section 128 of the Boston City Charter requires that districts "shall be compact and contain, as nearly as may be, an equal number of inhabitants as determined but the most recent state decennial census, shall be composed of contiguous existing

precincts, and shall be drawn with a view toward preserving the integrity of existing neighborhoods."

Id.

62.     However, Massachusetts no longer conducts a state decennial census; therefore, the necessary date for redrawing legislative districts is drawn from the 2020 Federal Census.

63.     The data from the 2020 Census as applied to the City of Boston dictates that the ideal district size is 75,071 residents, plus or minus 5%.

64.     Therefore, the range allowed per district is between 71,317.45 and 78,767.85 residents.

65.     The Voting Rights Act ("VRA") also prohibits the imposition of any voting qualification, practice or procedure that results in the denial or abridgement of any citizen's right to vote on account of race, color, or status as a member of a language minority group.

66.     Section 2 of the VRA further prohibits vote dilution by "cracking" minority populations across districts, just as it prohibits vote dilution by "packing" minority populations into one district.

67.     The Fourteenth Amendment to the Constitution of the United States and the VRA require the avoidance of both discriminatory intent and discriminatory effect when redistricting.

68.     The City Charter and the VRA require districts to also be "compact" meaning that there should be a minimum distance between all parts of the district and to be "contiguous" meaning that all precincts should be geographically connected.

69.     Last, but not least, it is required that consideration must be given to drawing districts that respect the boundaries of Boston's recognized neighborhoods in order to preserve historical neighborhood boundaries.

70.     The City Council redistricting process was flawed and unfair to the most vulnerable residents of the City, particularly public housing residents, immigrants, and language minorities.

Exhibit P – Affidavit of Edward Flynn at ¶ 2.

71.     The City Council did not engage residents in an effective way and failed to listen to or engage residents in public housing developments, immigrants, and language minorities.  Id. at ¶ 3.

72.     Communities of color had almost no involvement in the City Council's secretive process. Id. at ¶ 4.

73.     Throughout the redistricting debate, Councilor Flynn repeatedly informed his colleagues on the council that one of his most important goals was to ensure public housing residents were united in District 2. Id. at ¶ 5.

74.     Keeping the public housing residents united was and is an important goal because being united in one district allows public housing residents' collective voice to be heard in government. Id. at ¶ 6.

75.     In District 2, residents at the Anne Lynch Homes at Old Colony, the West 9th Apartments, and the West Broadway Development are all a short walk from each other and have much in common. Id. at ¶ 7.

76.     However, under the approved redistricting plan, these public housing developments would move from District 2 to District 3. Id. at ¶ 8.

77.     Under the previous version of the Breadon-Arroyo Map, the plan was to divide public housing developments in half, both at the Anne M. Lynch Homes (the previous version of the Breadon-Arroyo map proposed to divide public housing developments in half - both at the Anne M. Lynch Homes (along Mercer St.) and the West Broadway Development (along Orton Marotta Way) into District 2 and District 3. Id. at ¶ 9.

78.     At that time, public housing advocates like South Boston En Accion, BHA Task Force leaders, nonprofit partners, and all civic groups in South Boston voiced complete opposition to a proposal that would divide our public housing developments from District 2, and dilute the voice of communities of color to organize and advocate for their interests. Id. at ¶ 10.

79.     The approved map still divides public housing in South Boston. The version of the map made available to the Councilors only two days before the November 2nd vote completely cut out these developments from District 2, the Council district where these developments have traditionally been located. Id. at ¶ 11.

80.     And in the last hours before the vote, West Broadway was added into District 2, still dividing public housing developments into two districts. Id. at ¶ 12.

81.     It is critical residents of color in Boston Housing Authority units are not further divided from the community of South Boston. Id. at ¶ 13.

82.     These public housing developments, managed by the Boston Housing Authority, are mostly made up of communities of color and immigrants. Id. at ¶ 14.

83.     During the pandemic, Councilor Flynn and his staffed worked closely with neighbors in District 2's public housing developments on language and communication access, senior outreach, food access, access to COVID-19 testing, providing information on vaccines, support for immigrant families, social services, youth, educational and athletic programs. Id. at ¶ 15.

84.     Placing these residents out of District 2 punishes these public housing residents and dilutes their organizing power. Id. at ¶ 16.

