UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                      )
RASHEED WALTERS, et al.               )
                                      )
                                      )
              Plaintiffs,             )
                                      )        Civil Action
v.                                    )        No. 22-12048-PBS
                                      )
BOSTON CITY COUNCIL, et al.           )
                                      )
                                      )
              Defendants.             )
_____)
```

**MEMORANDUM AND ORDER**

May 8, 2023

Saris, D.J.

After the decennial federal census, the Boston City Council ("City Council") voted 9-4 to approve a redistricting map on November 2, 2022 that the Mayor signed into law. Plaintiffs, who are Boston voters and civic associations, sued the City of Boston, seeking a preliminary injunction that bars the use of the redistricting map in the next municipal election, scheduled for November 7, 2023. They allege violations of Sections 2 and 203[1] of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, the Open Meeting Law, Mass. Gen. Laws ch. 30A, § 20, and the Equal Protection Clause of the Fourteenth Amendment. They argue that the

_____

[1] Plaintiffs waived their Section 203 claim at the evidentiary hearing and are not likely to succeed on this claim.

enacted redistricting map was motivated by a desire to achieve "racial balancing" among districts in the City of Boston. The City contends that the City Council "appropriately considered race in District 4 and elsewhere to ensure VRA compliance, and that other, racially neutral and competing considerations were the Council's primary motivators." Dkt. 25 at 14.

The Court held an evidentiary hearing over six days from March 28 to April 5, 2023. Plaintiffs called Congressman Stephen Lynch, at-large Councilors Michael Flaherty and Erin Murphy, Rasheed Walters (a resident of Dorchester in District 4), Maureen Feeney (a Dorchester resident now in District 4 following redistricting), and Eleanor Flaherty Kasper (a Dorchester resident now in District 3 following redistricting). Defendants called an expert witness, Dr. Moon Duchin ("Dr. Duchin"), a Professor of Mathematics at Tufts University and a principal investigator at the Metric Geometry and Gerrymandering Group (MGGG) Redistricting Lab. The Court also listened to over 15 hours of City Council meetings uploaded onto YouTube, which were also submitted as exhibits.[2] No City Councilor testified for Defendants in support of the enacted redistricting plan.

The Court **ALLOWS** the motion for preliminary injunction (Dkt. 21). Plaintiffs have demonstrated a likelihood of success in

---

[2] Unfortunately, no transcripts of the City Council meetings were provided.

showing that race played a predominant role in the City Council's redrawing of Districts 3 and 4 in the enacted map, and Defendants have not demonstrated that the enacted redistricting map is narrowly tailored to achieve a compelling interest. However, Plaintiffs have not demonstrated a likelihood of success on their claims under the VRA and the Open Meeting Law. The ball is back in the City Council's court.

## FACTUAL BACKGROUND

### I.   The Parties

#### A.   Plaintiffs

Plaintiffs include individual residents and voters of Boston across several districts,[3] including Districts 2, 3, and 4, as well as several civic organizations.[4]

---

[3] Rasheed Walters is a District 4 voter; Rita Dixon is a District 5 voter; Shirley Shillingford is a District 8 voter; Maureen Feeney is now a District 4 voter following redistricting; Phyllis Corbitt is now a District 3 voter following redistricting; Eleanor Flaherty Kasper is now a District 3 voter following redistricting; Gladys Bruno and Zheng Huahua are voters residing in the Old Colony Housing Development; and Carmen Luisa Garcia Terrero and Carmen Garcia-Rosario are voters residing in the West Broadway Homes Housing Development.
[4] The South Boston Citizens Association, Martin F. McDonough American Legion Post, St. Vincent's Lower End Neighborhood Association, and Old Colony Tenant Association are civic associations whose members include residents and registered voters of South Boston.

**B.    Defendants**[5]

Defendants are the City of Boston, Michelle Wu in her official capacity as Mayor, Eneida Tavares in her official capacity as Commissioner of the Boston Election Commission, and the Boston City Council. The Court refers to them collectively as "the City."

The City Council, an elected municipal body, is composed of thirteen members: four elected at-large, or city-wide, and nine elected by district. Ruthzee Louijeune, Julia Mejia, Erin Murphy, and Michael Flaherty are at-large City Councilors.

- Gabriela Coletta is the District 1 Councilor, representing East Boston, the North End, and Charlestown.
- Ed Flynn is the City Council President and District 2 Councilor, representing almost all of South Boston.
- Frank Baker is the Councilor for District 3, which primarily contains Dorchester.
- Brian Worrell is the Councilor for District 4, which contains Mattapan.
- Ricardo Arroyo is the District 5 Councilor, representing Hyde Park and Roslindale.
- Kendra Lara is the District 6 Councilor, representing West Roxbury, Jamaica Plain, and part of Mission Hill.
- Tania Fernandes Anderson is the District 7 Councilor, representing Roxbury.
- Kenzie Bok is the District 8 Councilor, representing Back Bay, Beacon Hill, Mission Hill, and part of Fenway and Audubon Circle.

---

[5] Lawyers for Civil Rights and K&L Gates LLP filed a brief in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction on behalf of the NAACP Boston Branch, MassVOTE, the Massachusetts Voter Table, La Colaborativa, the Chinese Progressive Association, the Massachusetts Immigrant & Refugee Advocacy Coalition, and New England United for Justice. See Dkt. 32 at 1-3.

- Liz Breadon is the District 9 Councilor, representing Allston and Brighton.

## II.   **The City Council's Redistricting**

### A.   **The Census**

The federal decennial census is conducted every ten years by the U.S. Census Bureau. The 2020 census indicated that Boston's population grew 9.4% from 2010 to 2020. Growth did not occur evenly across the entire city. Significantly, South Boston, which grew by 6,132 people, accounted for 10.6% of Boston's population growth. Boston's demographic makeup also changed. Boston's Hispanic population grew 16.9%, making up 18.7% of the total population in 2020. The Asian population grew 37.8%, making up 11.2% of Boston's population. The non-Hispanic White population grew 3.8%, making up 44.6% of Boston's population. The Black population fell by 6.4%, dropping to 19.1% of Boston's population.[6]

As a result of the census, redistricting was necessary to meet the one-person, one-vote mandate of the Fourteenth Amendment of the Constitution. See Reynolds v. Sims, 377 U.S. 553, 579 (1964) (explaining that equal protection requires "substantial equality of population" among districts). Significantly, District 2 was

---

[6] These figures from the 2020 census data refer to single race categories, e.g., Black or African American Alone, White Alone, or Asian Alone. See Joint Ex. 10 at 5. Dr. Handley notes that the Black and Asian statistics "under-represent the actual number of Black and Asians in Boston because these counts do not include[] respondents who indicated they were Black or Asian and one or more other races." Id. at 5 n.8.