85.     Language and communication access are critical issues that unite residents in public housing developments. Id. at ¶ 17.

86.     In District 2, many residents in public housing speak Spanish and an increasing number also speak Cantonese. Id. at ¶ 18.

87.     Both of these languages directly unite the history and residents of District 2, with a large Cantonese speaking community in Chinatown, the South End and Bay Village.  Id. at ¶ 19.

88.     Plaintiff Zheng Huahua is a Chinese speaker who resides in Old Colony which was in District 2.

89.     Ms. Huahua alleges that in the past, Councilor Flynn in District 2 had staffers and aides who spoke her language, and because now she is in a new district, she does not know where to go to advocate for herself and her community.

90.     The larger Spanish speaking community in the South End, such as Cathedral Public Housing and Villa Victoria, also have much in common with the public housing residents in South Boston that also speak Spanish. Id. at ¶ 20.

91.     Plaintiff Gladys Bruno is a Spanish Speaker who resides in the Old Colony Housing Development.

92.     Ms. Bruno advises that the Spanish and Chinese residents have always advocated together, and not that Old Colony has been split between districts, she is concerned that her community will have less of a political impact.

93.     The City Council, with its approved map, failed to engage these residents in the redistricting process. Id. at ¶ 21.

94.     It is unconscionable to separate these public housing developments from District 2, the Council district where these developments have traditionally been located. Id. at ¶ 22.

95.     These actions are wholly contrary to the redistricting principles that we discussed at length with experts and academics when it comes to the preservation of the core of prior districts and maintaining communities of interest.  Id. at ¶ 23.

96.     Our public housing developments have a large number of Hispanic and Black residents, and they contribute greatly to the diversity of South Boston and District 2. Id. at ¶ 24.

97.     These developments have always been in District 2, and they identify with the neighborhood of South Boston. Id. at ¶ 25.

98.     Removing them completely, and separating them from the rest of South Boston, makes District 2 less diverse. Id. at ¶ 26.

99.     The Redistricting Committee ignored the requests from community groups to hold additional meetings in Cantonese, Spanish, Vietnamese, and Haitian Creole, and went ahead with a vote on November 2nd. Id. at ¶ 27.

100.    The deadline of having a map in place by November 7th was an artificial and self-imposed one. Id. at ¶ 28.

101.    According to the City of Boston Corporation Counsel, the only explicit statutory deadline set forth in the Boston City Charter is that City Council districts be redrawn by August 1, 2026. Id. at ¶ 29.

102.    Moreover, the Council did not know what the exact map was when there were plans to vote on October 26, 2022and they still did not know the exact map until a few hours before the vote on November 2, 2022. Id. at ¶ 30.

103.    Both the public and Councilors voting on the maps had not been afforded an opportunity to view or offer feedback in a public hearing on a final map, and there were also no further meetings, hearings, or working sessions after October 25th. Id. at ¶ 31.

104.    The Council and the public did not have the opportunity to discuss the latest version of the Breadon-Arroyo map, and nobody knew what were the amendments that made it into this version that the Council was supposed to vote on.  Id. at ¶ 32.

105.    Councilors also did not have the chance to have their constituents have further input. Id. at ¶ 33.

106.    District 2 and District 3 had the most stake in this redistricting process and, yet, the final map had not taken into serious consideration the voices of the communities in these districts. Id. at ¶ 34.

107. Despite the insistence that this would strengthen these districts, there is no doubt that these districts will suffer from losing some core communities that are not preserved from prior districts, as well as not maintaining communities of interest. Id. at ¶ 35.

108. More time was spent by the Council with the advocates of the so-called UNITY map, some of whom may not live in the City of Boston, than listening to the voices of the communities that will bear the brunt of the irreparable harm that this redistricting will cause. Id. at ¶ 36.

109. Council President Flynn tried to offer support for the recommended criteria to be formally considered and adopted by our body. Id. at ¶ 37.

110. Councilor Flynn argued that already established communities of interest, such as public housing residents, should be respected, united and factored in. Id. at ¶ 38.

111. Councilor Flynn's request was denied, as was his request to hold off on a vote and to seek more community meetings in various languages. Id. at ¶ 39.