overpopulated and needed to shed about 13,000 voters to meet this constitutional requirement.

Complicating the redistricting challenge was the reprecincting process, which had just been completed for the first time in almost 100 years. In April 2022, the Board of Election Commissioners adjusted voting precinct boundaries, increasing the number of precincts in the city from 255 to 275. Reprecincting resulted in sixteen "split precincts," or precincts that impermissibly crossed the boundaries of multiple existing City Council districts. Joint Ex. 6 at 11.[7] To facilitate the redistricting, the City Council initially agreed on a "baseline map" that assigned each split precinct to one district. Id. However, the "baseline map" could not be used as the final enacted map because the population was still imbalanced among the districts. Id. at 12; Dkt. 74 at 93:20-25. The parties agree that due to population growth and reprecincting, it was impossible for the enacted map to be identical to the 2012 map (the "benchmark map").

As a result of the population growth, the ideal population for each district was 75,072 residents. Dkt. 74 at 128:20-23; see

---

[7] Record citations include documents on the docket (e.g., Dkt. 50), evidentiary hearing transcripts (Dkts. 71-76) and exhibits from the Joint Exhibit List submitted at the evidentiary hearing (e.g., Joint Ex. 6). Video citations include approximate timestamps (e.g., 1:23:45 refers to 1 hour, 23 minutes, and 45 seconds into the video).

Reynolds, 377 U.S. at 579. However, District 2 (South Boston) deviated from the ideal size by 13,481 residents, a deviation of approximately +18.0%, and District 3 (Dorchester) deviated from the ideal size by 6,511 residents, a deviation of approximately -8.7%. District 4 (Mattapan) had approximately 71,811 residents, 3,261 people under the ideal size, a deviation of approximately -4.3%.

**B.   The Redistricting Process**

The City Council began the redistricting process in September 2021, with Councilor Arroyo from District 5 (Hyde Park/Roslindale) chairing the Committee on Redistricting ("Committee"). The Committee was formally established in January 2022, and held virtual meetings on March 24, March 31, and April 7, 2022, during which attendees offered public testimony. The Committee held an in-person meeting on August 4, 2022.

On August 31, 2022, Councilor Breadon from District 9 (Allston and Brighton) replaced Arroyo as Chair. Councilor Worrell from District 4 (Mattapan) became Vice-Chair. Councilors Arroyo, Mejia, Flaherty, Murphy, and Louijeune were members of the Committee. The redistricting process was rushed because the City Council strived to establish new district boundaries by November 2022, one year prior to the November 2023 municipal election, in light of the one-year residency requirement for candidates running for City Council.

The City Council held public meetings and working sessions to hear testimony, review various maps, and discuss traditional districting principles and legal requirements under the U.S. Constitution, the VRA, and the City Charter. These meetings were held on September 16, September 20, September 23, September 26, September 27, September 29, September 30, October 17, October 20, October 21, October 24, and October 25. Five plans were submitted and referred to the Committee:

- Docket No. 1186: sponsored by Councilors Arroyo and Fernandes Anderson and referred on September 28, 2022.
- Docket No. 1215: sponsored by Councilor Murphy and referred on October 5, 2022.
- Docket No. 1216: sponsored by Chair Breadon and Councilor Worrell and referred on October 5, 2022.
- Docket No. 1273: sponsored by Councilor Baker and referred on October 19, 2022.
- Docket No. 1275: sponsored by Chair Breadon and Councilor Arroyo and referred on October 19, 2022.
- Docket No. 1351: sponsored by Councilor Flaherty.

The City Council voted to adopt redistricting principles on October 19, 2022. These guidelines state that:

> Proposed maps should be drawn to ensure population equality and avoidance of excessive deviation, have compact and contiguous boundaries, avoid over-concentration of protected groups, preserve communities of interest, <u>provide voters of protected groups opportunities to achieve proportionality by electing their candidates of choice</u>, and prohibit favoring of incumbent residency.

Joint Ex. 1A at 2 (emphasis added).

On November 2, 2022, Chair Breadon issued a report recommending that the City Council adopt Docket No. 1275, which

she sponsored with Councilor Arroyo. See Joint Ex. 6 at 26-27
(summarizing the precincts moved in Docket No. 1275 and the
rationale for the changes). The report, over 25 pages in length,
provides an explanation of the City Council's redistricting
process, including relevant law, census data, statistical
analyses, timelines, breakdowns of the proposed and recommended
plan, and future recommendations. See id.

Docket No. 1275 is largely similar to the "Unity Map," which
was a map supported by various civil rights and advocacy groups.
At-large Councilor Murphy testified that the Unity Map was
presented at a media event on City Hall Plaza on October 18 that
was attended by Chair Breadon and Councilors Arroyo, Mejia, and
Fernandes Anderson -- all members of the Committee. Murphy
testified that she was not notified about the event.

On November 2, 2022, the City Council voted in favor of Docket
No. 1275 by a vote of 9-4. Mayor Wu signed the enacted map into
law on November 7, 2022.

### C.    City Council's Subject Matter Experts

Although the City Council did not retain any experts to help
draw district lines, it received presentations from redistricting
experts. The City engaged Attorney Jeffrey Wice ("Attorney Wice")
and Dr. Lisa Handley ("Dr. Handley") to advise the City Council.

Attorney Wice is an Adjunct Professor/Senior Fellow at New
York Law School, a specialist in legislative redistricting, and a

co-editor of the National Conference of State Legislatures' 2020 Redistricting Handbook. Attorney Wice provided a memo on key federal and local districting principles. Significantly, in response to a question about whether District 4 violated the VRA in the benchmark map, he informed the City Council that, to the "best of [his] knowledge," there was "no risk of a [VRA] violation." Joint Ex. 24 at 1.