112. The process lacked transparency and it was completely flawed. Id. at ¶ 40.

113. The Council failed as a collective body to respect the most impacted by our decision; residents living in public housing and our immigrant neighbors. Id. at ¶ 41.

114. They failed as a city to include the voices and opinions of communities of color, immigrants and public housing residents during the districting debate. Id. at ¶ 42.

115. The current map that was approved, and the process that led to it, has not done right by the neighbors living in my district in public housing in South Boston, and the rushed process was not done right for the residents across the City of Boston. Id. at ¶ 43.

116. Councilor Baker contends that the map the Boston City Council approved on November 2, 2022, and the actions taken by his colleagues on the City Council indicate that the goal of the redistricting map is to split up the southeastern part of District Three, even though there is no Voting Rights Act violation. Exhibit Q – Affidavit of Frank Baker at ¶ 2

117.    Communities of interest in other parts of the City were a non-starter when it came to being moved; however the southeastern part of Dorchester was not offered the same privilege. Id. at ¶ 3.

118.    The redistricting process was disingenuous and was at the expense of marginalized communities that have been organized and worked together for decades. Id. at ¶ 4.

119.    District 3 contains a cohesive network of civic groups that has traditionally banded together under common interests such as schools, churches, safe streets, developments, billboards, libraries and other public programs. Id. at ¶ 5.

120.    Those civic groups are anchored in District 3's villages which happen to coincide with parish boundaries. Id. at ¶ 6.

121.    These communities from St. Margaret's to St. Brendan's and everything in between play sports together - Dorchester Youth Hockey, Dorchester Baseball, Dorchester Youth Soccer and in times of need, unite together for a common cause, in places like Florian Hall. Id. at ¶ 7.

122.    There is a complete disruption of District 3, by removing the core of its district from its historical home – something of which does not need to happen. Id. at ¶ 9.

123.    District 3 is a community that is integrated, supportive, and diverse, who share resources and services, but will now be split apart from one another – Carney Hospital, Eileen's Recovery House for Women, Olmstead designed Dorchester Park and especially the Neponset River Greenway, Pope John Paul II Park and Joseph Finnegan Park. Id. at ¶ 10-11.

124.    The aforementioned parks came to fruition as a direct result of the civic groups in these communities advocating, in concert, for decades. Id. at ¶ 11.

125.    Under Docket #1275 there are no clear boundaries for District Three, unlike previous redistricting years (1983, 1993, 2003, 2013) Dorchester Avenue and the Neponset River are not just

boundaries but also are common interests on important issues facing the City of Boston including transportation, business, and environment concerns including coastal flooding. Id. at ¶ 12.

126.    These two boundaries give District Three common interests from South to North. Id. at ¶ 13.

127.    The purpose of redistricting should be more than just balancing populations, but must also take into account the existing structure of neighborhoods and avoid splitting up neighborhood unless absolutely necessary. Id. at ¶¶ 14-15.

128.    The proposed maps offered by Councilors Baker, Flynn, Murphy and Flaherty all provide a means by which population can be equalized with minimal damage to the communities. Id. at ¶ 16.

129.    The proposed map not only destroys District 3, but also causes significant harm to other communities, including South Boston which will be carved in half, and Mattapan, which will dilute the African-American voting power in District 4. Id. at ¶ 17.

130.    The approved map not only dilutes a moderate vote and breaks up Ward 16, it will also adversely affect the African-American vote in District Four for no reason. Id. at ¶ 18.

131.    Plaintiff Rasheed Walters is a resident of District 4, residing at 30 Fendale Ave, 02124.]

132.    Mr. Walters believes that the redistricting map violates his voting rights and the City Charter by gerrymandering District  4 so it is no longer a majority black seat.

133.    Mr. Walters worries that this forced gentrification of District 4 may result in the black voters of District 4 never being represented by an African American again.

134.    Plaintiff Ruth Dixon specifically believes that dividing her Mattapan neighborhood in half is against the City Charter and her voting rights, making it impossible to elect the candidate of her choice because rather than be a united community with an ability to influence their city councilor we will be divided on the edge of 2 districts.