Dr. Handley has over 35 years of experience in advising jurisdictions on minority voting rights and redistricting issues. She has served as an expert in "dozens of voting rights cases," providing her expertise to clients like the U.S. Department of Justice, national civil rights organizations (including the ACLU), international organizations, and state and local jurisdictions. Joint Ex. 10 at 1. Dr. Handley has also co-authored a book, Minority Representation and the Quest for Voting Equality, co-edited a volume on redistricting, and published research on redistricting in peer-reviewed journals. Dr. Handley submitted a report to the City Council entitled "An Analysis of Voting Patterns by Race and an Assessment of Minority Voters' Opportunities to Elect Candidates in Recent Boston Municipal Elections." Id.

In her presentation on October 25, 2022, Dr. Handley stated that an opportunity district is a district that provides minority voters with an opportunity to elect their candidates of choice. Determining if a district allows for minority voters to elect their

candidates of choice is a functional, district-by-district analysis that requires an evaluation of recompiled election results and voting patterns. It is not tied to any specific demographic targets or percentages of voters in that district.

On a volunteer basis, Dr. Duchin also presented districting principles to the City Council on October 21, 2022 and provided a brief memo in conjunction with the presentation. In her presentation to the City Council, she described the relevant "traditional districting principles" as population balance, compactness, contiguity, racial fairness (which is governed by both the VRA and the Equal Protection Clause of the Constitution), and respect for "communities of interest" (which means that "when there's an identifiable community with shared interests, that should be kept whole when possible or treated in some way that amplifies the voice [of] government"). Dkt. 74 at 53:25-54:1-5.[8] She also told the City Council about the related districting principles of respect for incumbency and core retention. Core retention refers to the principle that "districts from the benchmark configuration should resemble the districts from the

---

[8] The Court will use "traditional districting principles" to refer to both required and non-required districting criteria. The City Charter contains slightly different districting principles than those presented by Dr. Duchin. Notably, although the Charter does not require the consideration of communities of interest, it requires the districts to "be drawn with a view toward preserving the integrity of existing neighborhoods." Joint Ex. 1-O at 2.

newly enacted plan." Id. at 54:10-12. Dr. Duchin advised that it was important to identify communities of interest at the beginning of the process because redistricting involves dividing neighborhoods.

Dr. Duchin emphasized to the City Council that total population analyses do not tell the whole story and warned against "chas[ing]" racial percentages as a goal. Dkt. 75 at 7:13. In her opinion, a redistricting process would need to look at both voter turnout and voting history as part of an "effectiveness analysis" to determine whether protected minority voters have the opportunity to elect their candidates of choice. Dkt. 74 at 78:16-22. She explained that an "opportunity district" analysis involves an examination under the three-part test in Thornburg v. Gingles, 478 U.S. 30, 46-51 (1986). She opined to the City Council that, based on her analysis, District 4 remained an "effective" district, although she did not conduct an analysis to determine whether District 4 was "packed." Dkt. 75 at 63:21-23, 17:5-6. She emphasized to the City Council that it was a "mistake to rely on demographic targets at all." Dkt. 74 at 109:11.

### D. Opportunity Districts

One of the City Council's stated redistricting goals at the meetings and working sessions was the maintaining and

strengthening of "opportunity districts."[9] In both the benchmark and enacted maps, there are four majority-minority districts in Boston: Districts 3, 4, 5, and 7.

In the hearings and working sessions, the majority of Councilors stated they wanted to maintain and strengthen District 3 as an "opportunity district," and avoid "packing" more Black residents into District 4 out of concern about violating the VRA. For example, on October 17, 2022, Worrell stated that his "goal has always been to preserve the historical districts of color, maintain opportunity districts, and also grow in those opportunity districts, where that opportunity has yet to be realized . . . ." Joint Ex. 16, Tab 3 at 00:40:47.

On October 25, 2022, following the expert presentation, Chair Breadon opposed a plan that would keep several majority White precincts in District 3 and decrease the percentage of White residents in District 4 to make up only 7.5% of the district. Chair Breadon explained that "the whole idea is to try to increase diversity in District 4, and then also increase the opportunity for . . . communities of color in District 3 to elect the candidates of their choice, so reducing the number of White

---

[9] Plaintiffs highlight an email sent by one of Chair Breadon's staff members, sent a few weeks before the announcement of the Unity Map. The email states that the "top objective was to create a 4th minority-opportunity district of at least 60% Voting Age Population . . . . [T]his could also be achieved with just moving 7 precincts, but we decided to go bold[.]" Joint Ex. 24 at 9.

population in District 4 is certainly contrary, and would even be increasing the packing in District 4." Joint Ex. 16, Tab 6 at 1:46:26.

On November 2, 2022, the day of the vote, Bok applauded the fact that the enacted map strengthened District 3 as Boston's fourth opportunity district, given that Boston is a city with a majority-minority population. As she explained, "one of the really important aspects" of the map was to strengthen "a fourth opportunity district in District 3 [which] the residents of Boston deserve . . . in a majority city of color." Joint Ex. 27 at 2:55:14.

At the October 21 working session, Arroyo stated that in order to unpack District 4 and maintain District 3 as an opportunity district, the City Council had to move precincts to the east of District 4 into the district. Joint Ex. 16, Tab 5 at 2:22:40. In his view, District 3 was an opportunity district that the City Council needed to strengthen, not weaken. Joint Ex. 16, Tab 6 at 1:39:40. On the day of the vote, Arroyo, as co-sponsor of the enacted map, reiterated that the City Council's goal was to maintain opportunity districts, stating that the enacted map "goes out of its way to make sure that [the City Council is] creating and strengthening opportunity districts[.]" Joint Ex. 27 at 2:28:11, 2:29:30.

E.   **The Enacted Map**[10]

The enacted map was largely based on the Arroyo-Breadon proposed map (Docket No. 1275). There are four precinct changes that were made in the enacted map that are significant to the current dispute.

First, the enacted map unified the Vietnamese community in Fields Corner, which the parties called the Boston Little Saigon Cultural District (or "Little Saigon"), by moving precincts 16-1 and 16-3 from District 4 to District 3. Historically, precincts 16-1 and 16-3 were located together in District 3 (i.e., in the district plans of 1983, 1993, and 2002), prior to being moved to District 4 in 2012.

Second, the plan unified neighborhoods in Roslindale by shifting precincts 18-7 and 19-12 from District 4 to District 5. This change resulted in a population deficit in District 4.