135.    Similarly, Plaintiff Shirley Shillingford believes that the Redistricting Plan will divide the Afro-Caribbean community in and around Mission Hill in Roxbury, diluting the voice of the Afro-Caribbean community.  Under the Redistricting Plan, Mission Hill would be represented by Kenzie Bok who is the councilor for District 8 which is largely comprised of Beacon Hill.  District 8 and Mission Hill have a 30-year life expectancy gap, and wildly different populations.

136.    There has been no racial polarization regarding voting in the City, as was confirmed by Professor Wice, as can be seen from Councilor Baker's re-election in his 63% non-white district, in the election of Secretary Galvin in the African-American majority of District 4, and in various other elections throughout the City. Id. at ¶ 20.

137.    Hundreds of emails were sent to the Council from residents throughout District Three, but their voice and concerns fell on deaf ears. Id. at ¶ 21.

138.    Councilor Erin Murphy avers that the approved map is primarily focused on race in violation of the Voting Rights Act and the Fourteenth Amendment.  Exhibit R – Affidavit of Erin Murphy at ¶ 2.

139.    The approved map does not focus on creating voting opportunity neighborhoods for particular minority groups but instead focuses on the non-white populations as if it were a homogeneous group in each City Council District. Id. at ¶ 3.

140.    The approved map focuses on City Council District 3 as being "too white".  Id. at ¶ 4.

141.    The approved map does not distinguish between different minority groups but added all minority group's total populations without regard for the vast differences in background, language, history, voting strengths etc., in order to achieve "racial balance".  Id. at ¶ 5.

142.    The approved map dismantles the compact City Council District 3 boundary along Dorchester Ave and substitutes a gerrymandered, wandering boundary in order to achieve "racial balancing". Id. at ¶ 6.

143.    The approved map is designed to diminish the voting power of white voters in City Council District 3.  Id. at ¶ 7.

144.    The approved map destroys the Cedar Grove neighborhood ignoring the requirement to preserve existing communities of related and mutual interest solely in order to achieve "racial balancing".  Id. at ¶¶ 8-9.

145.    The stated goal of the approved map is to make District 4 less black and District 3 less white.  Id. at ¶ 11.

146.    Councilor Breadon expressed fear that the majority black population of District 4 could invite accusations of "packing" which is the term used to describe the practice of drawing district lines so that minority voters are compressed into a small number of districts when they could effectively control more. Id. at ¶ 12.

147.    Using this reasoning, the approved map swaps majority black precincts in District 4 with majority white precincts in District 3 in order to make District 4 less black and District 3 less white. Id. at ¶ 13.

148.    District 3, under the existing plan before redistricting, does not have a majority race, and there is no evidence whatsoever that the widely diverse groups of American blacks, Vietnamese, Cape Verdean, Haitian and Dominican people in District 3, that is the non-white people, are a cohesive minority and they are surely not a single minority. Id. at ¶ 14.

149.    However, the precincts that comprise the Cedar Grove neighborhood are majority white neighborhoods. Id. at ¶ 15.

150.    Using a "racial balancing" criteria, the approved map carves these precincts out of District 3 purely on the basis of race.  Id. at ¶ 16.

151.    This is an example of "cracking" which is the practice of drawing District boundaries that split or fracture voting groups to diminish their ability to elect officials that represent their interests. Id. at ¶ 17.

152.    District 3, under the existing plan before redistricting and termed "too white" by the Council, has a history of electing black officials.  Linda Dorcena Forrey was elected as the State Representative in 2004 and reelected until 2012 when she was elected as State Senator.  She was reelected until 2018 when she retired from politics.  The specific precincts that the approved map carves out of District 3 voted overwhelmingly in the 2022 primary for Attorney General candidate Andrea Campbell, a black woman. Id. at ¶ 18-19.

153.    Also, District 4's black majority (also attacked and diluted by the approved map) has created a significant political power base for the black community resulting in electing black councilors for over four decades along with a U.S Representative, State Senators and State Representatives.  Id. at ¶ 20.

154.    Councilor Breadon stated at the October 5, 2022 City Council meeting that her goal was to "racially balance" District 3 so that it becomes a majority minority district. Id. at ¶ 21.

155.    The approved map achieves this unconstitutional "racial balancing" by pretending that all non-white citizens of Boston belong to a homogeneous group that has one set of political goals and that each and every member is opposed to all of their white neighbors, their views, and their political goals. Id. at ¶ 22.