Third, the communities of the Anne Lynch Homes at Old Colony and the West 9th St. Apartments in precincts 7-5 and 7-6 were moved from District 2 to District 3. Congressman Stephen Lynch and at-large Councilor Flaherty testified in opposition to this shift, arguing that it divided public housing developments -- long-time neighborhoods and communities of interest. Congressman Lynch testified that the public housing developments had more political

---

[10] The enacted map, Dkt. 5B, is in Appendix A. A close-up map of Districts 2, 3, and 4 is in Appendix B.

"clout" when they were linked together, not divided. Dkt. 74 at 19:9-19. Kasper, president of the St. Vincent's Parish Civic Association, testified that the movement of precincts from District 2 to District 3 would split up certain civic organizations, threatening their ability to support residents because they would not be able to "function" as well across district lines. Dkt. 73 at 17:2-10.

Fourth, the City Council moved Dorchester precincts 16-8, 16-11, 16-12, and 17-13 (referred to by the parties as "the boot") from District 3 to District 4. These precincts constitute the Cedar Grove neighborhood and parts of Adams Corner/Adams Village. Precinct 16-9 is also part of the Adams Corner/Adams Village neighborhood, but it remained in District 3 under the enacted map. Councilor Flaherty described the residents of the boot as a majority White "super-voting" bloc that turn out to vote even "in a hurricane." Dkt. 71 at 84:12-14.

Rasheed Walters, a long-time resident of District 4, objected to the move of the boot because he was concerned it would dilute the Black vote in District 4. Walters testified that District 4 was "drowning in the ocean of gentrification." Dkt. 72 at 13:20. In his view, gentrification caused the Black population in District 4 to decrease from 61% to 52% since 2012. He stated that the addition of "super-voting [W]hite precincts" to District 4 would allow White voters to "determin[e] the political destiny and

political representation of [B]lack residents." Dkt. 72 at 19:4-5, 23:18-19.

Two other witnesses, Maureen Feeney and Councilor Murphy, testified that historic neighborhoods were being divided by the shift of the boot from District 3 to District 4. Feeney stated that when she was a City Councilor and Chair of the Committee on Redistricting in 2002, one of her goals was to strengthen the Black majority in District 4. The move of the boot into District 4 concerned her because it threatened District 4 voters' ability to "be able to elect the person they feel would best represent them, and [] in District 4 it's quite clear that [] would be someone who is of the [B]lack race[.]" Dkt. 72 at 46:18-24. In addition, the move would mean the loss of Adams Village, the "heart" of District 3 and a "vibrant business district." Dkt. 72 at 49:11, 40:20-21. Feeney testified that this move would impact the availability of funding and opportunities in District 3 and have a "devastating impact" on the Cedar Grove Civic Association. Dkt. 72 at 40:11-23. Murphy similarly described how the move of the boot to District 4 "cuts right up the middle of Adams Corner," which is the "heart" of District 3. Dkt. 73 at 37:16, 38:8.

###### F.    Population and Racial Demographics

At the evidentiary hearing, Dr. Duchin helpfully provided population and racial demographic data relevant to redistricting.[11] As explained above, the threshold problem was that District 2 (South Boston) was overpopulated by 18% beyond the ideal district size and needed to shed excess population. The enacted map addressed this overpopulation by making changes to certain neighboring districts. Dr. Duchin described these changes, starting with District 2. Four precincts (3-15, 6-1, 7-5, 7-6) and one split precinct (8-6) were moved from District 2 to District 3. In total, 9,830 people were reassigned from District 2 to District 3. About two-thirds of the shifted population was White: precinct 3-15's population is "two-thirds White," precinct 8-6 is "plurality White," 6-1 is "heavily White," precinct 7-5 is "heavily White," and precinct 7-6 is about "half White." Dkt. 74 at 69:11-15. Not surprisingly, the shift in population to the south had a cascading effect on other districts.

Based on the census data, District 3 (Dorchester) was about 7,000 residents underpopulated, or about 9% short of the ideal size, and needed to grow to take care of the deficit. By moving in five precincts from District 2 (South Boston), District 3 now had

---

[11] Dr. Duchin's data relied on total population data, rather than voting age population. Many of the City's statistics, as well as the City Council's and Dr. Handley's data, use voting age population.

an excess population of about 3,000 people. District 4 (Mattapan) also needed to grow because "it was almost at the legal limit in terms of being underpopulated." Dkt. 74 at 71:18-20. In other words, District 4 was barely within the "national standard" of 5% deviation from the ideal population size. Id. at 71:23-24.

The City Council moved the boot, the four precincts in the southwest part of Dorchester (16-8, 16-11, 16-12 and 17-13), into District 4. Precinct 16-8 has a total population of 3,042 that is slightly over half White. Precinct 16-11 has 1,138 people, of whom more than two-thirds are White, and Precinct 16-12 has 1,590 people, of whom nearly all are White. Precinct 17-13 has a total population of 1,796 that is about half White. Altogether, 7,566 residents were reassigned from District 3 to District 4. Because the precincts moved in from District 2 and the precincts moved out of District 3 were both about two-thirds White, the number of White residents in District 3 remained "virtually identical" in the benchmark and enacted maps. Dkt. 74 at 75:20-22. Under the benchmark map, White residents accounted for 41.5% of the voting age population ("VAP") in District 3; under the enacted map, White residents accounted for 41.9% of the VAP.

Two precincts, 16-1 and 16-3, were moved from District 4 to District 3. Precinct 16-1 has a total population of 2,142, with Asian residents constituting the largest demographic group, about a third of the population, in that precinct. Precinct 16-3 has a

total population of 2,518, with a plurality Black population of 840 people and a significant Asian population of 685 people. In total, 4,660 people moved from District 4 to District 3.

Essentially, the enacted map moved predominantly White precincts from District 3 into District 4, and predominantly minority precincts from District 4 into District 3. However, as Dr. Duchin pointed out, the racial composition in District 3 remained roughly the same due to the influx of White voters from District 2. In comparison to the benchmark map, under the enacted map in District 4, the VAP of White voters increased from 10.6% to 14.5%; the VAP of Black voters remained constant, decreasing only from 52.6% to 52.1%; and the VAP of Asian voters decreased from 5.7% to 4.3%.