156.    The Little Saigon neighborhood is a vital part of District 3 that spans Dorchester Avenue in the Fields Corner neighborhood of Dorchester. It is a vibrant area and is home to 75% of Vietnamese Americans in the city of Boston.  These neighbors are mostly first and second-generation immigrants from a country in south East Asia, with a rich culture, extremely strong family and religious values, and a deep commitment to education.  Id. at ¶ 25.

157.     The first black community of Dorchester came almost exclusively from the southern states fleeing discrimination and poverty in the 1960's.  These were the descendants of slaves and came north for work and to escape Jim Crow laws.  In 1965 a new wave of blacks arrived in Dorchester: Haitians, Cape Verdeans, West Indians and Dominicans.  Although they shared a skin color with the recently settled Southern blacks, in all other respects they were a widely diverse group with little in common: an eclectic mix of languages, religions, native countries, education levels, goals and aspirations. Id. at ¶ 26.

158.     The approved map lumps all of these divergent people into one category calling them non-white, or people of color, or minority. Id. at ¶ 27.

159.     The approved map divides District 3 into two groups: white and non-white, ignoring the immense differences in each of the categories.  There is no cohesive history, ethnicity, religion, language, or culture that binds them into a recognizable group with a compact and united neighborhood that should create an opportunity neighborhood.  Id. at ¶ 28.

160.     The goal of equal population distribution across districts could have been achieved without damaging the existing neighborhood in Districts 2, 3, and 4, and without an improper focus on "racial balancing" as the driving force behind redistricting. Id. at ¶ 29.

161.     The proposed maps provided by Councilors Murphy, Flynn, Baker, and Flaherty all achieve the goals of redistricting with minimal impact to neighborhood cohesiveness and without an improper focus on race. Id. at ¶ 30.

162.     United States Congressman Stephen Lynch also wrote to this Honorable Court regarding the unconstitutional nature of the redistricting legislation.  Exhibit S.

163.     Specifically, Congressman Lynch stated that "the City Council proposal will arbitrarily and recklessly divide longstanding and close-knit public housing developments – including the Anne M. Lynch Homes at Old Colony and West Broadway development – across multiple city districts."

164.     Congressman Lynch further stated that "these public housing communities are communities of common interest whose abrupt division into multiple city districts will unfairly and irreparable dilute their voting power and encumber them with unfamiliar and disparate political representation."

165.     Congressman Lynch urges the Court to consider the "preservation of neighborhoods and communities" and notes that "[t]he failure to safeguard these communities against division not only neglects to preserve the cores of the preexisting districts but could very well have the potential to weaken the voting strength of these politically cohesive and like-minded voters in future City Council elections."

<u>COUNT I – INJUNCTIVE RELIEF</u>

166.     Paragraphs 1 through 165 of this Complaint are hereby incorporated by reference.

167.     The Boston City Council failed to comply with the Open Meeting Law by having secretive meetings and not providing adequate language access to non-English speakers.

168.     Furthermore, the final map approved by the City Council was not provided to the public or the Councilors until less than 48 hours before the scheduled vote.

169.     Because the public did not have broad access to the deliberations and decision-making process of the City Council regarding the redistricting process, Plaintiffs respectfully request this Honorable Court issue a preliminary injunction enjoining the implementation of the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 and enacted into law by the Mayor of the City of Boston on November 7, 2022, while this action and request for equitable relief is pending.

<u>COUNT II – VIOLATION OF THE VOTING RIGHTS ACT</u>

170.     Paragraphs 1 through 169 of this Complaint are hereby incorporated by reference.

171.     Section 2 of the Voting Rights Act of 1965 prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in a language minority group.

172.     As discussed hereinabove, Defendants have discriminated against residents based solely on their race in an effort to achieve their stated goal of "racial balancing".

173.     There was no violation of the Voting Rights Act in any of the affected Districts that would necessitate the aggressive redistricting of boundaries along racial lines.

174.     Moreover, as is evident from the attachments to this Complaint, many minority residents and language minority residents were shut out from the deliberative and legislative process due to a failure of the City Council to provide access.

175.     The City Council deliberately diluted the white vote in District 3, while also diluting the African-American vote in District 4 for no valid reason other than their stated purpose of "racial balancing".