The City Council made other moves. Precinct 14-5, a heavily Black precinct in the Mattapan neighborhood, was moved from District 5 to District 4. Two precincts in the Roslindale area, 19-12 and 18-7, were reassigned from District 4 to District 5. Precinct 19-12's population is more than half White and precinct 18-7's population is nearly equal parts Black and Hispanic.

## LEGAL STANDARDS

### I.  Preliminary Injunction

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent

interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." <u>Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.</u>, 794 F.3d 168, 171 (1st Cir. 2015).

## II.   <u>Voting Rights Act</u>

Under Section 2 of the VRA:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a).

A line-drawing body violates Section 2 of the VRA if, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. 1245, 1248 (2022) (quoting 52 U.S.C. § 10301(b)).

The Supreme Court set forth the framework for analyzing voter dilution claims in <u>Thornburg v. Gingles</u>. 478 U.S. at 46-51. Plaintiffs must establish that three "preconditions" are met: (1) the minority group must be "sufficiently large and geographically

compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) a "significant bloc voting by non-minorities" must exist. Vecinos De Barrio Uno v. City of Holyoke, 72 F.3d 973, 979 (1st Cir. 1995) (citing Gingles, 478 U.S. at 50-51).

The Supreme Court has reiterated that "unless each of the three Gingles prerequisites is established, 'there neither has been a wrong nor can [there] be a remedy.'" Cooper v. Harris, 581 U.S. 285, 306 (2017) (quoting Growe v. Emison, 507 U.S. 25, 41 (1993)). If the Gingles preconditions are met, then courts consider the "totality of circumstances to determine 'whether the political process is equally open to minority voters.'" Wis. Legislature, 142 S. Ct. at 1248 (quoting Gingles, 478 U.S. at 79).

Much of the City Council meetings focused on opportunity districts. The term "opportunity district" has its roots in VRA litigation:

> A successful Gingles claim undoes the dispersal of minorities by requiring the state to concentrate them in a new, majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. See Bartlett v. Strickland, 556 U.S. 1, 13 (2009) (plurality opinion). Such Section 2—required districts are often described as "opportunity districts." See, e.g., LULAC v. Perry, 548 U.S. 399, 428-29 (2006); Nicholas O. Stephanopoulos, The South After Shelby County, 2013 Sup. Ct. Rev. 55, 75 n.84 (2013).

League of United Am. Citizens v. Abbott, No. 3:21-CV-259-DCG-JES, 2022 WL 17683191, at *2 (W.D. Tex. Dec. 14, 2022).

III. **Equal Protection Clause**

"The Equal Protection Clause of the Fourteenth Amendment provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const., Amdt. 14, § 1. Its central mandate is racial neutrality in governmental decisionmaking." Miller v. Johnson, 515 U.S. 900, 904 (1995). The Equal Protection Clause limits racial gerrymandering without "sufficient justification" to separate voters on the basis of race. Cooper, 581 U.S. at 291.

Courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislation, will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." Miller, 515 U.S. at 915-16. Further, "[a]t the same time that the Equal Protection Clause restricts the consideration of race in the districting process, compliance with the [VRA] pulls in the opposite direction: [i]t often insists that districts be created precisely because of race." Abbott v. Perez, 138 S. Ct. 2305, 2314 (2018). Therefore, courts must exercise "extraordinary caution" in making a finding that a line-drawing body has drawn district lines based on race. Miller, 515 U.S. at 916.

Courts analyze such Equal Protection Clause claims under a two-step analysis. Cooper, 581 U.S. at 291-92. First, a plaintiff

must prove "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller, 515 U.S. at 916.

A finding of racial predominance means that the line-drawing body "subordinated traditional race-neutral districting principles," such as compactness, contiguity, and respect for communities of interest, to racial considerations. Id. While the use of racial targets or demographic goals can be evidence of predominance, a plaintiff must show that such goals "had a direct and significant impact on the drawing of at least some of [the district lines]," such that they predominated over traditional districting principles. Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 274 (2015). In addition, in conducting a racial predominance analysis, a line-drawing body's efforts to create districts of equal population are not a factor to be used in determining whether race predominates. See id. at 273-74. Rather, the racial predominance inquiry is about which voters the legislature decides to move in or out of a district to meet the need for equal population, and whether race, as opposed to traditional districting principles, predominated as a reason for that decision. Id. at 273.

Second, if racial considerations predominated over other factors, then the redistricting map must withstand strict scrutiny. Cooper, 581 U.S. at 292. The line-drawing body must "prove that its race-based sorting of voters serves a 'compelling interest' and 'is narrowly tailored' to that end." Id. (quoting Bethune-Hill v. Va. State Bd. of Elections, 580 U.S. 178, 193 (2017)). The Supreme Court has "long assumed that one compelling interest is complying with operative provisions of the [VRA]." Id. Further, a redistricting plan drawn based on race is narrowly tailored if the line-drawing body has "a strong basis in evidence in support of the (race-based) choice that it has made." Alabama, 575 U.S. at 257 (cleaned up). For example, a line-drawing body may have a strong basis in evidence to draw a race-based map "in order to comply with a statute when [it has] good reasons to believe such use is required, even if a court does not find that the actions were necessary for statutory compliance." Id. at 278.

## ANALYSIS

### I.   Likelihood of Success

#### A.   Equal Protection Clause (Count III)

Plaintiffs argue that race predominated over traditional districting principles, like preserving neighborhoods, when the City Council (1) moved four largely White high-voter turnout precincts (the boot) from District 3 to District 4 and (2) moved the Anne Lynch Homes at Old Colony and the West 9th St. Apartments

from District 2 to District 3. Approximately 7,500 people were

moved from District 3 to District 4 – a significant number of

people.

As direct evidence of improper racial motivation, Plaintiffs

rely on the following quotes from City Council meetings:[12]

> 1.  September 30, 2022 – Boston City Council Working
>     Session, available at [https://youtu.be/ShKQHyScOm4]
>     (last accessed January 27, 2023).