176.     Under the existing plan before redistricting, District 3 had a long history of electing African –American officials, and District 4 had a long history of electing white officials.

177.     There was no racial polarization of voting blocs in either district that would require redistricting based on race.

178.     Also, the City Council failed to take into account the various different minority groups in the affected districts, instead seeing them as a duopoly of monolithic groups of whites and non-whites.

179.     In pursuing their stated goal of racial balancing, the City Council has diluted the voting power of African-Americans in District 4, of whites in District 3, and of various other minority groups whose tight-knit communities have been severed across multiple districts, damaging their collective power to effect meaningful change at the ballot box.

180.     Defendants have also violation Section 203 of the Voting Rights Act by failing to provide language access to language minority citizens.

181.     Plaintiffs respectfully request this Honorable Court order that the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 and enacted into law by the Mayor of the City of Boston on November 7, 2022, violates Section 2 of the Voting Rights Act.

<u>COUNT III – VIOLATION OF THE FOURTEENTH AMENDMENT</u>

182.     Paragraphs 1 through 181 of this Complaint are hereby incorporated by reference.

183.     The Fourteenth Amendment to the United States Constitution provides, in pertinent part that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

184.     The Equal Protection Clause prohibits a state, "without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"<u>Bethune-Hill v. Va. State Bd. of Elections</u>, 137 S. Ct. 788, 797 (2017)

185.     Race-based lines, therefore, are unconstitutional where (1) "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district,"and (2) the district's design cannot withstand strict scrutiny. <u>Miller v. Johnson</u>, 515 U.S. 900, 916 (1995).

186.     To pass strict scrutiny, the state must prove that its race-based redistricting scheme is "narrowly tailored" to meet a "compelling interest."  <u>Bethune-Hill</u>, 137 S. Ct. at 801.

187.     As discussed hereinabove, the primary (if not the only) goal of the City Council was to engage in "racial balancing" of various districts.

188.    There was no compelling interest that would excuse the naked racial animus behind the City Council's plan, and certainly there was no narrow tailoring to achieve such compelling interest that would survive strict scrutiny.

189.    There is no evidence in the record of racial polarization of votes in the City of Boston or in the affected districts.

190.    There have been no Voting Rights Act violations (as confirmed by Professor Wice).

191.    The Districts most affected by the redistricting legislation each have long histories of race-neutral elections, with white candidates winning elections in majority minority districts and minority candidates winning in majority white districts and precincts.

192.    Because the redistricting legislation does not meet a compelling interest, and because the legislation is not narrowly tailored to that compelling interest, Plaintiffs respectfully request that this Honorable Court issue an order finding said legislation unconstitutional.

**WHEREFORE, the Plaintiffs respectfully requests this Honorable Court:**

1.  Issue a preliminary injunction enjoining the implementation of the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 and enacted into law by the Mayor of the City of Boston on November 7, 2022, while this action and request for equitable relief is pending.

2.  Enter an order finding that the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 violates Section 2 of the Voting Rights Act;

3.  Enter an order finding that the Redistricting Plan (Docket #1275) approved by the Boston City Council on November 2, 2022 violates the Fourteenth Amendment to the United States Constitution; and

4.  Grant all other relief which the Court may deem just and proper.

Respectfully Submitted,
Plaintiffs,
By their Attorneys,

/s/ Paul Gannon, Esq.
Paul Gannon, Esquire
Law Office of Paul Gannon, P.C.
546 E. Broadway
South Boston, MA 02127
(617) 269-1993
BBO# 548865
pgannon@paulgannonlaw.com

/s/ Glen Hannington
Glen Hannington, Esq.
LAW OFFICES OF GLEN HANNINGTON
Ten Post Office Square, 8th Floor South
Boston, MA  02109
TEL#: (617) 725-2828
BBO#: 635925
glenhannington@aol.com

/s/ Frederick E. Dashiell
Frederick E. Dashiell, Esq.
Dashiell & Associates, P.C.
6 Codman Hill Avenue
Boston, Massachusetts 02124
Ph: (617) 590-5780 (Direct Line)
Fax: (972) 474-9171
BBO# 114520
fred.dashiell@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was filed through the ECF System and will be served upon the attorney of record for each party registered to receive electronic service on this the 27th day of February 2023.

/s/ Glen Hannington
Glen Hannington, Esquire