>     a.  Co-author of the Unity Map Councilor Ricardo
>         Arroyo stated: "I think part of this was trying
>         to make sure that we kept . . . the racial
>         demographics essentially in line[.]" (at 47:05)
>     b.  Councilor Bok stated: ". . . the Voting Rights
>         Act is racially conscious . . . because the
>         history in America is of being racially conscious
>         the other way, right, of trying to disenfranchise
>         people of color and that therefore although
>         communities of interest that are neighborhoods
>         are important, that may come in second, right,
>         to making sure that racial minorities have the
>         opportunity to have strong political power." (at
>         1:09:36)
>     c.  Councilor Lara stated: "It's someone's turn on
>         this map to be an opportunity district, it is
>         very obvious that is District 3, and the reason
>         why it's not District 2, it's because we build
>         the Seaport and we put 13,000 white people into
>         the Seaport." (at 1:02:20)
>     d.  Councilor Fernandes Anderson stated: "If this
>         was monopoly and the pieces in the districts were
>         houses and hotels and different types of objects
>         and they all had different colors, black, white,
>         brown, I think a ten year old would be able to
>         make all these districts an opportunity district
>         . . . A ten year old would be able to look at
>         this entire map and shift it and split it
>         evenly[.]" (at 1:29:12)

---

[12] These YouTube quotes are unaltered from the text of Joint
Exhibit 7.

2.  October 7, 2022 – Boston City Council Working Session, available at [https://youtu.be/bcHqzUfkAYE] (last accessed January 27, 2023).

    a.  Chair Liz Breadon stated ". . . we're trying to strengthen the, actually, we're trying to balance the racial minority, the total minority numbers between District 3 and District 4 to try to get a little more, increase the opportunity in District 3. I think that's really the crux of it." (at 45:55)

    b.  Council Arroyo stated: "District 4, frankly, and I think the Voting Rights Act is clear on this, cannot pack more people of color into it, it has to become a more white district." (at 1:34:40).

    c.  Councilor Mejia, discussed the negative racial history of District 2 and 3 and stated "So if [t]he goal and the exercise is for us to move forward in an equitable way, I just think that we need to just be super mindful of staying here in the present because bringing into this conversation neighborhoods like Savin Hill to my colleague's reference was very different in 1981, 1982, 1983, so let's just try to remain focused on the here and now and the racial makeup of the city that we're living in today." (at 1:57:20).

3.  October 17, 2022 – Boston City Council Working Session, available at [https://youtu.be/HFrYE2zUPNg] (last accessed January 27, 2023).

    a.  Councilor Breadon stated: "Both District 5 and District 3 are opportunity districts, and we need to ensure that they continue to be opportunity districts and strengthen them." Councilor Baker responded: "And so opportunity being 60% of non-white?" Councilor Breadon responded: "60% of non-white or ideally pushing it up higher than that up to 65." Council Baker queried: "Ideally, as a political aspiration?". Councilor Breadon responded: "Yes." (at 1:09:07)

    b.  Councilor Breadon stated: "It's my understanding that a white population of 9% in District 4 is not a high enough percentage." (at 1:12:43)

    c.  Councilor Bok stated: "It's one thing to talk about neighborhoods, it's another thing to talk about multiple distinct neighborhoods being a block together in a way that then sort of

definitionally creates racial blocks across multiple neighborhoods of the city as being like a block in and of themselves because then inherently you're not going to be able to define a desegregating map." (at 1:19:30)

d.  Councilor Bok stated: "We clearly can't have maps that make District 4, that reduce its white population, and I would say we clearly can't have maps that increase District 3's white population, those are very simple guardrails." (at 1:18:08).

4.  October 20, 2022 – Boston City Council Redistricting Meeting, available at [https://youtu.be/huEpOC3Mn9s] (last accessed January 27, 2023).

a.  Councilor Fernandes Anderson stated: "The redistricting process seems so contrived, doesn't it, and there's a lot of sort of mystical nuances to it. What exactly is happening in the back door it's so political, it's becoming so racial – wait – in fact it is racial, it's the one thing that we can actually prioritize in this process." (at 1:47:30)

b.  Councilor Fernandes Anderson discussed Boston's history of segregation and stated "Racial tension? Yeah, that's right. That's a good thing. Let's talk about it because you know it's due time. And so if we're here and you're not used to it and you're uncomfortable, that is a good thing, let's have those conversations and talk about how we create true equity across the board for everyone, it's just something that we're not used to[.]" (at 1:49:48).

Joint Ex. 7 at 1-3.

Plaintiffs also emphasize the voting history of the precincts the City Council chose to remove from District 3 to strengthen it as an opportunity district. While the VAP of White voters in District 4 marginally increased from 10.5% to 14.5%, the residents in the boot have large voter turnout percentages: the residents

are super-voters. For example, the voter turnout in 2021 was 50.6% in precinct 16-8, 48.4% in precinct 16-11, 70.1% in precinct 16-12, and 43.7% in precinct 17-13. In contrast, the voter turnout for precincts added to District 3 was about half of that for the same election.

Defendants argue that these quotes are mere "snippets." They rely primarily on the expert testimony of Dr. Duchin to prove that the City Council's enacted map does not exhibit any statistical or demographic evidence of racial gerrymandering. Dr. Duchin testified that signs of racial gerrymandering, such as significant demographic changes or split precincts, are not present in the enacted map. Rather, the enacted map has one of the highest rates of "core retention" Dr. Duchin has seen in the country. Dr. Duchin inferred that core retention must have been a high priority for the City Council. According to Dr. Duchin, the districts in the enacted map are also contiguous and compact.

Dr. Duchin also opined that the enacted map did not improve "the effectiveness in District 3 from a [B]lack voting point of view." Dkt. 74 at 125:4-5. Based on her analysis of past elections, to the extent the City Councilors were motivated by a desire to improve the effectiveness of Black voters in electing their candidates of choice, they did not succeed. In her opinion, Plaintiffs have not established a VRA violation because District 4 remains "effective for [B]lack voters to elect their candidates of

choice." Dkt. 74 at 47:18-19. Plaintiffs have also failed to establish an Equal Protection Clause violation because of the absence of statistical or demographic evidence of racial gerrymandering in Districts 2, 3, and 4. Dkt. 74 at 47:20-48:2. However, Dr. Duchin did not conduct a <u>Gingles</u> analysis.

Dr. Duchin further highlights that there is no significant change to the racial demographics in Districts 3 or 4. She acknowledges, however, that she did not watch the City Council working sessions or hear the race-based comments made by City Councilors. Her conclusions are based on the statistical evidence.

After a review of the record, I find that Plaintiffs have met their burden of proving a likelihood of success on their claim that a majority of Councilors relied on race as the predominant consideration in drawing the boundaries between Districts 3 and 4. Plaintiffs have provided direct evidence of the City Council's racial motivation to strengthen District 3 as an opportunity district and address concerns regarding "packing" in District 4. Contrary to the City's argument, discussions about racial demographics were not isolated "snippets" made by a few City Councilors. Defendants argue that the predominant goal was "core retention," but the concept of "core retention" was not a focus of discussion in either the City Council working sessions or Chair Breadon's report.

The City also argues that Chair Breadon's report demonstrates that other important goals, such as the preservation of neighborhoods between Districts 3 and 4 (e.g., Little Saigon, Cedar Grove, and the Neponset/Port Norfolk and St. Ann's communities), align with traditional districting principles. While this is true, these traditional principles were secondary to the overarching goals of strengthening District 3 as an opportunity district and compliance with the VRA by "unpacking" District 4. These goals had a "direct and significant impact" on District 3 and 4's border. Cooper, 581 U.S. at 300 (quoting Alabama, 575 U.S. at 274); see Bush v. Vera, 517 U.S. 952, 959-62 (1996) (concluding that race predominated in several districts because one of the legislature's explicit goals was to create majority-minority districts, which was never "seriously questioned," and because the legislature "neglected traditional redistricting criteria" and "manipulated district lines"); Shaw v. Hunt, 517 U.S. 899, 906 (1996) (explaining that the principal drafter of the enacted map testified that the creation of two majority Black districts was the "principal reason" for drawing two districts). On this record, the Court finds a likelihood of success on the claim that race predominated the City Council's decision to move four precincts with largely White super-voters from District 3 to District 4.

I further find that Plaintiffs have not demonstrated a likelihood of success in establishing that the movement of public

housing developments constituted race-based gerrymandering. District 2 had to shed population and District 3 needed population. While residents expressed concern that the enacted map split their neighborhoods and diminished their political muscle, Plaintiffs provided little evidence to support a claim that this move was predominantly race-based.

The next question is whether District 3's and 4's lines can survive strict scrutiny, i.e., whether they were narrowly tailored to achieve a compelling interest. Cooper, 581 U.S. at 292. Significantly, no City Councilor testified to explain the enacted map, and Chair Breadon's report does not address the City Council's desire to strengthen and maintain District 3 as an opportunity district, or the desire to unpack District 4 -- themes consistently repeated throughout the City Council meetings.

As an initial matter, a line-drawing body cannot use race as a predominant factor in drawing district lines unless there is a compelling interest, such as compliance with the VRA. See Cooper, 581 U.S. at 292. Certain Councilors frequently expressed concerns that packing more minority voters into District 4 would raise a possible VRA violation. Similarly, the City Council's emphasis on "opportunity districts" may reflect a good faith misunderstanding that VRA compliance requires redistricting based on racial demographics.

However, when a line-drawing body "invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had a 'strong basis in evidence' for concluding that the statute required its action." Cooper, 581 U.S. at 292 (quoting Alabama, 575 U.S. at 278). Because the City Council has failed to produce a "strong basis in evidence" of a VRA violation to justify drawing District 3 and 4 lines primarily based on race, it cannot demonstrate that the enacted map was narrowly tailored to serve a compelling interest. See Alabama, 575 U.S. at 278.

Defendants argue that many of the City Councilors' stated racial goals preceded presentations from Dr. Duchin, Dr. Handley, and Attorney Wice. It is true that after the expert presentations, Chair Breadon referred to electoral "opportunity" and "effectiveness," and disavowed the use of demographic data. Even then, many City Councilors continued to discuss race in proposing various redistricting plans. For example, on October 25, several Councilors continued to discuss race and reaffirmed their adherence to the goal of strengthening District 3 as an opportunity district. Critically, the City Council did not provide a factual basis or expert analysis for its concerns about packing in District 4. Instead, experts indicated to the City Council that there were no VRA violations with the benchmark nor with the enacted map.

On this record, Defendants have not established that strengthening District 3 as an opportunity district or shifting more White voters into District 4 to avoid packing serves a compelling interest that is narrowly tailored to serve that end. See Cooper, 581 U.S. at 306; Alabama, 575 U.S. at 278; cf. Miller, 515 U.S. at 921 ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws.").

**B.   Voting Rights Act (Count II)**

Plaintiffs are not likely to succeed on their claim that the enacted map violated the VRA. Plaintiffs allege that the enacted map dilutes the voting power of Black residents in District 4, of White residents in District 3, "and of various other minority groups whose tight-knit communities have been severed across multiple districts, damaging their collective power to effect meaningful change at the ballot box." Dkt. 50 ¶ 179, at 21. At the evidentiary hearing, Plaintiffs' primary VRA claim was that the transfer of the boot, i.e., four predominately White, high-voter turnout precincts, diluted the voting power of Black voters in District 4. Plaintiffs also deny racial polarization exists in Boston, an essential component to their voter dilution claim. Compare Joint Ex. 9 ¶ 10, at 5 (explaining that the second and third Gingles factors "call for demonstrations of racially

polarized voting") <u>with</u> Dkt. 50 ¶ 177, at 21 ("There was no racial polarization of voting blocs in either district that would require redistricting based on race.").

Even assuming that Plaintiffs established the first and second <u>Gingles</u> factor with respect to Black voters in District 4, there is no evidence in the record to support the third <u>Gingles</u> factor, i.e., "that the [W]hite majority votes sufficiently as a bloc" to defeat the preferred candidate of minority voters. <u>Gingles</u>, 478 U.S. at 51. Quite the contrary: in District 4, the preferred candidates of Black voters won in 2015, 2019, and 2021 in municipal elections.

Further, both Dr. Duchin and Dr. Handley independently concluded that District 4 in the enacted map "would not undermine the ability of Black voters in District 4 to elect candidates of their choice." Dkt. 46-1 ¶ 12, at 15. Because Plaintiffs are likely to fail in satisfying all three of the <u>Gingles</u> preconditions, Plaintiffs are unlikely to succeed on their VRA claim.

### C.   Open Meeting Law (Count I)

Under Massachusetts' Open Meeting Law ("OML"), "a public body shall post notice of every meeting at least 48 hours prior to the meeting, excluding Saturdays, Sundays and legal holidays." Mass. Gen. Laws ch. 30A, § 20(b). The OML was "designed to eliminate much of the secrecy surrounding the deliberations and decisions on which public policy is based." <u>City of Revere v. Mass. Gaming</u>

Comm'n, 71 N.E.3d 457, 475 (Mass. 2017) (quoting <u>Ghiglione v.</u>
<u>School Comm. of Southbridge</u>, 378 N.E.2d 984, 987 (Mass. 1978)).
The Supreme Judicial Court of Massachusetts believes that "[i]t is
essential to a democratic form of government that the public have
broad access to the decisions made by its elected officials and to
the way in which the decisions are reached." <u>Id.</u> (quoting <u>Foudy v.</u>
<u>Amherst-Pelham Regional Sch. Comm.</u>, 521 N.E.2d 391, 394 (Mass.
1988)).

Even if there is a violation of the OML, "violations of the
open meeting law may be cured by subsequent 'independent
deliberative action' taken in a full meeting." <u>McCrea v. Flaherty</u>,
885 N.E.2d 836, 841 (Mass. App. Ct. 2008) (quoting <u>Pearson v.</u>
<u>Selectmen of Longmeadow</u>, 726 N.E.2d 980, 985 (Mass. App. Ct.
2000)). Taking subsequent independent deliberative action "helps
to accomplish the purpose of the open meeting law," but it cannot
be "merely a ceremonial acceptance" or "a perfunctory ratification
of secret decisions." <u>Id.</u> (cleaned up).

Plaintiffs allege that the October 10, October 18, and
October 19, 2022 meetings violated the OML. Plaintiffs are likely
to prevail in showing that at least the October 19 meeting violated
the OML. Defendants acknowledge that a quorum of the City Council

attended the meeting and discussed redistricting, but that no notice was provided at least 48 hours in advance of the meeting.[13]

However, even if there were a violation of the OML, Defendants are likely to prevail in establishing that they cured it. See McCrea, 885 N.E.2d at 841 (explaining that "violations of the open meeting law may be cured by subsequent 'independent deliberative action' taken in a full meeting."). After the October 19 meeting, the City Council held five properly noticed meetings, hearings, and working sessions regarding redistricting on October 20, October 21, October 24 (working session), October 24 (hearing), and October 25. Several meetings involved extensive discussions on redistricting plans, while others had public testimony. At the last meeting on November 2, 2022, the City Council voted on the enacted map.

These meetings go beyond "merely a ceremonial acceptance" or "a perfunctory ratification of secret decisions," and consisted of substantive debate and discussion regarding the redistricting legislation. Id. Accordingly, Plaintiffs are unlikely to succeed on their Open Meeting Law claim.

## II.  **Irreparable Harm**

The Court finds that Plaintiffs have demonstrated that they will suffer irreparable harm if voting takes place based on a

---

[13] Defendants do not concede that "deliberation" took place at the October 19 meeting.

redistricting map that violates the Equal Protection Clause. "Courts routinely deem restrictions on fundamental voting rights irreparable injury" and "discriminatory voting procedures in particular are 'the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief.'" League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (quoting United States v. City of Cambridge, 799 F.2d 137, 140 (4th Cir. 1986)). Requiring Plaintiffs to vote under a redistricting map that violates the Equal Protection Clause constitutes irreparable harm.

III.   **Balance of Equities**

Of concern, the next election relying on the enacted map is the November 2023 regular municipal election. The deadline for submitting nomination papers for candidacy is currently May 23, 2023. At the evidentiary hearing, the parties were unclear if this deadline could be extended by the Boston Election Commission, a defendant in the case. There are also concerns regarding the one-year residency requirement for candidates if the enacted map is enjoined, in addition to well-founded election concerns regarding the constitutionality of using the benchmark map in the next election. Defendants argue that preserving the status quo by using the benchmark map would result in "demonstrable, unconstitutional vote dilution" due to the large population variance in that map, which would violate the one-person, one-vote mandate. Defendants

also argue that an injunction would frustrate public reliance on the City Council and cause confusion. Dkt. 25 at 25.

The Court does not take these concerns, in addition to administrative and logistical harms, lightly. However, on balance, constitutional concerns with the enacted map prevail.

## IV.   Remedy

On the last day of the evidentiary hearing, Plaintiffs asked the Court to appoint a special master to oversee the redistricting process. Chair Breadon's report made several recommendations for future redistricting committees, including petitioning the state legislature to authorize the drawing of new precincts, ensuring funding for experts, and establishing an "independent advisory commission representative" to advise the City Council during redistricting. Joint Ex. 6 at 27-28. During closing arguments, the Court asked for supplemental briefing on possible remedies, such as extending the deadline for filing nomination papers. However, the Court received none.

"Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.'" North Carolina v. Covington, 581 U.S. 486, 488 (2017) (quoting Reynolds, 377 U.S. at 585). This Court must "undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." Id. (cleaned up). Federal court review of redistricting

"represents a serious intrusion on the most vital of local functions." Miller, 515 U.S. at 915. Redistricting is primarily the duty and responsibility of line-drawing bodies, and "is a most difficult subject for legislatures," necessitating the need for line-drawing bodies to "have discretion to exercise the political judgment necessary to balance competing interests." Id. Courts must presume good faith of line-drawing bodies, until a party makes a sufficient showing otherwise. Id.; see also Jacksonville Branch of NAACP v. City of Jacksonville, Case No. 3:22-cv-493-MMH-LLL, 2022 WL 7089087, at *48 (M.D. Fl. Oct. 12, 2022) (concluding that the City Council did not act with "ill motive or bad intention," but despite perhaps having the "very understandable desire to assure continued minority representation on the City Council," still likely violated the Equal Protection Clause).

In my view, the City Council is best positioned to redraw the lines in light of traditional districting principles and the Constitution. The role of race in redistricting is complicated and in flux, and the Court finds that the City Council acted in good faith in trying to comply with complex voting rights laws.

**ORDER**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Dkt. 21) is **ALLOWED** with respect to Count III (violation of the Fourteenth Amendment). The Court does not find a likelihood of success on the remaining counts. Defendants are enjoined from using the enacted map in municipal elections.

SO ORDERED.

                              /s/ PATTI B. SARIS
                              Hon. Patti B. Saris
                              United States District Judge

# APPENDIX A
## City Council Redistricting - Docket #1275 Committee Report
## November 2, 2022





# APPENDIX B

